1  TODD A. ROBERTS (SBN 129722)
   JESSHILL E. LOVE (SBN 208348)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   1001 Marshall Street, Suite 300
3  Redwood City, CA  94063
   Telephone:    (650) 364-8200
4  Facsimile:    (650) 780-1701

5  Attorneys for Plaintiffs
   STEVE TRACHSEL, an individual; SUN CITY
6  TOWERS, LLC, a California corporation;
   THOMAS CIRRITO, an individual; ATOCHA
7  LAND, LLC, a Delaware limited liability company;
   MICHAEL CIRRITO, an individual; and CIRRITO
8  HOLDINGS, LLC, a Delaware limited liability
   company

9
10      UNITED STATES DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12
13  STEVE TRACHSEL, an individual; SUN         CASE NO.  C08 02248RS
    CITY TOWERS, LLC, a California
14  corporation; THOMAS CIRRITO, an            **NOTICE OF *EX PARTE* APPLICATION
    individual; ATOCHA LAND, LLC, a            FOR TEMPORARY RESTRAINING
15  Delaware limited liability company;        ORDER**
    MICHAEL CIRRITO, an individual; and
16  CIRRITO HOLDINGS, LLC, a Delaware          **[FED. R. CIV. PROC. § 65, NORTHERN
    limited liability company,                 DISTRICT OF CALIFORNIA CIVIL
17                                             LOCAL RULES 7-10 AND 65-1]**
                    Plaintiffs,
18                                             **Date:     June 4, 2008**
    v.                                         **Time:     9:30 a.m.**
19                                             **Ctrm:     4**
    RONALD BUCHHOLZ; CHARICE                   **Judge:    Hon. Richard Seeborg**
20  FISCHER; RDB DEVELOPMENT, LLC,
    a Nevada limited liability company;
21  SOLOMON CAPITAL, INC., a Nevada
    corporation; JONATHON VENTO;
22  GRACE CAPITAL, LLC, dba GRACE
    COMMUNITIES, an Arizona limited
23  liability company; DONALD ZELEZNAK;
    Z-LOFTS, LLC, an Arizona limited
24  liability company; ZELEZNAK
    PROPERTY MANAGEMENT, LLC dba
25  KELLER WILLIAMS REALTY, an
    Arizona limited liability company;
26  KELLER WILLIAMS REALTY, INC., a
    Texas corporation; and DOES 1-50,
27  inclusive,

28                  Defendants.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

2    NOTICE IS HEREBY GIVEN that on June 4, 2008, at 9:30 a.m. in Courtroom 4 of the

3    above-entitled court, located at 280 South First Street, San Jose, California, Plaintiffs STEVE

4    TRACHSEL, SUN CITY TOWERS, LLC, THOMAS CIRRITO, ATOCHA LAND, LLC,

5    MICHAEL CIRRITO, and CIRRITO HOLDINGS, LLC ("Plaintiffs") will move the Court for a

6    Temporary Restraining Order against Defendants RONALD BUCHHOLZ, CHARICE

7    FISCHER, RDB DEVELOPMENT, LLC, and SOLOMON CAPITAL, INC. ("Buchholz

8    Defendants").

9    The Ex Parte Application for Temporary Restraining Order is brought on the grounds that

10   Plaintiffs have a high likelihood of success on its claims against the Buchholz Defendants,

11   Plaintiffs will suffer irreparable harm if the Court does not preserve the status quo in this matter,

12   and given the Buchholz Defendants' prior dishonest acts, there is an immediate danger that the

13   Buchholz Defendants will seek to spend, conceal, or disperse their wrongfully acquired funds in

14   order to frustrate Plaintiffs' efforts.

15   This ex parte application is based on this Notice, the Memorandum of Points and

16   Authorities, all the papers and files lodged and filed in this proceeding, and on oral argument at

17   the time of hearing.

18   Dated: June 3, 2008                    ROPERS, MAJESKI, KOHN & BENTLEY

19

20                                          By: _____

21                                          TODD A. ROBERTS
                                            JESSHILL E. LOVE
22                                          Attorneys for Plaintiffs
                                            STEVE TRACHSEL, an individual; SUN
23                                          CITY TOWERS, LLC, a California
                                            corporation; THOMAS CIRRITO, an
24                                          individual; ATOCHA LAND, LLC, a
                                            Delaware limited liability company;
25                                          MICHAEL CIRRITO, an individual; and
                                            CIRRITO HOLDINGS, LLC, a Delaware
26                                          limited liability company

27

28

1  TODD A. ROBERTS (SBN 129722)
   JESSHILL E. LOVE (SBN 208348)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   1001 Marshall Street, Suite 300
3  Redwood City, CA  94063
   Telephone:    (650) 364-8200
4  Facsimile:    (650) 780-1701

5  Attorneys for Plaintiffs
   STEVE TRACHSEL, an individual, SUN CITY
6  TOWERS, LLC, a California corporation,
   THOMAS CIRRITO, an individual,
7  ATOCHA LAND, LLC, a Delaware limited liability
   company, MICHAEL CIRRITO, an individual, and
8  CIRRITO HOLDINGS, LLC, a Delaware limited
   liability company

9

        UNITED STATES DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA
10
                            SAN JOSE DIVISION
11

12
   STEVE TRACHSEL, an individual; SUN          CASE NO.  C08 02248RS
13 CITY TOWERS, LLC, a California
   corporation; THOMAS CIRRITO, an             **PLAINTIFF'S *EX PARTE* APPLICATION
14 individual; ATOCHA LAND, LLC, a             FOR TEMPORARY RESTRAINING
   Delaware limited liability company;         ORDER AND MEMORANDUM OF
15 MICHAEL CIRRITO, an individual; and         POINTS AND AUTHORITIES IN
   CIRRITO HOLDINGS, LLC, a Delaware           SUPPORT THEREOF**
16 limited liability company,
                                               **[FED. R. CIV. PROC. § 65, NORTHERN
17              Plaintiffs,                     DISTRICT OF CALIFORNIA CIVIL
                                               LOCAL RULES 7-10 AND 65-1]**
18 v.
                                               **Date:    June 4, 2008**
19 RONALD BUCHHOLZ; CHARICE                    **Time:    9:30 a.m.**
   FISCHER; RDB DEVELOPMENT, LLC,              **Dept.:   4**
20 a Nevada limited liability company;
   SOLOMON CAPITAL, INC., a Nevada
21 corporation; JONATHON VENTO;
   GRACE CAPITAL, LLC, dba GRACE
22 COMMUNITIES, an Arizona limited
   liability company; DONALD ZELEZNAK;
23 Z-LOFTS, LLC, an Arizona limited
   liability company; ZELEZNAK
24 PROPERTY MANAGEMENT, LLC dba
   KELLER WILLIAMS REALTY, an
25 Arizona limited liability company;
   KELLER WILLIAMS REALTY, INC., a
26 Texas corporation; and DOES 1-50,
   inclusive,
27
                Defendants.
28

RCI/5103779.1/BRL                    - 1 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Pursuant to Federal Rule of Civil Procedure 65 and Northern District of California Local

2    Rules 7-10 and 65-1, Plaintiffs STEVE TRACHSEL, SUN CITY TOWERS, LLC, THOMAS

3    CIRRITO, ATOCHA LAND, LLC, MICHAEL CIRRITO, CIRRITO HOLDINGS, LLC

4    ("Plaintiffs"), will appear *Ex Parte* on June 4, 2008, at 9:30 a.m. in Courtroom 4 of the United

5    States District Court, District of Northern California, San Jose Division, and request an Order

6    granting a Temporary Restraining Order against Defendants BUCHHOLZ, FISCHER, RDB

7    DEVELOPMENT, and SOLOMON CAPITAL preserving the status quo until such time as

8    Plaintiffs' noticed Application for a Right to Attach Order and an Order for Issuance of a Writ of

9    Attachment may be heard.

**I.**

**INTRODUCTION**

12    This action involves a fraudulent "pump and dump" investment scheme whereby

13    Defendants RONALD BUCHHOLZ, CHARICE FISCHER, RDB DEVELOPMENT, LLC,

14    SOLOMON CAPITAL, INC., JONATHON VENTO, GRACE CAPITAL, LLC, dba GRACE

15    COMMUNITIES, DONALD ZELEZNAK, Z-LOFTS, LLC, ZELEZNAK PROPERTY

16    MANAGEMENT, LLC dba KELLER WILLIAMS REALTY, and KELLER WILLIAMS

17    REALTY, INC. ("Defendants") purchased real property in Phoenix, Arizona using funds

18    obtained from Plaintiffs STEVE TRACHSEL, SUN CITY TOWERS, LLC, THOMAS

19    CIRRITO, ATOCHA LAND, LLC, CIRRITO HOLDINGS, LLC, and MICHAEL CIRRITO,

20    who were investors in Solomon Towers, LLC.  However, Defendants purchased this property at

21    approximately five times its actual market value, dividing the investment funds with the sellers,

22    and left the undercapitalized property in the hands of the swindled investors.

23    Plaintiffs are entitled to a temporary restraining order and preliminary injunction to:

24    (1) enjoin Defendants' continued expenditure of Solomon Towers, LLC funds or other investor

25    funds for Defendants' personal debts and obligations; (2) prevent the alteration or destruction of

26    evidence, including, but not limited to, all corporate business and financial records of Solomon

27    Towers, Solomon Capital, RDB Development, and all other related companies; and (3) to prevent

28    the use of Solomon Towers, LLC funds or other investor funds for the defense of this action until

RC1/5103779.1/BRL

- 2 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    such time as the Court can resolve the unlimited civil lawsuit filed concurrently herewith.

2                                              **II.**

3                            **FACTUAL BACKGROUND**

4         In or around February of 2005, Defendants presented the Solomon Towers, LLC high rise

5    condominium investment ("Solomon Towers project") opportunity to investors, who included

6    Plaintiffs. In this investment scheme, Defendants would purchase raw land in downtown

7    Phoenix, Arizona using investors' funds, then develop the land into upscale condominiums,

8    providing investors with a purported significant return upon the sale of the condominiums.

9    Notwithstanding a brief Power Point presentation and Pro Forma financials for the project, no

10   other disclosure documentation was disseminated to the Plaintiff investors regarding the Solomon

11   Towers project. There was no Private Placement Memorandum provided to the Plaintiff investors

12   at the presentation or anytime thereafter setting forth the potential risks inherently involved in the

13   project and the potential future loss of the entire investment. (Declaration of Steve Trachsel in

14   support of Application for Temporary Restraining Order, ¶ 3.)

15        Previously, on July 25, 2002, a company owned by Defendant ZELEZNAK purchased

16   625-643 N. 2nd Avenue, Phoenix, AZ (hereinafter referred to as "the Property") from Core

17   Builders, Inc. for $392,000.00. At 28,000 square feet, the cost for this transaction was $14.00 per

18   square foot. On April 11, 2005, Defendants ZELEZNAK and VENTO sold the Property to

19   SOLOMON TOWERS, LLC for $5,004,929.00, which Defendants BUCHHOLZ and FISCHER

20   paid for using Plaintiffs' investment funds. The cost for this transaction was approximately

21   $178.75 per square foot. Based on comparable lot sales in the region, the actual market rate for

22   the land from February to March of 2005 was approximately $33.19 per square foot. In addition,

23   Defendant ZELEZNAK received a commission of $1,000,000.00 on the sale, or approximately

24   20%, far exceeding the prevailing market rate of 5% to 6% for sales transactions involving raw

25   land. (Trachsel Decl., ¶ 4.)

26        Further, Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

27   with the presentation to the Plaintiff investors regarding the Solomon Towers project, materially

28   misrepresented the actual return or "profit" to the Plaintiff investors. The Pro Forma Finance &

RCI/5103779.1/BRL                          - 3 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   Investment Analysis promised investors a 50% share of all profits.  To date, the Plaintiff investors

2   have received no return on investment from the Solomon Towers project.  To the contrary, the

3   Plaintiff investors have been requested to make further capital contributions to the project.

4   Further, according to pro forma financials disseminated by Defendants SOLOMON CAPITAL,

5   BUCHHOLZ, and FISCHER on February 29, 2008, the Solomon Towers project is in severe

6   financial distress and overleveraged in an amount in excess of $2,400,000.  (Trachsel Decl., ¶ 5.)

7          Rather than applying the investment funds toward development of the Property,

8   Defendants divided the investment funds among themselves and left the investors holding an

9   overleveraged property.  This scheme, involving overpayment for property, followed by a

10  division of investor funds between the seller and the buyer, and an "inexplicable" failure of the

11  investment is commonly referred to as a "pump and dump" scheme.  (Trachsel Decl., ¶ 6.)

12         Plaintiffs did not learn of Defendants' fraudulent enterprise until July 2007, after federal

13  and state authorities raided Defendant SOLOMON CAPITAL's offices in San Jose due to

14  allegations of fraudulent investment schemes.  On May 2, 2008, Plaintiffs filed an unlimited civil

15  complaint for, among other things, rescission of the investment contract based on Defendants'

16  misrepresentations and lack of qualification to sell securities under California Corporations Code.

17  In addition, Plaintiffs are filing, concurrent with this Application, a noticed application for a Right

18  to Attach Order and an Order for Issuance of a Writ of Attachment. (Trachsel Decl., ¶ 7.)

19                                              **III.**

20                                    **LEGAL ANALYSIS**
     A.    **To Maintain The Status Quo And Prevent Irreparable Harm, This Court Should**
21         **Grant Plaintiffs' Application For A Temporary Restraining Order**

22         Where a plaintiff can show a probable success on the merits and the possibility of

23  irreparable injury, it is entitled to a temporary restraining order maintaining the status quo during

24  the pendency of its action.  (Rodeo Collection, Ltd. v. West Seventh, (9th Cir. 1987) 812 F.2d

25  1215, 1217; Weinberger v. Romero-Barcelo (1982) U.S. 305, 312.)  A temporary restraining

26  order is an interim order issued to preserve the status quo.  (Cal. Code Civ. Proc. §527(c);

27  Voorhies v. Roosevelt Browne Green (1983) 139 Cal.App.3d 989, 995.)  The affidavits,

28  declarations, or complaint must contain specific facts, on personal knowledge, supporting the

RC1/5103779.1/BRL                          - 4 -

1    allegations that are the basis for the request for a temporary restraining order. (<u>Low v. Low</u>

2    (1956) 143 Cal.App.2d 650, 654.) In determining whether there is "irreparable injury," no one

3    factor is determinative; rather, a court "must exercise its discretion 'in favor of the party most

4    likely to be injured.'" (See, e.g. <u>Nutro Products, Inc. v. Cold Grain Co.</u> (1992) 3 Cal.App.4th

5    860, 867; citing <u>Robbins v. Superior Court</u> (1985) 38 Cal.3d 199, 205.)

6    **B.    Plaintiffs Are Likely to Succeed on the Merits of the Action**

7         To obtain a temporary restraining order, a plaintiff must first show a likelihood of success

8    on the merits of the claim or action. (<u>Rodeo Collection, Ltd. v. West Seventh,</u> (9th Cir. 1987)

9    812 F. 2d 1215, 1217; <u>Weinberger v. Romero-Barcelo</u> (1982) U.S. 305, 312.) Here, Plaintiffs'

10   claim for rescission of their investment contracts under the California Corporations Code is likely

11   to succeed on its merits. Under California Corporations Code section 25019, investment

12   contracts are explicitly defined as securities. The United States Supreme Court, the California

13   Supreme Court, and the California Department of Corporations all confirm this interpretation.

14   (<u>S.E.C. v. Howey</u> (1946) 328 U.S. 293, 298; <u>Silver Hills Country Club v. Sobieski</u> (1961) 55

15   Cal.2d 811, 908; <u>Cal. Comm'r of Corp. v. Fairshare</u> (1998) OAH No. N 1998110288.)

16   Accordingly, Plaintiffs' investments in the Solomon Towers Project are securities under

17   California Corporations Code section 25019 and relevant case law.

18        By issuing these securities and engaging in the business of effecting transactions based on

19   these securities, Defendants are considered "issuers" under Corporations Code section 25010 and

20   "broker-dealers" under section 25004. Issuer transactions of securities are governed by section

21   25110, which states, in relevant part: "It is unlawful for any person to offer or sell in this state

22   any security in an issuer transaction...unless such sale has been qualified," meaning that the

23   issuer has a permit from the state to sell such securities. Defendants neither qualified nor

24   exempted themselves in accordance with these requirements. (Trachsel Decl., ¶ 3.) They do not

25   have any kind of permit to sell these securities. (Id.) As a result, all sales to Plaintiffs may be

26   rescinded as if they had never taken place, and all proceeds must be immediately returned with

27   interest under Corporations Code section 25503. Further, under Corporations Code section

28   25403, all parties that can be construed to have aided and abetted the sale of the securities are

RCI/5103779.1/BRL

- 5 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    jointly and severally liable under the Code for the return of the investment, damages, interest,

2    attorney's fees, and costs.

3        This statutory language is clearly worded, strictly construed, and beyond debate.

4    Moreover, the statute directly applies to Defendants, requiring rescission of Defendants'

5    investment contract with Plaintiffs and return of Plaintiffs' investment funds. Because both the

6    statute and its application to Defendants are clear, the likelihood of Plaintiffs' success on this

7    claim and related claims is very high. Because Plaintiffs, upon the facts presented, are likely to

8    succeed on the claim upon which the temporary restraining order is based, the Court should issue

9    an order preserving the status quo in this matter until such time as it has the opportunity to hear

10   the matter on its merits.

11   **C.**   **Plaintiffs Will Suffer Irreparable Harm If This Court Does Not Issue A Temporary
         Restraining Order To Preserve The Status Quo**

12

13       The concept of "irreparable injury" describes the rule that "an injunction may issue to

14   prevent wrongs of a repeated and continuing character, or which occasion damages estimable

15   only by conjecture and not by any accurate standard." (Wind v. Herbert (1960) 186 Cal.App.2d

16   276, 285.)

17       In the instant action, Plaintiffs are seeking to enjoin Defendants' continued expenditure of

18   fraudulently obtained investor funds. Absent the grant of this Court's authority to restrain

19   Defendants' illegal activities, Plaintiffs are likely to suffer irreparable injury by litigating this

20   matter to a judgment in Plaintiffs' favor, only to have Defendants' assets exhausted or

21   substantially diminished. (Trachsel Decl., ¶ 8.) Further, Defendants will be able to defend this

22   matter using the very same ill-gotten gains for which the matter is being brought. (Id.) This

23   constitutes an irreparable injury, and entitles Plaintiffs to the requested equitable relief.

24   **D.**   **The Court May Grant This Temporary Restraining Order *Ex Parte* Due to the
         Danger that Defendants Will Seek to Spend, Conceal or Dispense the Investment
         Funds**

25

26

27       Temporary restraining orders may be granted ex parte if it appears from the facts set forth

28   in the affidavits or declarations that great or irreparable injury would result to the applicant before

PLAINTIFF'S *EX PARTE* APPLICATION
FOR TEMPORARY RESTRAINING ORDER

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    the matter could be heard on notice.  (<u>Granny Goose Foods v. Brotherhood of Teamsters & Auto</u>

2    <u>Truck Drivers</u> (1974) 415 U.S. 423.)

3        As a direct and proximate result of Defendants' fraudulent acts, Plaintiffs were deprived

4    of investment funds in the amount of $5,100,000.00.  Defendants are now on notice that a lawsuit

5    is being filed on the above facts, and based on their prior dishonest business dealings and

6    concealment of funds, there is a serious danger that Defendants will seek to spend, conceal, or

7    disperse the investment funds to frustrate Plaintiffs' legal efforts.  (Trachsel Decl., ¶ 9.)  Because

8    there is a significant concern of said expenditure or concealment before this matter may be heard

9    on a noticed motion, the Court should hear and grant this Application for a Temporary

10    Restraining Order *ex parte*.

11        Concurrently herewith, Plaintiffs are filing a noticed Application for a Right to Attach

12    Order and an Order for the Issuance of a Writ of Attachment.  (Trachsel Decl., ¶ 7.)  Plaintiffs

13    seek this *ex parte* relief to preserve the status quo until such time as Plaintiffs' Application for

14    Attachment may be heard.  (Id.)

15   **E.    <u>Plaintiffs Are Not Required To File An Undertaking In Order For The Court To</u>**
     **<u>Issue A Temporary Restraining Order</u>**

16

17        In the case of a temporary restraining order, the Court has the authority to issue a valid

18    temporary restraining order in the absence of an undertaking or posted security.  (<u>Chico Feminist</u>

19    <u>Women's Health Ctr. v. Scully</u> (1989) 208 Cal.3d 230, 237.)  In fact, it is entirely within the

20    Court's discretion whether or not the party applying for the temporary restraining order should be

21    required to provide an undertaking.  (<u>City of San Francisco v. Cypress Lawn Cemetery</u>

22    <u>Association</u> (1992) 11 Cal.App.4th 916, 920; <u>Allen v. Pritchess</u> (1973) 36 Cal.App.3d 321.)

23        In the present action, the cost to provide a bond for the $1,000,000.00 of Plaintiffs'

24    investment funds that Defendants converted is prohibitive for Plaintiffs, even in the aggregate, as

25    it would be for most litigants.  (Trachsel Decl., ¶ 10.)  Therefore, the Court should waive the

26    requirement of an undertaking.  (<u>Davis v. Custom Switching Inc.</u> (1970) 13 Cal.App.3d [Court

27    waived the undertaking requirement for the appellant, who would need to completely liquidate

28    the corporation to afford an appellate bond]).  In the alternative, the Court should allow Plaintiffs

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5103779.1/BRL                                   - 7 -

to post a single undertaking at the statutory rate as to all Defendants in order to have the

Temporary Restraining Order issued, and carry said undertaking over to the Right to Attach

Order.

**IV.**

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant a Temporary

Restraining Order (1) enjoining Defendants' continued expenditure of Solomon Towers, LLC

funds for Defendants' personal debts and obligations; (2) preventing alteration or destruction of

evidence, including, but not limited to, all corporate business and financial records for Solomon

Towers, Solomon Capital, RDB Development, and all other related companies in both written and

electronic format; and (3) preventing the use of Solomon Towers, LLC funds or other investor

funds for the defense of this action.  Said Order will preserve the status quo until the Court has an

opportunity to hear Plaintiffs' noticed Application for a Right to Attach Order and an Order for

Issuance of a Writ of Attachment.

Dated: June 3, 2008

ROPERS, MAJESKI, KOHN & BENTLEY

By: _____
TODD A. ROBERTS
JESSHILL E. LOVE
Attorneys for Plaintiffs
STEVE TRACHSEL, an individual, SUN
CITY TOWERS, LLC, a California
corporation, THOMAS CIRRITO, an
individual, ATOCHA LAND, LLC, a
Delaware limited liability company,
MICHAEL CIRRITO, an individual, and
CIRRITO HOLDINGS, LLC, a Delaware
limited liability company

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  TODD A. ROBERTS (SBN 129722)
   JESSHILL E. LOVE (SBN 208348)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   1001 Marshall Street, Suite 300
3  Redwood City, CA  94063
   Telephone:    (650) 364-8200
4  Facsimile:    (650) 780-1701

5  Attorneys for Plaintiffs
   STEVE TRACHSEL, an individual, SUN CITY
6  TOWERS, LLC, a California corporation,
   THOMAS CIRRITO, an individual,
7  ATOCHA LAND, LLC, a Delaware limited
   liability company, MICHAEL CIRRITO, an
8  individual, and CIRRITO HOLDINGS, LLC, a
   Delaware limited liability company

9

10        UNITED STATES DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA

11                                 SAN JOSE DIVISION

12
   STEVE TRACHSEL, an individual; SUN       CASE NO:  C08 02248RS
13 CITY TOWERS, LLC, a California
   corporation; THOMAS CIRRITO, an          **DECLARATION OF STEVE
14 individual; ATOCHA LAND, LLC, a          TRACHSEL IN SUPPORT OF
   Delaware limited liability company;      PLAINTIFFS' *EX PARTE*
15 MICHAEL CIRRITO, an individual; and      APPLICATION FOR A TEMPORARY
   CIRRITO HOLDINGS, LLC, a Delaware        RESTRAINING ORDER**
16 limited liability company,
                                            **[FED. R. CIV. PROC. § 65, NORTHERN
17                 Plaintiffs,              DISTRICT OF CALIFORNIA CIVIL
                                            LOCAL RULES 7-10 AND 65-1]**
18 v.
                                            **Date:     June 4, 2008**
19 RONALD BUCHHOLZ; CHARICE                 **Time:     9:30 a.m.**
   FISCHER; RDB DEVELOPMENT, LLC, a         **Ctrm:     4**
20 Nevada limited liability company;        **Judge:    Hon. Richard Seeborg**
   SOLOMON CAPITAL, INC., a Nevada
21 corporation; JONATHON VENTO; GRACE
   CAPITAL, LLC, dba GRACE
22 COMMUNITIES, an Arizona limited liability
   company; DONALD ZELEZNAK;
23 Z-LOFTS, LLC, an Arizona limited liability
   company; ZELEZNAK PROPERTY
24 MANAGEMENT, LLC dba KELLER
   WILLIAMS REALTY, an Arizona limited
25 liability company; KELLER WILLIAMS
   REALTY, INC., a Texas corporation; and
26 DOES 1-50, inclusive,

27                 Defendants.

28

RC1/5103878.1/BRL                          - 1 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    I, STEVE TRACHSEL, declare:

2    1.    I am a plaintiff in the above-titled action.  Further, I am the President of Sun City

3    Capital, LLC, which is also a plaintiff herein.  I have personal knowledge of all representations

4    made herein, and if called to testify, will testify as to their truthfulness.

5    2.    I submit this declaration in support of Plaintiffs' *Ex Parte* Application for a

6    Temporary Restraining Order.

7    3.    In or around February of 2005, I was notified of a meeting where Defendants

8    presented the Solomon Towers, LLC high rise condominium investment ("Solomon Towers

9    project") opportunity to investors.  Although I was not present at this meeting, Defendant

10   FISCHER later informed me of its substance.  Defendant FISCHER also provided me with

11   documents for the investment during our discussion.  In this investment scheme, Defendants

12   would purchase raw land in downtown Phoenix, Arizona using investors' funds, then develop the

13   land into upscale condominiums, providing investors with a purported significant return upon the

14   sale of the condominiums.  Notwithstanding a brief Power Point presentation and Pro Forma

15   financials for the project, no other disclosure documentation was disseminated to me regarding

16   the Solomon Towers project.  There was no Private Placement Memorandum provided to me at

17   any time setting forth the potential risks inherently involved in the project and the potential future

18   loss of the entire investment.  Based on information and belief, there was no other disclosure

19   documentation provided to other investors other than that referenced herein.  Further, as I

20   subsequently learned, Defendants neither qualified nor exempted themselves to be issuers or

21   broker-dealers of securities in accordance with the requirements of California Corporations Code

22   section 25110.

23   4.    On April 11, 2005, Defendants ZELEZNAK and VENTO sold a 28,000 square

24   foot parcel located at 625-643 N. 2nd Avenue, Phoenix, AZ (hereinafter referred to as "the

25   Property") to SOLOMON TOWERS, LLC for $5,004,929.00, which Defendants BUCHHOLZ

26   and FISCHER paid for using Plaintiffs' investment funds.  The cost for this transaction was

27   approximately $178.75 per square foot.  Based on comparable lot sales in the region, the actual

28   market rate for the land from February to March of 2005 was approximately $33.19 per square

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

RCI/5103878.1/BRL                          - 2 -

1    foot. In addition, Defendant ZELEZNAK received a commission of $1,000,000.00 on the sale, or

2    approximately 20%, far exceeding the prevailing market rate of 5% to 6% for sales transactions

3    involving raw land.

4         5.    During my conversation with Defendant FISCHER following the February

5    meeting, Defendant FISCHER materially misrepresented the actual return or "profit" to the

6    Plaintiff investors on the Solomon Towers project. Based on information and belief, Defendants

7    BUCHHOLZ, FISCHER, and SOLOMON CAPITAL similarly misrepresented this "profit" to

8    the investors present at the meeting. The Pro Forma Finance & Investment Analysis I received

9    represented that investors would receive a 50% share of all profits. To date, the Plaintiff

10   investors have received no return on investment from the Solomon Towers project. To the

11   contrary, the Plaintiff investors have been requested to make further capital contributions to the

12   project. Further, according to pro forma financials disseminated by Defendants SOLOMON

13   CAPITAL, BUCHHOLZ, and FISCHER on February 29, 2008, the Solomon Towers project is in

14   severe financial distress and overleveraged in an amount in excess of $2,400,000. Attached

15   hereto as Exhibit "A" is a true and correct copy of the Powerpoint presentation given at the

16   meeting and provided to me in substance soon thereafter. Attached hereto as Exhibit "B" is a true

17   and correct copy of the Pro Forma Finance & Investment Analysis presented at the meeting and

18   provided to me soon thereafter.

19        6.    On information and belief, Defendants did not apply the investment funds toward

20   development of the Property. Rather, they divided the investment funds among themselves and

21   left the investors holding an overleveraged property. I did not learn of Defendants' fraudulent

22   enterprise until July 2007, after federal and state authorities raided Defendant SOLOMON

23   CAPITAL's offices in San Jose due to allegations of fraudulent investment schemes.

24        7.    Plaintiffs have filed an unlimited civil complaint with this Court for, among other

25   things, rescission of the investment contract based on Defendants' misrepresentations and lack of

26   qualification to sell securities under California Corporations Code. In addition, Plaintiffs are

27   filing, concurrent with this application, a noticed application for a Right to Attach Order and an

28   Order for Issuance of a Writ of Attachment.

RCI/5103878.1/BRL                          - 3 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

8.    Absent the grant of this Court's authority to restrain Defendants' illegal activities, Plaintiffs are likely to suffer irreparable injury by litigating this matter to a judgment in Plaintiffs' favor, only to have Defendants' assets exhausted or substantially diminished.  Further, Defendants will be able to defend this matter using the very same ill-gotten gains for which the matter is being brought.

9.    Defendants are now on notice that a lawsuit is being filed on the above facts, and based on their prior dishonest business dealings and concealment of funds, there is a serious danger that Defendants will seek to spend, conceal, or disperse the investment funds to frustrate Plaintiffs' legal efforts.

10.    The cost to provide a bond for the $5,100,000.00 in investment funds that Defendants converted is prohibitive for Plaintiffs, even in the aggregate.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April _30_, 2008, in San Jose, California.

STEVE TRACHSEL

- 4 -

DECLARATION OF STEVE TRACHSEL IN SUPPORT OF APPLICATION FOR PLAINTIFFS' *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

# Exhibit A









2



# Downtown Phoenix

Downtown Phoenix and the central Copper Square are at the center of a reverse migration of citizens that want to live in metropolitan phoenix.

Recent Key Headlines and Events in Downtown Phoenix:
• Federal Transit Authority pledge $587 million for Phoenix Valley light rail
• City has goal of filling 137 acres of downtown vacant land by building 10,000 high density units and adding 10,000 downtown workers within 10 years
• ASU downtown plans
  • 3-block wide biomedical research campus in the Evans-Churchill neighborhood
  • move 1,500 College of Nursing students to downtown by 2006
  • locate schools of Community Resources and Development, Public Affairs and Social Work to 210,000 sqft APS building (1,300 students)
• Downtown Phoenix Partnership announces plans to launch Wi-Fi in Copper Square area
• Downtown Phoenix Public Market grand opening is Feb 12, 2005

3

















## Project Overview

- 10 Story high-rise, residential loft development
- Mid range price point: $400 psf
- 100 Units Planned
- Estimated Project Timeframe: 36 months



## Project Advantages & Benefits

▷ Central downtown Phoenix locations takes advantage of reverse migration trend
▷ Highly congruent with City of Phoenix general plan



## Comparative Sales Case: Monroe Towers

**MONROE PLACE**
LUXURY LOFTS

▷ Located 4 blocks south of our site
▷ Selling at $600 psf - $200 psf higher than the Solomon Tower proforma

8



### Residential Loft Buyer Analysis

Our local sales team is in place and ready to market the development once it is released. The sales team expects buyers to be from the following categories:

- 20% established, single professionals
- 25% empty-nesters
- 20% second home buyers
- 10% starter families
- 25% other, including investors

### Solomon Tower Proforma Numbers

9



## Development Proforma

| | |
|---|---|
| Land Area | 0.75 Acres |
| Land Cost psf | $ 153.05 |
| Building Area | 135,000 Gross Square Feet |
| Coverage | 413% |
| Number of Units | 100 |
| | |
| Total Land Cost | $ 5,000,000 |
| Closing Cost | 10,000 |
| Total Land Acquisition Cost | $ 5,010,000 |

## Development Proforma – 10 Stories

| | |
|---|---|
| Construction Costs | $ 27,000,00 |
| Permit Fees | 250,000 |
| Utility Connection Fees | 250,000 |
| Plan Review Fees | 50,000 |
| Construction Management | 500,000 |
| Architectural Design | 1,400,000 |
| Civil | 50,000 |
| Survey | 25,000 |
| Testing | 50,000 |
| Engineering | 50,000 |
| Signage | 25,000 |
| Legal Fees | 65,000 |
| Real Estate Taxes & Accounting | 75,000 |

10



## Development Proforma (cont.)

| | |
|---|---|
| Insurance | 900,000 |
| Marketing | 900,000 |
| Design Center Fees | 100,000 |
| Furniture, Furnishings & Equipment | 200,000 |
| Site Maintenance | 30,000 |
| Developer Fee | 1,000,000 |
| Interest Carry | 1,579,974 |
| Construction Finance Fees | 328,306 |
| Miscellaneous | 200,000 |
| Contingency | 1,000,000 |
| TOTAL CONSTRUCTION COST | $ 36,028,280 |
| TOTAL LAND COST | 5,010,000 |
| TOTAL PROJECT COST | $ 41,038,280 |

## Sales Proforma – 10 Stories

| | |
|---|---|
| Loft Sales | $54,225,000 |
| Sales Commissions (6%) | -3,253,500 |
| Closing Costs (0.75%) | -406,688 |
| Net Revenue | $50,564,813 |

11





## Sales Proforma – 15 Stories

| | |
|---|---|
| Loft Sales | $81,225,000 |
| Sales Commissions (6%) | -4,873,500 |
| Closing Costs (0.75%) | -609,188 |
| Net Revenue | $75,742,313 |
| Solomon Tower, LLC Profit | $20,545,669 |
| | |
| Investors (50%) | $10,272,834 |
| Solomon Capital (50%) | $10,272,834 |
| | |
| Total Return | 410% |

## Next Steps

1. Form Partnership and Raise Capital (3 weeks)

   a. Turn in your Commitment Form and signed Operating Agreement by Friday, Feb. 11th

   b. Initial Capital Contributions by Monday, Feb. 28th

2. Acquire Land (60 days)

3. Explore Project Definition (9-12 months)

4. Proceed with Build-out & Marketing (2 years)

13

# Exhibit B

Z Lofts
100 Lofts
1/14/2005

**Development Budget**

| | | | | |
|---|---|---|---|---|
| Land Area | | 0.75 | acres | |
| Land Cost psf of Land Area | $ | 153.05 | | |
| Building Area | | 135,000 | s.f. | |
| Coverage | | 413% | | |
| Number of Units | | 100 | units | |

| | | | PSF | Per Unit |
|---|---|---|---|---|
| Land | 5,000,000 | $ | 37.04 | $ 50,000 |
| Closing Costs | 10,000 | $ | 0.07 | $ 100 |
| Total Land Costs | 5,010,000 | $ | 37.11 | $ 50,100 |
| | | | | |
| Construction Costs | 27,000,000 | $ | 200.00 | $ 270,000 |
| Permit Fees | 250,000 | $ | 1.85 | $ 2,500 |
| Utility Connection Fees | 250,000 | $ | 1.85 | $ 2,500 |
| Plan Review Fees | 50,000 | $ | 0.37 | $ 500 |
| Construction Mgt Fees | 500,000 | $ | 3.70 | $ 5,000 |
| Architecture | 1,400,000 | $ | 10.37 | $ 14,000 |
| Civil | 50,000 | $ | 0.37 | $ 500 |
| Survey | 25,000 | $ | 0.19 | $ 250 |
| Testing | 50,000 | $ | 0.37 | $ 500 |
| Engineering | 50,000 | $ | 0.37 | $ 500 |
| Design Center Fees | 100,000 | $ | 0.74 | $ 1,000 |
| Furniture, Furnishings & Equipment | 200,000 | $ | 1.48 | $ 2,000 |
| Signage | 25,000 | $ | 0.19 | $ 250 |
| Legal | 65,000 | $ | 0.48 | $ 650 |
| Real Estate Taxes | 25,000 | $ | 0.19 | $ 250 |
| Insurance | 900,000 | $ | 6.67 | $ 9,000 |
| Marketing | 900,000 | $ | 6.67 | $ 9,000 |
| Site Maintenance | 30,000 | $ | 0.22 | $ 300 |
| Developer Fee | 1,000,000 | $ | 7.41 | $ 10,000 |
| Miscellaneous | 200,000 | $ | 1.48 | $ 2,000 |
| Contingency | 1,000,000 | $ | 7.41 | $ 10,000 |
| Accounting | 50,000 | $ | 0.37 | $ 500 |
| Interest Reserve 5.500% | 1,579,974 | $ | 11.70 | $ 15,800 |
| Financing Fees 1.00% | 328,306 | $ | 2.43 | $ 3,283 |
| Total Construction Costs | 36,028,280 | $ | 266.88 | $ 360,283 |
| | | | | |
| Total Project Costs | 41,038,280 | $ | 303.99 | $ 410,383 |

## Sales Summary

| | Size | Quantity | $ psf | | | | PSF | Per Unit |
|---|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 100 | $ 400 | | | 54,000,000 | $ 400.00 | $ 540,000 |
| Unit B | 0 | 0 | $ - | $ | - | | $ - | #DIV/0! |
| Unit C | 0 | 0 | $ - | $ | - | | $ - | #DIV/0! |
| Unit D | 0 | 0 | $ - | $ | - | | $ - | #DIV/0! |
| Lot Premiums | | 45 | $ 5,000 | per unit | $ | 225,000 | $ 1.67 | $ 5,000 |
| | | | | | | | | |
| Gross Sales Proceeds | | | | | $ | 54,225,000 | $ 401.67 | $ 1,205,000 |
| Less: | | | | | | | | |
|   Sales Commission | 6.00% | | | | | 3,253,500 | $ 24.10 | $ 72,300 |
|   Closing Costs | 0.75% | | | | | 406,688 | $ 3.01 | $ 9,038 |
| Net Sales Proceeds | | | | | $ | 50,564,813 | $ 374.55 | $ 1,123,663 |

## Equity Analysis

| | | |
|---|---|---|
| Total Project Costs | $ | 41,038,280 |
| Loan to Cost | | 80% |
| | | |
| Loan Amount | $ | 32,830,624 |
| | | |
| Cash Equity | $ | 5,000,000 |
| | | |
| Project Profit | $ | 9,526,532 |
| | | |
| Manager Profit | 50% | $ 4,763,266 |
| | | |
| Investor Profit | 50% | $ 4,763,266 |
| | | |
| Project Cash on Cash Return | | 191% |
| Investor Cash on Cash Return | | 95% |

Z Lofts
150 Lofts
1/14/2005

| Development Budget | | | |
|---|---|---|---|
| Land Area | | 0.75 acres | |
| Land Cost psf of Land Area | $ | 153.05 | |
| Building Area | | 202,500 s.f. | |
| Coverage | | 620% | |
| Number of Units | | 100 units | |

| | | | PSF | | Per Unit | |
|---|---|---|---|---|---|---|
| Land | 5,000,000 | $ | 24.69 | $ | 50,000 | |
| Closing Costs | 10,000 | $ | 0.05 | $ | 100 | |
| Total Land Costs | 5,010,000 | $ | 24.74 | $ | 50,100 | |
| | | | | | | |
| Construction Costs | 40,500,000 | $ | 200.00 | $ | 405,000 | |
| Permit Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Utility Connection Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Plan Review Fees | 50,000 | $ | 0.25 | $ | 500 | |
| Construction Mgt Fees | 500,000 | $ | 2.47 | $ | 5,000 | |
| Architecture | 1,400,000 | $ | 6.91 | $ | 14,000 | |
| Civil | 50,000 | $ | 0.25 | $ | 500 | |
| Survey | 25,000 | $ | 0.12 | $ | 250 | |
| Testing | 50,000 | $ | 0.25 | $ | 500 | |
| Engineering | 50,000 | $ | 0.25 | $ | 500 | |
| Design Center Fees | 100,000 | $ | 0.49 | $ | 1,000 | |
| Furniture, Furnishings & Equipment | 200,000 | $ | 0.99 | $ | 2,000 | |
| Signage | 25,000 | $ | 0.12 | $ | 250 | |
| Legal | 65,000 | $ | 0.32 | $ | 650 | |
| Real Estate Taxes | 25,000 | $ | 0.12 | $ | 250 | |
| Insurance | 900,000 | $ | 4.44 | $ | 9,000 | |
| Marketing | 900,000 | $ | 4.44 | $ | 9,000 | |
| Site Maintenance | 30,000 | $ | 0.15 | $ | 300 | |
| Developer Fee | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Miscellaneous | 200,000 | $ | 0.99 | $ | 2,000 | |
| Contingency | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Acounting | 50,000 | $ | 0.25 | $ | 500 | |
| Interest Reserve 5.500% | 2,125,071 | $ | 10.49 | $ | 21,251 | |
| Financing Fees 1.00% | 441,573 | $ | 2.18 | $ | 4,416 | |
| Total Construction Costs | 50,186,644 | $ | 247.84 | $ | 501,866 | |
| | | | | | | |
| Total Project Costs | 55,196,644 | $ | 272.58 | $ | 551,966 | |

## Sales Summary

| | Size | Quantity | $ psf. | | | | PSF | | Per Unit |
|---|---|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 150 | $ | 400 | | 81,000,000 | $ | 400.00 | $ 540,000 |
| Unit B | 0 | 0 | $ | - | $ | - | $ | - | #DIV/0! |
| Unit C | 0 | 0 | $ | - | $ | - | $ | - | #DIV/0! |
| Unit D | 0 | 0 | $ | - | $ | - | $ | - | #DIV/0! |
| Lot Premiums | | 45 | $ | 5,000 per unit | $ | 225,000 | $ | 1.11 | $   5,000 |
| | | | | | | | | | |
| Gross Sales Proceeds | | | | | $ | 81,225,000 | $ | 401.11 | $ 1,805,000 |
| Less: | | | | | | | | | |
| Sales Commission | 6.00% | | | | | 4,873,500 | $ | 24.07 | $  108,300 |
| Closing Costs | 0.75% | | | | | 609,188 | $ | 3.01 | $   13,538 |
| Net Sales Proceeds | | | | | $ | 75,742,313 | $ | 374.04 | $ 1,683,163 |

## Equity Analysis

| | | |
|---|---|---|
| Total Project Costs | $ | 55,196,644 |
| Loan to Cost | | 80% |
| | | |
| Loan Amount | $ | 44,157,315 |
| | | |
| Cash Equity | $ | 5,000,000 |
| | | |
| Project Profit | $ | 20,545,669 |
| | | |
| Manager Profit    50% | $ | 10,272,834 |
| | | |
| Investor Profit    50% | $ | 10,272,834 |
| | | |
| Project Cash on Cash Return | | 411% |
| Investor Cash on Cash Return | | 205% |

1   TODD A. ROBERTS (SBN 129722)
    JESSHILL E. LOVE (SBN 208348)
2   ROPERS, MAJESKI, KOHN & BENTLEY
    1001 Marshall Street, Suite 300
3   Redwood City, CA  94063
    Telephone:   (650) 364-8200
4   Facsimile:   (650) 780-1701

5   Attorneys for Plaintiffs
    STEVE TRACHSEL, an individual, SUN CITY
6   TOWERS, LLC, a California corporation,
    THOMAS CIRRITO, an individual,
7   ATOCHA LAND, LLC, a Delaware limited liability
    company, MICHAEL CIRRITO, an individual, and
8   CIRRITO HOLDINGS, LLC, a Delaware limited
    liability company

**ORIGINAL FILED**

APR 3 0 2008

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13   STEVE TRACHSEL, an individual, SUN        CASE NO.   C08   02248
     CITY TOWERS, LLC, a California
14   corporation, THOMAS CIRRITO, an           
     individual, ATOCHA LAND, LLC, a
15   Delaware limited liability company,        COMPLAINT FOR:
     MICHAEL CIRRITO, an individual, and
16   CIRRITO HOLDINGS, LLC, a Delaware          (1)    VIOLATION OF SECTION 1962(a)
     limited liability company,                 OF THE RACKETEER INFLUENCED
17                                              AND CORRUPT ORGANIZATIONS ACT
                    Plaintiffs,                 OF 1970 (18 U.S.C. SECTIONS 1, ET SEQ.)
18                                              ("RICO");
            v.                                  (2)    VIOLATION OF RICO SECTION
19                                              1962(C);
     RONALD BUCHHOLZ, CHARICE                   (3)    VIOLATION OF RICO SECTION
20   FISCHER, RDB DEVELOPMENT, LLC,             1962(D);
     a Nevada limited liability company,        (4)    VIOLATION OF SECURITIES
21   SOLOMON CAPITAL, LLC, a Nevada             EXCHANGE ACT OF 1934 SECTION 10B
     limited liability company, JONATHON        AND RULE 10B-5 (17 C.F.R. SECTION
22   VENTO, GRACE CAPITAL, LLC, dba             240.10B-5;
     GRACE COMMUNITIES, an Arizona              (5)    VIOLATION OF SECURITIES ACT
23   limited liability company, DONALD          OF 1933 SECTION 12(A) (15 U.S.C.
     ZELEZNAK, Z-LOFT, LLC, an Arizona          SECTION 771(A));
24   limited liability company, ZELEZNAK        (6)    BREACH OF FIDUCIARY DUTY;
     PROPERTY MANAGEMENT, LLC dba               (7)    BREACH OF CONTRACT;
25   KELLER WILLIAMS REALTY, an                 (8)    NEGLIGENT
     Arizona limited liability company,         MISREPRESENTATION;
26   KELLER WILLIAMS REALTY, INC., a            (9)    INTENTIONAL
     Texas corporation, and DOES 1-50,         MISREPRESENTATION;
27   inclusive,                                 (10)   CONSPIRACY;
                                                (11)   FRAUD;
28                  Defendants.                 (12)   CONSTRUCTIVE FRAUD;
                                                (13)   ALTER EGO;

RC1/5092539.3/JEL
                              - 1 -

**COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES,
FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY**

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City



(14) **VIOLATION OF SECTION 17200, ET SEQ. OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE;**
(15) **RESCISSION OF SECURITY TRANSACTION PURSUANT TO CALIFORNIA CORP. CODE SECTIONS 25501 AND 25401;**
(16) **DAMAGES FOR SECURITIES TRANSACTION PURSUANT TO CALIFORNIA CORP. CODE SECTIONS 25501, 25401, 25504;**
(17) **RESCISSION OF SALE OF SECURITIES NOT QUALIFIED FOR SALE AND RESTITUTION PURSUANT TO CALIFORNIA CORP. CODE SECTIONS 25503, 25102, 25110;**
(18) **DAMAGES FOR SALE OF SECURITIES NOT QUALIFIED FOR SALE PURSUANT TO CALIFORNIA CORP. CODE SECTIONS 25503, 25102, 25110**

**JURY TRIAL DEMANDED**

PLAINTIFFS STEVE TRACHSEL, an individual, SUN CITY TOWERS, LLC, a California corporation, THOMAS CIRRITO, an individual, ATOCHA LAND, LLC, a Delaware limited liability company, CIRRITO HOLDINGS, LLC, a Delaware limited liability company, and MICHAEL CIRRITO, an individual, ("Plaintiffs"), by and through their attorneys, submit their Complaint against DEFENDANTS RONALD BUCHHOLZ, CHARICE FISCHER, RDB DEVELOPMENT, LLC, a Nevada limited liability company, SOLOMON CAPITAL, LLC, a Nevada limited liability company, JONATHON VENTO, GRACE CAPITAL, LLC, dba GRACE COMMUNITIES, an Arizona limited liability company, DONALD ZELEZNAK, Z-LOFT, LLC, an Arizona limited liability company, ZELEZNAK PROPERTY MANAGEMENT, LLC dba KELLER WILLIAMS REALTY, an Arizona limited liability company, KELLER WILLIAMS REALTY, INC., a Texas corporation, and DOES 1-50, inclusive ("Defendants") as follows.

## I.

## INTRODUCTION AND OVERVIEW OF THE ACTION

1.    This is an unlimited civil action brought under Sections 1962(a), 1962(c), and

**COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES, FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY**

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1962(d) of the Racketeer Influenced & Corrupt Organizations Act of 1970 (18 U.S.C. §§1961 et

seq.) ("RICO"); Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934 (17 C.F.R. §

240.10b-5) ("Rule 10b-5"); Section 12(a) of the Securities Act of 1933 (15 U.S.C. § 771(a))

("Section 12(a)"); Section 17200 of the California Business & Professions Code; Breach of

Fiduciary Duty; Breach of Contract; Negligent Misrepresentation; Intentional Misrepresentation;

Conspiracy; Alter Ego; and California Corporations Code §§ 25401, 25501, 25503, 25110, and

25130.

2.    On information and belief, Plaintiffs allege that Defendants created a real estate

"Ponzi scheme" to defraud Plaintiff investors of millions of dollars of invested securities.

Defendants misrepresented, among other things, that they were paying fair market value for the

land to be purchased by Defendants with Plaintiffs' investment capital and that Plaintiffs would

receive a fair return on their investments. Plaintiffs were lured into these transactions believing

that Defendants were paying fair market value for the land subject to the investment when

Defendants had, in fact, agreed and engineered a fraudulent Enterprise to purchase the land at

highly inflated or above-market rates in order to defraud the investors and garner ill-gotten gains

for the Defendants' benefit.

3.    Plaintiffs allege, on information belief, that Defendants' fraudulent Enterprise or

"Ponzi scheme" involved the "operators," SOLOMON CAPITAL, RONALD BUCHHOLZ,

RDB DEVELOPMENT, and CHARICE FISCHER, who raised the investment capital, the

"speculators," DONALD ZELEZNAK, Z-LOFT, JONATHON VENTO, and GRACE CAPITAL,

who purchased the land in advance in preparation for later sale to the investors at a highly inflated

price, and the "agent and broker" DONALD ZELEZNAK, ZELEZNAK PROPERTY

MANAGEMENT, and KELLER WILLIAMS REALTY, INC., who facilitated the transactions

and received, in some instances, 20% (twenty percent) commission rates. The proceeds from this

fraudulent Enterprise were then used by Defendants to perpetrate a fraud upon other investors.

By this complaint, Plaintiffs seek rescission of the unqualified securities, damages, and injunctive

relief to enjoin Defendants from continuing to perpetrate the fraudulent Enterprise or "Ponzi

scheme" upon other putative investors or transferring any assets acquired therefrom.

RC1/5092539.3/JEL

- 3 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

## II.

## JURISDICTION AND VENUE

4.    This is an action for damages and a permanent injunction arising out of Defendants' violations of Sections 1962(a), 1962(c), and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act of 1970 (18 U.S.C §§ 1961, et seq. ("RICO"); Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"); Section 12(a) of the Securities Act of 1933 (15 U.S.C. § 77l(a)) ("Section 12(a)"); Section 17200 of the California Business & Professions Code; Breach of Fiduciary Duty; Breach of Contract; Negligent Misrepresentation; Intentional Misrepresentation; Conspiracy; Fraud, Constructive Fraud; Alter Ego; and California Corporations Code §§ 25401, 25501, 25503, 25110, and 25130.

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction, based on the RICO, Rule 10b-5, and Section 12(a) claims in this action. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the remaining state law claims are so related to the RICO, Rule 10b-5, and Section 12(a) claims that they form a part of the same case or controversy and fall within this Court's supplemental jurisdiction.

6.    In addition, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), diversity of citizenship jurisdiction, because all Plaintiffs are citizens of different states than all Defendants, and because the amount in controversy exceeds $75,000.00.

7.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1965(a) because the Defendants transact affairs in this District; pursuant to 28 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; pursuant to 28 U.S.C. §1291(b) because a substantial part of the events or omissions giving rise to this action occurred in this District; and/or pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants is subject to personal jurisdiction in this District.

8.    The Court has jurisdiction over Defendants RONALD BUCHHOLZ and CHARICE FISCHER because RONALD BUCHHOLZ and CHARICE FISCHER own property

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    in the State of California.  Several of the companies they manage, including RDB

2    DEVELOPMENT and SOLOMON CAPITAL, list as their principal address 20 Great Oaks

3    Blvd., Suite 230, San Jose, California.

4        9.    This Court has jurisdiction over Defendant RDB DEVELOPMENT, LLC ("RDB

5    DEVELOPMENT") because it maintains an office or place of business in the State of California,

6    it regularly conducts business in the State of California, and it purposefully directed the activities

7    complained of herein toward residents of California and otherwise established contacts with

8    California in participating in and otherwise engaging in the Enterprise as described herein.

9        10.    This Court has jurisdiction over Defendant SOLOMON CAPITAL, LLC

10   ("SOLOMON CAPITAL") because it maintains an office or place of business in the State of

11   California, it regularly conducts business in the State of California, and it purposefully directed

12   the activities complained of herein toward residents of California and otherwise established

13   contacts with California in participating in and otherwise engaging in the Enterprise as described

14   herein.

15       11.    This Court has jurisdiction over Defendants DONALD ZELEZNAK

16   ("ZELEZNAK") and Z-LOFT, LLC ("Z-LOFT") they regularly conduct business in the State of

17   California, because ZELEZNAK owns property in the State of California, and because both

18   DONALD ZELEZNAK and Z-LOFT purposefully directed the activities complained of herein

19   toward residents of California and otherwise established contacts with California in participating

20   in and otherwise engaging in the Enterprise as described herein.

21       12.    The Court has jurisdiction over Defendants JONATHON VENTO ("VENTO")

22   and GRACE CAPITAL, LLC dba GRACE COMMUNITIES ("GRACE CAPITAL") because

23   they regularly conduct business in the State of California, because they own property in the State

24   of California, and because they purposefully directed the activities complained of herein toward

25   residents of California and otherwise established contacts with California in participating in and

26   otherwise engaging in the Enterprise as described herein.

27       13.    This Court has jurisdiction over Defendants ZELEZNAK PROPERTY

28   MANAGEMENT ("ZPM") and KELLER WILLIAMS REALTY ("KELLER WILLIAMS"),

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   because they regularly conduct business in the State of California, because they own or lease

2   property in the State of California, and purposefully directed the activities complained of herein

3   toward residents of California and otherwise established contacts with California in participating

4   in and otherwise engaging in the Enterprise as described herein, and because KELLER

5   WILLIAMS maintains multiple places of business in the State of California, is qualified to

6   conduct business in California, and regularly conducts business in the State of California.

7                                                   **III.**

8                                              **PARTIES**

9       14.    Plaintiffs STEVE TRACHSEL is, and at all times relevant was, a citizen of

10  California. TRACHSEL is, and at all times relevant was, a resident of Santa Clara County.

11  TRACHSEL is an investor in the Solomon Towers project and/or a member of the Solomon

12  Towers limited liability company. TRACHSEL purchased the unqualified securities from

13  SOLOMON CAPITAL based on the misrepresentations discussed herein.

14      15.    Plaintiffs SUN CITY TOWERS, LLC, is, and at all times relevant was, a

15  California limited liability company, with its principal place of business in California. Said

16  corporation was an investor in the Solomon Towers project and/or a member of the Solomon

17  Towers limited liability company. Said corporation purchased the unqualified securities from

18  SOLOMON CAPITAL based on the misrepresentations discussed herein.

19      16.    Plaintiff THOMAS CIRRITO is, and at all times relevant was, a citizen of

20  Virginia. CIRRITO is, and at all times relevant was, a resident of Fairfax County, Virginia.

21  CIRRITO was an investor in the Solomon Towers project and/or a member of the Solomon

22  Towers limited liability company. CIRRITO purchased the unqualified securities from

23  SOLOMON CAPITAL based on the misrepresentations discussed herein.

24      17.    Plaintiff ATOCHA LAND, LLC, is, and at all times relevant was, a Delaware

25  limited liability company, with its principal place of business in Virginia. Said corporation was

26  an investor in the Solomon Towers project and/or a member of the Solomon Towers limited

27  liability company. Said corporation purchased the unqualified securities from SOLOMON

28  CAPITAL based on the misrepresentations discussed herein.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

18. Plaintiff MICHAEL CIRRITO is, and at all times relevant was, a citizen of California. CIRRITO is, and at all times relevant was, a resident of Marin County, California. CIRRITO was an investor in the Solomon Towers project and/or a member of the Solomon Towers limited liability company. CIRRITO purchased the unqualified securities from SOLOMON CAPITAL based on the misrepresentations discussed herein.

19. Plaintiff CIRRITO HOLDINGS, LLC, is, and at all times relevant was, a Delaware limited liability company, with its principal place of business in California. Said corporation was an investor in the Solomon Towers project and/or a member in the Solomon Towers limited liability corporation. Said corporation purchased the unqualified securities from SOLOMON CAPITAL based on the misrepresentations discussed herein.

20. Defendant SOLOMON CAPITAL is a Nevada limited liability company and maintains an office at 20 Great Oaks Blvd., Suite 230, San Jose, California. SOLOMON CAPITAL, in connection with Defendants RONALD BUCHHOLZ and CHARICE FISCHER, was the issuer of the unqualified securities for investment procured by the Plaintiffs herein.

21. On information and belief, Defendant RONALD BUCHHOLZ is, and at all times relevant was, a citizen of Nevada. Defendant BUCHHOLZ, at all times relevant was, a resident of Washoe County, Nevada.

22. On information and belief, Defendant CHARICE FISCHER is, and at all times relevant was, a citizen of Nevada. Defendant FISCHER, at all times relevant was, a resident of Washoe County, Nevada.

23. On information and belief, Defendant JONATHON VENTO, is, and at all times relevant was, a citizen of Arizona. Defendant VENTO, at all times relevant was, a resident of Maricopa County, Arizona.

24. On information and belief, Defendant DONALD ZELEZNAK, is, and at all times relevant was, a citizen of the State of Arizona and a resident of Washoe County, Nevada.

25. Defendant Z-LOFT, LLC is an Arizona limited liability company, with its principal place of business in Maricopa County, Arizona. Z-LOFT, in connection with Defendants SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, FISCHER,

RCI/5092539.3/JEL

- 7 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    ZELEZNAK, ZPM, VENTO, and GRACE CAPITAL materially assisted Defendants to

2    perpetrate the fraudulent Enterprise discussed herein upon the Plaintiffs for the purchase and sale

3    transaction for the Property for an over-inflated and above fair market value price.

4            26.    Defendant GRACE CAPITAL, LLC dba GRACE COMMUNITIES is an Arizona

5    limited liability company, with its principal place of business in Maricopa County, Arizona.

6    GRACE CAPITAL, in connection with Defendants SOLOMON CAPITAL, RDB

7    DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK, Z-LOFT, ZPM, and VENTO,

8    materially assisted Defendants to perpetrate the fraudulent Enterprise discussed herein upon the

9    Plaintiffs for the purchase and sale transaction for the Property for a grossly over-inflated and

10   above fair market value price.

11           27.    Defendant ZELEZNAK PROPERTY MANAGEMENT, LLC, is an Arizona

12   limited liability company, with its principal place of business at 10101 N. 92nd St., # 101,

13   Scottsdale, Maricopa County, Arizona. ZPM, in connection with Defendants SOLOMON

14   CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK, Z-LOFT, VENTO,

15   and GRACE CAPITAL, was the responsible broker for the agent ZELEZNAK and materially

16   assisted Defendants to perpetrate the fraudulent Enterprise discussed herein upon the Plaintiffs for

17   the purchase and sale transaction for the Property for an over-inflated and above fair market value

18   price.

19           28.    Defendants RDB DEVELOPMENT, LLC, is a limited liability company, with its

20   principal place of business at 19 Avenida Sorrento, Henderson, Clark County, Nevada. RDB

21   DEVELOPMENT, in connection with Defendants SOLOMON CAPITAL, BUCHHOLZ,

22   FISCHER, ZELEZNAK, Z-LOFT, ZPM, VENTO, and GRACE CAPITAL, materially assisted

23   Defendants to perpetrate the fraudulent Enterprise discussed herein upon the Plaintiffs for the

24   purchase and sale transaction for the Property for an over-inflated and above fair market value

25   price. Based on information and belief, Defendants BUCHHOLZ and FISCHER diverted

26   undisclosed funds from the Solomon Towers project to RDB DEVELOPMENT for their own

27   personal use to the detriment of Plaintiffs herein.

28           29.    Defendant KELLER WILLIAMS REALTY, INC., is a Texas corporation, with its

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL

- 8 -

1  principal place of business in Austin, Travis County, Texas.  KELLER WILLIAMS is vicariously

2  liable for the actions of its franchise, ZPM, which materially assisted Defendants to perpetrate the

3  fraudulent Enterprise discussed herein upon the Plaintiffs for the purchase and sale transaction for

4  the Property for an over-inflated and above fair market value price.  Based on information and

5  belief, Defendants BUCHHOLZ and FISCHER diverted undisclosed funds from the Solomon

6  Towers project to RDB DEVELOPMENT for their own personal use to the detriment of Plaintiffs

7  herein.

8      30.      Plaintiffs do not know the true names of Defendants DOES 1 through 50 and

9  therefore sue them by those fictitious names.  Plaintiffs are informed and believe and on that basis

10  allege, that at all times mentioned in this complaint, DOES 1 through 50 were the agents and

11  employees of their co-Defendants, and in performing the acts and omissions alleged in this

12  complaint were acting within the course and scope of that agency and employment.

**IV.**

**FACTUAL ALLEGATIONS**

A.    **Defendants' Alleged Real Estate Investment Company**

16      31.      Defendants BUCHHOLZ and FISCHER are members of the Family Community

17  Church (hereinafter "Church") located at 478 Piercy Road, San Jose, California.  William

18  Buchholz, who is Defendants BUCHHOLZ and FISCHER's father, is the Senior Pastor for the

19  Church.

20      32.      According to the SOLOMON CAPITAL website located at

21  http://www.solomoncap.com, BUCHHOLZ is the President of Defendant SOLOMON

22  CAPITAL.  Defendant FISCHER is both a principal and the Chief Financial Officer of Defendant

23  SOLOMON CAPITAL.  Based on information and belief, BUCHHOLZ, FISCHER, and

24  SOLOMON CAPITAL market and advertise themselves as experts in the context of real estate

25  investing.

26      33.      Plaintiffs allege on information and belief that SOLOMON CAPITAL is an

27  investment group associated with RDB DEVELOPMENT and Equity Enterprises, Inc.

28  Defendants BUCHHOLZ and FISCHER founded Equity Enterprises, Inc. as the predecessor to

RC1/5092539.3/JEL                                              - 9 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   SOLOMON CAPITAL.  BUCHHOLZ is the President of both entities.  SOLOMON CAPITAL,

2   BUCHHOLZ, and FISCHER, acted as the "issuers" of the unqualified securities to the Plaintiff

3   investors.

4       34.    Defendants BUCHHOLZ, FISCHER and SOLOMON CAPTITAL derive their

5   income through investment activities on behalf of themselves and others, some of who they met

6   through their relationship with the Church.  Based on information and belief, BUCHHOLZ,

7   FISCHER and SOLOMON CAPTITAL market and advertise themselves as experts in the context

8   of real estate investing.

9       35.    Based on information and belief, Defendants BUCHHOLZ' father, William

10  Buchholz, repeatedly recommended that the parishioners of his Church invest with his son and

11  daughter, Defendants BUCHHOLZ and FISCHER, and their "investment company," SOLOMON

12  CAPITAL.  At times, Pastor Buchholz made statements directly to his congregation from the

13  "pulpit" encouraging them to invest with his son and daughter.

14      36.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL secured

15  investments from Plaintiffs in numerous different investment vehicles, including raw land

16  developments and acquisition and development projects.  The investor funds were placed in

17  different positions within the project inclusive of debt and equity positions.

18      37.    In each case for each alleged investment, Defendants BUCHHOLZ, FISCHER and

19  SOLOMON CAPITAL received a "developer fee" of the amount raised and invested.  Based on

20  information and belief, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL were

21  also to receive a percentage of any profit earned from the investment projects.

22      38.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and

23  SOLOMON CAPITAL also took undisclosed "kick backs" from third parties in connection with

24  the purchase, sale, and alleged development of SOLOMON CAPITAL investment projects to the

25  detriment of the Plaintiff investors.

26      39.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and

27  SOLOMON CAPITAL have taken approximately $330,000 in "developer fees" to date from the

28  Solomon Towers project to the detriment of the Plaintiff investors.

RC1/5092539.3/JEL                                    - 10 -

40.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL moved or transferred the investments of the Plaintiff investors to additional projects without their consent and encumbered the projects with additional debt without the consent of the Plaintiff investors.

41.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL have improperly commingled the investor funds with their own and with those of the other investors.

42.    Based on information and belief, RDB DEVELOPMENT materially assisted Defendants to perpetrate the fraud and Enterprise discussed herein upon the Plaintiffs for the purchase and sale transaction for the Property for an over-inflated and above fair market value price.

43.    Based on information and belief, Defendants BUCHHOLZ and FISCHER diverted undisclosed funds from the Solomon Towers project to RDB DEVELOPMENT for their own personal use to the detriment of Plaintiffs herein.

**B.**    **The Solomon Towers Project**

44.    In or around February of 2005, SOLOMON CAPITAL presented the Solomon Towers, LLC high rise condominium investment ("Solomon Towers project") opportunity to Plaintiffs.  The presentation consisted of an "oral" presentation with a Power Point presentation. A true and correct copy of the Power Point presentation disseminated to the Plaintiff investors is attached hereto as Exhibit "A" to the Complaint.  Pro Forma financials were also distributed to the Plaintiff investors.  A true and correct copy of the Pro Forma financials distributed to the Plaintiff investors is attached hereto as Exhibit "B" to the Complaint.

45.    Notwithstanding the Power Point presentation and the Pro Forma financials described herein, no other disclosure documentation was disseminated to the Plaintiff investors regarding the Solomon Towers project.  There was no Private Placement Memorandum or "PPM" provided to the Plaintiff investors at the presentation or anytime thereafter setting forth the potential risks inherently involved in the project and the potential future loss of the entire investment.

RC1/5092539.3/JEL

- 11 -

COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES, FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY

46.    Defendant ZELEZNAK was present at the February 2005 meeting with potential investors, was introduced during a subsequent meeting on June 8, 2005 as a "key player," and spoke at length during that later meeting regarding the benefits of real estate investment in the Arizona market. ZELEZNAK also acted as the buyer's broker for the purchase of the Solomon Towers property.

47.    In March of 2005, the investors executed an Operating Agreement with Solomon Towers, LLC. The Operating Agreement includes 18 initial members who contributed a total of $4,169,400.00 [1]. Further, the Operating Agreement includes 13 loans made to Solomon Towers, LLC, totaling $840,600.00. Accordingly, the total payments to Solomon Towers, LLC by Plaintiffs and other investors total $5,010,000.00. A true and correct copy of the Operating Agreement is attached hereto as Exhibit "C" to the Complaint.

48.    As part of this Operating Agreement, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, as managers of Solomon Towers, LLC, agreed, among other things, to use company funds only to further the purposes of the company, not to commingle the funds with their own or others' funds, not to knowingly perform any act that contravened the Operating Agreement or was inconsistent with the purposes of the company, and to keep accurate books and records for the company.

## C.    The Sale of Unqualified Securities

49.    The investments sold by the Plaintiff investors qualify as "securities" pursuant to California Corporations Code § 25019. Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL qualify as the "broker-dealers" and "issuers" of the securities pursuant to California Corporations Code §§ 25004 and 25010.

50.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL have neither qualified for nor exempted themselves from qualification of the "securities" in accordance with California Corporations Code § 25110.

51.    The potential investors approached by Defendants BUCHHOLZ and FISCHER were unsophisticated real estate investors and relied upon the representations of Defendants

---

[1]    Sun City Towers, LLC contributed 4.8% and Atocha Land, LLC contributed 15.9%.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   BUCHHOLZ and FISCHER.  The risks associated with the investments were not explained to the

2   Plaintiff investors, who relied upon Defendants BUCHHOLZ, FISCHER, and SOLOMON

3   CAPITAL in making their investment decisions.  The reliance of the Plaintiff investors upon the

4   representations, information and promises by Defendants BUCHHOLZ, FISCHER, and

5   SOLOMON CAPITAL was justified based upon Defendants' fiduciary role and apparent

6   experience.

7       52.     The Plaintiff investors had no say or control over their funds, the nature or types of

8   positions in which they were placed, the expenditure of the funds for development projects, or the

9   administration of the funds.

10      53.     The Plaintiff investors had no say or control over the additional investors or

11  members that were chosen by Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL

12  as their ostensible "partners" in the Solomon Towers project.

13      54.     Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, as the

14  principals of the company, acted as the managing members for the Solomon Towers project.

15  Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, therefore, held fiduciary duty

16  obligations to the Plaintiff investors that were breached pursuant to the fraudulent Enterprise and

17  acts set forth herein.

18  **D.    Defendants' "Pump and Dump" Purchase of the Land Above Market Price to the
          Detriment of the Plaintiff Investors**

19

20      55.     Soho Lofts, LLC was owned and managed by ZELEZNAK.  On July 25, 2002,

21  Soho Lofts purchased property located at 625-643 N. 2nd Avenue, Phoenix, AZ (hereinafter

22  referred to as "the Property") from Core Builders, Inc. for $392,000.00.  According to tax records,

23  the square footage of the Property is 28,000 square feet.  Thus, the cost for this transaction was

24  $14.00 per square foot.

25      56.     On August 17, 2004, Soho Lofts, LLC changed its name to Z-LOFT, LLC.

26      57.     On April 11, 2005, Z-LOFT, in connection with GRACE CAPITAL, sold the

27  Property to SOLOMON TOWERS, LLC for $5,004,929.00.  The cost per square foot for this

28  transaction was approximately $178.75 per square foot.  Based on information and belief, the

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- 13 -

1   actual market rate for the land from February to March of 2005 was approximately $33.19 per

2   square foot.

3       58.    Based on information and belief, the Plaintiff investors allege that Defendants

4   BUCHHOLZ, FISCHER, and SOLOMON CAPITAL shared in the distribution of ill-gotten gains

5   from the "pump and dump" transaction to the detriment of the Plaintiff investors.

6       59.    As the President and Chief Financial Officers of SOLOMON CAPITAL and the

7   managing partners of Solomon Towers, LLC, Defendants BUCHHOLZ, FISCHER, and

8   SOLOMON CAPITAL held fiduciary duties to the Plaintiff investors that were breached in

9   connection with the "pump and dump" transaction to the detriment of the Plaintiff investors.

10  Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL knew, or should have known,

11  that the price paid for the land was more than five times its fair market value and nearly thirteen

12  times the cost to Z-LOFT and ZELEZNAK, that the inflated purchase price benefited Defendants

13  personally to the detriment of Plaintiff investors, and constituted a breach of Defendants'

14  fiduciary duties to the Plaintiff investors.

15      60.    Based on information and belief, Plaintiffs allege that Defendants ZELEZNAK, Z-

16  LOFT, ZPM, VENTO, and GRACE CAPITAL all profited on the over-inflated and above market

17  "pump and dump" sale to the detriment of the Plaintiff investors.  Defendants ZPM and

18  ZELEZNAK received a commission on the sale of the Property of $1,000,000.00 (one million

19  dollars.)  This commission rate is equivalent to a 20% (twenty-percent) commission, which far

20  exceeds the prevailing market rate of 5% to 6% for sales transactions involving raw land.  A true

21  and correct copy of the HUD-1 Closing Statement for the purchase and sale transaction that sets

22  forth the payment of the commission of $1,000,000.00 (one million dollars) to Defendants

23  ZELEZNAK and ZPM is attached hereto as Exhibit "D".

24      61.    The implications of this commission for the sale of the Property supports the

25  conclusion that Defendants ZPM and ZELEZNAK knowing and materially aided and assisted

26  Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT,

27  ZELEZNAK, Z-LOFT, ZPM, VENTO, and GRACE CAPITAL to perpetrate the fraudulent

28  Enterprise as discussed herein against the Plaintiffs. The implications of the over-inflated and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5092539.3/JEL                          - 14 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  above market commission for the sale of the Property from Defendants Z-LOFT, GRACE

2  CAPITAL, VENTO and ZELEZNAK to the Plaintiffs supports the conclusion that Defendants

3  BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT, ZELEZNAK, Z-

4  LOFT, ZPM, VENTO, and GRACE CAPITAL knowingly and materially aided and assisted in an

5  Enterprise to perpetrate the fraud as discussed herein against the Plaintiffs.

6      62.    Based on information and belief, Defendants VENTO and GRACE CAPITAL

7  received a commission, "kick back", or distribution of the ill gotten proceeds from the "pump and

8  dump" transaction described herein and participated in the fraudulent Enterprise described herein

9  upon the Plaintiff investors to their benefit and to the detriment of the Plaintiff investors.

10      63.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and

11  SOLOMON CAPITAL also profited from the over-inflated and above market "pump and dump"

12  sale to the detriment of the investors.  Moreover, based on information and belief, Defendants

13  BUCHHOLZ, FISCHER, and SOLOMON CAPITAL have received "developer fees" in excess

14  of $330,000 from the amount raised and invested.  Based on information and belief, Defendants

15  BUCHHOLZ, FISCHER, and SOLOMON CAPITAL were also to receive a percentage of any

16  profit earned from the investment projects.

17      64.    Based on information and belief, Defendants BUCHHOLZ, FISCHER and

18  SOLOMON CAPITAL also took undisclosed "kick backs" from third-parties in connection with

19  the purchase, sale, and alleged proposed development of the Solomon Tower investment project

20  to the detriment of the Plaintiff investors.

21      65.    Based on information and belief, on February, 1 2006, Solomon Towers, LLC

22  deeded the Property to Z-LOFT, the original seller, for de minimus consideration.  Further, on

23  September 18, 2006, Solomon Towers, LLC purchased the Property from Z-LOFT for $10.00.

24  The aforementioned acts were undertaken as further attempts to disguise the fraudulent nature of

25  the Enterprise upon the Plaintiff investors.

26  **E.    Misrepresentations and Material Omissions Regarding the Sale of the Solomon
27          Tower Securities at Issue By Defendants BUCHHOLZ, FISCHER, and SOLOMON
        CAPITAL**

28      66.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

RC1/5092539.3/JEL                                    - 15 -

1  with the presentation to the Plaintiff investors regarding the Solomon Towers project (see Exhibit

2  "A"), failed to disclose the pre-existing relationship between Defendants BUCHHOLZ,

3  FISCHER, and SOLOMON CAPITAL with Defendants ZELEZNAK and VENTO and their

4  partnership entities Z-LOFT, ZPM, and GRACE CAPITAL. The failure to disclose this fact

5  constitutes a material omission since, among other reasons, the Property was purchased by

6  Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, using the Plaintiff investors'

7  funds, from Defendants ZELEZNAK and VENTO, and/or their companies, Z-LOFT, ZPM, and

8  GRACE CAPITAL, for a vastly over-inflated price.

9       67.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

10  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

11  "A"), failed to disclose that the Property was not worth the amount that would be paid. Further,

12  Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER failed to disclose that the

13  comparable square foot value for land in the area at the time of purchase was approximately

14  $33.19 per square foot, nowhere near the $178.75 per square foot amount paid by Defendants

15  BUCHHOLZ, FISCHER, and SOLOMON CAPITAL to Defendants ZELEZNAK and VENTO,

16  and/or their companies, Z-LOFT, ZPM, and GRACE CAPITAL.

17       68.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

18  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

19  "A"), failed to disclose the an accurate purchase price per square foot of the Property. According

20  to the documentation presented to the investors, the purchase price per square foot for the

21  Property was $153.05 per square foot when, in fact, the purchase price paid was $178.75 per

22  square foot paid by Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL to

23  Defendants ZELEZNAK and VENTO, and/or their companies, Z-LOFT, ZPM, and GRACE

24  CAPITAL.

25       69.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

26  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

27  "A"), failed to disclose the fact that the real estate agent and broker for the transaction,

28  ZELEZNAK and ZPM, was also the seller of the Property. Further, Defendants SOLOMON

**COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES, FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY**

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    CAPITAL, BUCHHOLZ, and FISCHER did not disclose until just before closing the fact that

2    ZELEZNAK received a $1,000,000.00 commission for his role as the seller's agent for the

3    transaction. (See Exhibit "D") This commission rate is equivalent to a 20% (twenty-percent)

4    commission, which far exceeds the prevailing market rate of 5% to 6% for sales transactions

5    involving raw land.  Based on information and belief, ZELEZNAK and ZPM acted in a dual

6    agency role in connection with the purchase and sale of the Property.  Defendants ZELEZNAK

7    and ZPM's dual agency was similarly not disclosed by Defendants SOLOMON CAPITAL,

8    BUCHHOLZ, and FISCHER to the Plaintiff investors.

9        70.    Based on information and belief, Defendants SOLOMON CAPITAL,

10    BUCHHOLZ, and FISCHER, in connection with the presentation to the Plaintiff investors

11    regarding the Solomon Towers project (See Exhibit "A"), failed to disclose that ZELEZNAK and

12    VENTO, and/or their related companies Z-LOFT, ZPM, and GRACE CAPITAL, would receive a

13    distribution of the purchase and sale proceeds from the transaction.  Defendants further failed to

14    disclose:  (1) the pre-existing relationship between Defendants BUCHHOLZ, FISCHER, and

15    SOLOMON CAPITAL and Defendants VENTO and ZELEZNAK; or (2) that VENTO and

16    ZELEZNAK were involved in the GRACE CAPITAL partnership with the real estate agent for

17    the transaction, ZELEZNAK, who was also the seller of the Property.  Based on information and

18    belief, Defendant VENTO and ZELEZNAK received a distribution from the purchase and sale

19    proceeds from the transaction at issue for the Property.  Defendants ZELEZNAK and VENTO,

20    and/or their related companies Z-LOFT, ZPM, and GRACE CAPITAL materially aided

21    SOLOMON CAPITAL, BUCHHOLZ, and FISCHER within the meaning of California

22    Corporations Code Sections 25503, 25102(f), and 25110 and are, therefore, jointly and severally

23    liable to Plaintiffs pursuant to California Corporations Code Sections 25501, 25401, and 25504.

24        71.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

25    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

26    "A"), failed to disclose that the Plaintiff investors may be subject to supplemental capital

27    obligations in the future.  To the contrary, Plaintiff investors were told that they had no obligation

28    beyond their initial investment.  The Pro Forma Finance & Investment Analysis: 10 Stories

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   (Exhibit "A") states: "Required Equity: $5,000,000." The Plaintiff investors were informed by

2   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, both verbally and in writing,

3   that no further capital contribution would be "required" of them.  At the time that Defendants

4   BUCHHOLZ, FISCHER, and SOLOMON CAPITAL solicited and received the investments,

5   however, Defendants were aware of the fact that the project was severely undercapitalized, in part

6   due to the diversion of Plaintiffs' investments to the purchase of the raw land at a grossly inflated

7   price that far exceeded its fair market value.  Defendants failed to disclose that information to

8   Plaintiff investors.

9           72.     Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

10  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

11  "A"), misrepresented the actual size of the Property to the Plaintiff investors by a material

12  amount.  Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER represented that the

13  parcel size for the Property was ¾ of an acre, approximately 32,670 square feet.  The tax records

14  for the Property, however, clearly show that the Property is approximately 28,000 square feet,

15  over 4,000 square feet smaller than SOLOMON CAPITAL represented to the Plaintiff investors.

16          73.     Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

17  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

18  "A"), materially misrepresented the actual return or "profit" to the Plaintiff investors.  The Pro

19  Forma Finance & Investment Analysis: 10 Stories (Exhibit "A") states: "Investor Profit: 50%."

20  To date the Plaintiff investors have received no return on investment from the Solomon Towers

21  project.  To the contrary, the Plaintiff investors have been requested to make further capital call

22  contributions to the project.  Further, according to pro forma financials disseminated by

23  Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER on Friday, February 29, 2008,

24  the Solomon Towers project is in severe financial distress and overleveraged in amount in excess

25  of $2,400,000.  (Exhibit "E")

26          74.     Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

27  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

28  "A"), misrepresented the zoning for the project.  The Sales Pro Forma document for the Power

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL                                    - 18 -

1    Point presentation states that the project would be for 15 stories. Based on information and

2    belief, however, the land, at the time of purchase and sale, was only zoned for 10 stories.

3            75.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

4    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

5    "A"), misrepresented the timeline for completion of the project and return of investment capital

6    and profits to the Plaintiff investors. According to the presentation to the investors in February of

7    2005, the project would require: (1) 60 days to acquire the land, (2) 9-12 months to explore

8    project definition, and (3) 2 years for build out and marketing. Thus, according to Defendants

9    SOLOMON CAPITAL, BUCHHOLZ, and FISCHER's representations to the Plaintiff investors,

10   the Solomon Towers project would be complete and in the sales phase within 3 years and 2

11   months, or April of 2008. To date, however, construction has not begun on the project and the

12   project is in severe financial distress due to the fraudulent activities and incompetence of

13   Defendants.

14           76.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER misrepresented

15   to the Plaintiff investors that they were buying into a viable investment opportunity for a high rise

16   condominium project. The reality, however, was that Defendants BUCHHOLZ, FISCHER,

17   SOLOMON CAPITAL, RDB DEVELOPMENT, ZELEZNAK, Z-LOFT, ZPM, VENTO, and

18   GRACE CAPITAL, through the investment scheme and Enterprise, had already extracted any

19   potential profits from the potential investment for themselves through the fraudulent Enterprise.

20   The plaintiff investors were then left with a project that was not viable since it was "under water,"

21   meaning that the debt on the project so far outweighed its value that the development was not

22   financially viable.

23   **F.    Defendants' Enterprise and Distribution of Ill-Gotten Gains**

24           77.    Based on information and belief, Defendants BUCHHOLZ, FISCHER,

25   SOLOMON CAPITAL, Z-LOFT, GRACE CAPITAL, ZELEZNAK and VENTO operated an

26   investment Enterprise designed to take unfair advantage of Plaintiff investors and other investors

27   in additional investment scams.

28           78.    Based on information and belief, the Enterprise was designed in a form or fashion

RC1/5092539.3/JEL                            - 19 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    in which Defendants Z-LOFT, GRACE CAPITAL, ZELEZNAK, and VENTO would purchase

2    property in less desirable areas for market rate, and then sell the property to SOLOMON

3    CAPITAL and its Plaintiff investor groups for significantly more than the market rate.

4    Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT, GRACE CAPITAL,

5    ZPM, ZELEZNAK, and VENTO would then benefit from the distribution of ill gotten gains to

6    the detriment of the Plaintiff investors. Defendants SOLOMON CAPITAL, BUCHHOLZ,

7    FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK, and VENTO would profit on the

8    "pump and dump" Enterprise through a "wash sale" of the land to the unsophisticated Plaintiff

9    investors and distribute the ill-gotten gains amongst the Defendants.

10        79.    Based on information and belief, Defendants KELLER WILLIAMS and

11    ZELEZNAK acted as the responsible broker and agent for the transaction at issue for the

12    Solomon Towers, LLC investment project as well as other fraudulent investment Enterprises

13    orchestrated by Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB

14    DEVELOPMENT, Z-LOFT, GRACE CAPITAL, ZELEZNAK and VENTO upon unknowing

15    and unsophisticated Plaintiff investors.

16        80.    Based on information and belief, Defendants BUCHHOLZ, FISCHER,

17    SOLOMON CAPITAL misrepresented to the Plaintiff investors that  they were buying into a

18    viable investment opportunity for a high rise condominium project.  The reality, however, was the

19    that Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT, Z-

20    LOFT, GRACE CAPITAL, ZELEZNAK and VENTO through the investment scheme and

21    Enterprise, had already extracted any potential profits from the potential investment for

22    themselves through the fraudulent Enterprise.  The plaintiff investors were then left with a project

23    that was not viable since it was "under water," meaning that the debt on the project so far

24    outweighed the value that development prospects were no longer possible absent an extreme pro

25    forma or forecasted loss.

26    **G.**    **Police Raid the Office of SOLOMON CAPITAL to Investigate Allegations of**
                **Defendants' "Pump and Dump" Sales and Fraudulent Investment Schemes**

27

28        81.    Based on information and belief, in or around July of 2007, the offices of

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL

- 20 -

1    Defendants SOLOMON CAPITAL, BUCHHOLZ and FISCHER were raided by both state and

2    federal authorities in connection with a warrant to investigate allegations of defendants' "pump

3    and dump" sales and fraudulent investment schemes.  The Plaintiffs' first notice of the alleged

4    fraudulent activities being conducted by the Defendants was received subsequent to the raid upon

5    SOLOMON CAPITAL by the state and federal authorities.  The Plaintiffs received a letter from

6    the Office of the District Attorney postdated July 31, 2007 requesting their voluntary responses to

7    a questionnaire about SOLOMON CAPITAL, and Equity Enterprises, Inc.  The letter from

8    Deputy District Attorney Michael Fitzsimmons is dated July 25, 2007.  The receipt of the District

9    Attorney's correspondence was Plaintiffs' first notice that the aforementioned businesses were

10   under investigation for potential allegations of fraud.

11        82.    Based on information and belief, Defendants activities are presently under

12   investigation by the state and federal authorities in connection with Defendants' activities and the

13   Enterprise as defined and set forth herein.  Based on information and belief, the pending

14   indictment has not been dismissed.

15        83.    Based on information and belief, the state and federal authorities seized the

16   contents of the offices of Defendants SOLOMON CAPITAL, BUCHHOLZ and FISCHER in

17   connection with the state and federal investigation and the pending indictment.

18                                    **V.**

19        **COUNT 1:  VIOLATION OF SECTION 1962(A) OF THE RACKETEERING**
          **INFLUENCED AND CORRUPT ORGANIZATION ACT OF 1970 ("RICO")**
20
          **(Against Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB**
21   **DEVELOPMENT, ZELEZNAK, Z-LOFT, ZPM, VENTO, GRACE CAPITAL, and DOES**
                                   **1-50)**
22
          84.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 83,
23
     inclusive, as though set forth fully herein.
24
          85.    Defendants, and each of them, are RICO "persons," as that term is defined in 18
25
     U.S.C. § 1961(3).
26
          86.    For purposes of this claim for relief, the RICO "Enterprise" is an ongoing and
27
     continuing association-in-fact formed for the common shared purpose of defrauding investors of
28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  real estate investment funds, including but not limited to, Plaintiffs, without the consent or

2  approval of the investors, and collecting profits from these illegal activities. Plaintiffs are

3  informed and believe that Defendants, and each of them, participated in the management or

4  direction of the Enterprise.

5       87.    Based on information and belief, the specific internal corporate mechanisms and

6  operations by which Defendants carried out their fraudulent scheme, and the specific activities

7  engaged in by Defendants in furtherance of their fraudulent scheme, are within the exclusive

8  knowledge of Defendants, and DOES 1-50. To date, given the far-reaching, complex, and

9  clandestine nature of Defendants' fraudulent scheme, Plaintiffs have only been able to gather

10  limited information regarding some aspects of the fraudulent scheme.

11       88.    Based on information and belief, and at all relevant times, Defendants, and each of

12  them, violated RICO when they conducted or participated in affairs of the Enterprise through a

13  pattern of racketeering activity, by fraudulently or negligently disclosing or failing to disclose

14  material facts to investors and engaging in fraudulent land sales and transfers that involve use of

15  investor funds for purchase of land at highly inflated and above-market prices. Plaintiffs received

16  their own ill-gotten gains via the use of the U.S. mail and wires from the sale of the land

17  described herein for over-inflated values.

18       89.    Defendants and DOES 1-50, have joined together with a common, shared purpose,

19  or community of interest, with an ongoing organization structure continuing throughout the

20  period of the time alleged herein, to collectively form an Enterprise, within the meaning of 18

21  U.S.C. § 1961(4).

22       90.    Defendants and DOES 1-50 have participated in the affairs of the Enterprise, and

23  are all involved in the conduct of the Enterprise.

24       91.    Defendants and DOES 1-50 have used or caused to be used the mails and wires

25  and intrastate commerce in furtherance of their scheme and artifice to defraud purported

26  investors, including but not limited to Plaintiffs, by inducing them to place investments with that

27  were then used to purchase land at over-inflated and above-market values to allow for the

28  distribution of ill-gotten gains to Defendants herein. The acts described herein were without the

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL

- 22 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Plaintiff investors' consent and were derived by means of false and fraudulent pretenses, or

2    representations, in violation of 18 U.S.C. §§ 1341 and 1343. Defendants herein used negotiable

3    instruments, mails, and wires in furtherance of their fraudulent scheme.

4        92.    Defendants and DOES 1-50 were fully aware, or should have been aware, that the

5    investors had not consented to the distribution of ill-gotten gains to Defendants herein arising

6    from the purchase and sale of land and property for over-inflated and above-market rates for the

7    benefit of Defendants herein. Defendants herein continue their participation in the fraudulent

8    scheme with this knowledge.

9        93.    The acts of Defendants and DOES 1-50 in defrauding Plaintiffs have been ongoing

10   since at least February 2005 and continue to date.

11       94.    Defendants and DOES 1-50 defrauded Plaintiffs by luring them to place

12   investments in various real estate companies owned or operated by the Defendants, and used

13   these investments to purchase land and/or property for over-inflated and above-market values

14   while Defendants simultaneously defrauded Plaintiffs by benefiting from the over-inflated and

15   above-market land sales. The specifics of the transactions at issue were never disclosed to

16   Plaintiffs, and Plaintiffs had no knowledge of the same.

17       95.    On information and belief, there is evidence establishing a sophisticated pattern of

18   fraud perpetrated by the Defendants in which the Defendants herein baited Plaintiffs (and on

19   information and belief, over 250 additional potential investors) with the prospect of high

20   investment returns, and then failed to deliver the promised returns, instead using fraudulent land

21   transfers to derive ill-gotten gains from Plaintiffs' investments without their authority,

22   knowledge, or consent, thereby leaving Plaintiffs and other purported investors without the

23   promised returns or land values to cover their investments.

24       96.    The fraud perpetrated by Defendants and DOES 1-50 utilizing the tactics described

25   herein, in connection with their multiple dealings with Plaintiffs over the span of three to four

26   years and their active concealment of their activities was furthered by Defendants' and DOES 1-

27   50's use of the mails and wires, constitutes a pattern of racketeering activity within the meaning

28   of U.S.C. § 1961(5).

RC1/5092539.3/JEL

- 23 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    97.    The Enterprise alleged herein was, at all times mentioned herein, engaged in

2    activities which affect intrastate commerce.

3    98.    Defendants and DOES 1-50 have received income derived from their participation

4    in the pattern of racketeering activities alleged herein.  That income consisted of the activities

5    derived by the Defendants over-inflated and above-market property transfers wherein Defendants

6    would defraud the Plaintiff investors of their investments.  On information and belief, Defendants

7    obtained income from other putative investors consisting of over $1,000,000.00 of investment

8    capital.

9    99.    Based on information and belief, this income, which Defendants herein have

10    received from their participation and racketeering activities, and the participation in the

11    Enterprise, has been used or invested in the operations of the Enterprise.

12    100.    On information and belief, Defendants used the proceeds from their racketeering

13    activity to further fund and operate Enterprises under Defendants' name.  The Enterprises were

14    entitled, but not limited to, SOLOMON CAPITAL, Z-LOFT, ZPM, GRACE CAPITAL, and

15    RDB DEVELOPMENT.  These entities were used to further operate "bait and switch" operations

16    of Defendants' racketeering activity.

17    101.    Defendants' use of an investment of such income is a cause of Plaintiffs' injuries,

18    and Plaintiffs were injured by reason of Defendants' use of an investment of, such income arising

19    from Defendants' wrongful acts of defrauding Plaintiffs through the purchase and sale of property

20    at over-inflated and above-market rates.

21    102.    As a result of the alleged acts and activities of Defendants and DOES 1-50,

22    Plaintiffs have been injured in their business and property.  Plaintiffs have incurred and continue

23    to incur legal fees and costs for the prosecution of the instant matter in an attempt to recoup their

24    investment capital.  These amounts include interest and costs to recover Plaintiffs' losses and any

25    potential judgments against Defendants in the pending lawsuit.

26    103.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their

27    actual damages, plus attorneys' fees and costs.

28    ///

## VI.

## COUNT 2:  VIOLATION OF SECTION 1962(C) OF THE RICO ACT

### (Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, RDB DEVELOPMENT and DOES 1-50)

104.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 103, inclusive, as though fully set forth herein.

105.    Defendants and DOES 1-50 were and are employed by, or associated with the Enterprise.  Furthermore, Defendants have participated in the conduct of the affairs of the Enterprise.

106.    Defendants and DOES 1-50 have participated in the conduct of the affairs of the Enterprise by leading, running, managing, and/or directing the affairs of the Enterprise by initiating and formulating the process by which Defendants herein would bait Plaintiffs and other potential investors by offering them investments in which Plaintiffs were informed that they would receive a rate of return on the investments that were later subject to fraud by Defendants' over-inflated and above-market property transactions and sales that were operated to defraud Plaintiffs of their investment and provide Defendants with ill-gotten gains from the property transfers and/or sale.  Defendants knew, or should have known, that their representations to Plaintiffs in that regard were false and fraudulent.

107.    Defendants and DOES 1-50 have participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  On information and belief, there is evidence indicating a sophisticated pattern of fraud by Defendants in which the Defendants induced the Plaintiff investors to invest with SOLOMON CAPITAL, who in turn purchased land and/or property from Defendants for over-inflated and above-market prices in order to allow for Defendants to share in the profits from the sales and to garner ill-gotten gains from Plaintiffs' investments through the perpetration of fraud.

108.    As a result of the alleged acts and activities of Defendants and DOES 1-50, Plaintiffs have been injured in their business and property.  Plaintiffs have been defrauded of their investment capital.  Further, Plaintiffs have incurred and continue to incur legal fees and costs for

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL

- 25 -

1    the prosecution of this matter.

2        109.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their

3    actual damages plus attorneys' fees and costs.

4                                                **VII.**

5            **COUNT 3:  VIOLATION OF SECTION 1962(D) OF THE RICO ACT**

6        **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT,**
     **GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, RDB DEVELOPMENT, KELLER**
7                        **WILLIAMS, and DOES 1-50)**

8        110.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 109,

9    inclusive, as though fully set forth herein.

10        111.    Defendants and DOES 1-50 have conspired between themselves to use or invest

11   the proceeds from their activities to either acquire an interest in, or establish, or operate an

12   Enterprise, the activities of which affect interests of intrastate commerce.

13        112.    Defendants and DOES 1-50 participated in the conduct of the affairs of the

14   Enterprise by leading, running, managing, and/or directing the affairs of the Enterprise by

15   initiating and/or formulating the process by which Defendants would bait Plaintiffs and other

16   purported investors by offering them investments with a proffered rate of return.  On information

17   and belief, Defendants would then engage in the purchase and/or sale of land for over-inflated or

18   above-market rates in order to defraud the investors of their investment capital to Defendants'

19   benefit.  Defendants knew that their representations and/or misrepresentations in that regard were

20   false and fraudulent.

21        113.    The conduct of Defendants outlined above further evidences and satisfies the

22   Enterprise prong of 18 U.S.C. § 1962(a) of a RICO cause of action.  The proceeds from this

23   activity were then used to further the same racketeering activities and establish and operate

24   further racketeering activities of the Enterprise under 18 U.S.C. § 1962(a) of a RICO cause of

25   action.

26        114.    Plaintiffs are informed and believe, and on that basis allege, that Plaintiffs agreed

27   to invest, and did invest, investments with Defendants based upon Defendants' representations

28   and misrepresentations that they were paying fair market value for the land to be purchased by

RC1/5092539.3/JEL                           - 26 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  Defendants and that Plaintiffs would receive a rate of return on their investments.  Plaintiffs were

2  lured into transactions believing that Defendants were paying fair market value for the land

3  subject to the investment when Defendants had, in fact, agreed and engineered an Enterprise to

4  purchase the land at highly inflated or above-market rates in order to defraud the investors and

5  garner ill-gotten gains for the Defendants' benefit.  The proceeds from this wrongful activity were

6  then used by Defendants to further the same racketeering activity evidenced herein.  The use of

7  proceeds from earlier racketeering activity to further establish and operate Defendants' ongoing

8  racketeering activities satisfies the requirements of an Enterprise under 18 U.S.C. § 1962(a).

9      115.    As a result of the alleged acts and activities of Defendants and DOES 1-50,

10  Plaintiffs have been injured in their business and property.  Plaintiffs have incurred and continue

11  to incur legal fees and costs for the prosecution of this matter.

12      116.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their

13  actual damages, plus attorneys' fees and costs.

14                                    **VIII.**

15  **COUNT 4:  VIOLATION OF SECTION 10B AND RULE 10B-5 OF THE 1934 ACT**

16  **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT,**
    **GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, RDB DEVELOPMENT, KELLER**
17  **WILLIAMS, and DOES 1-50)**

18      117.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 116,

19  inclusive, as though fully set forth herein.

20      118.    Defendants engaged in a scheme to secure money from investors and purchase

21  land at highly inflated or above-market rates and disseminated or approved the false statements

22  specified above, which they knew or recklessly disregarded were misleading in that they

23  contained misrepresentations and failed to disclose material facts necessary in order to make the

24  statements made, in light of the circumstances under which they were made, not misleading.

25      119.    Defendants violated §10(b) and Rule 10b-5 of the 1934 Act in that they:

26      (a)    Employed devices, schemes and artifices to defraud Plaintiffs;

27  ///

28  ///

RC1/5092539.3/JEL                           - 27 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1        (b)    Made untrue statements of material facts or omitted to state material facts

2    necessary in order to make the statements made, in light of the circumstances under which they

3    were made, not misleading; or

4        (c)    Engaged in acts, practices and a course of business that operated as a fraud or

5    deceit upon Plaintiffs with Defendants' purchases of land at highly inflated or above-market rates

6    using investor funds.

7        120.    Plaintiffs have suffered damages in that, in reliance on Defendants'

8    representations, their investments were used to pay an artificially inflated or above-market price

9    for the Solomon Towers Property. Plaintiffs would not have invested in the Property at the rate

10    presented, or at all, if they had been aware that the purchase price for the land had been

11    artificially and falsely inflated as part of Defendants' scheme.

12        121.    As a direct and proximate result of Defendants' violation of §10(b) and Rule 10b-5

13    of the 1934 Act, Plaintiffs have been injured in their business and property. Portions of Plaintiffs'

14    investments have been transferred to the Defendants or third parties in the form of wrongfully

15    earned sales prices for land purchased at over inflated or above-market values, commissions on

16    the land sales, closing fees and costs, and development costs on over-encumbered land. Plaintiffs

17    have incurred and continue to incur legal fees and costs to recover such losses and any potential

18    judgments against Defendants in the pending lawsuits.

19    ## IX.

20    ## COUNT 5: VIOLATION OF SECTION 12(A) OF THE 1933 ACT

21    **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELENAK, VENTO, RDB DEVELOPMENT, KELLER WILLIAMS, and DOES 1-50)**

22

23        122.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 121

24    inclusive, as though set forth fully herein.

25        123.    Defendants violated 15 U.S.C. § 77l in that they:

26        (a)    Offered to sell a security by oral communication; and,

27        (b)    Made untrue statements of material facts and omitted to state material facts

28    necessary in order to make the statements made, in light of the circumstances under which they

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  were made, not misleading.

2      124.    Plaintiffs suffered damages in that, in reliance on the statements of Defendants,

3  Plaintiffs' investment funds were used to pay a highly inflated or above-market price for the

4  Property.  Plaintiffs would not have invested in the Property at the rate presented, or at all, if they

5  had been aware that the purchase price for the land had been artificially and falsely inflated as

6  part of Defendants' scheme.

7      125.    As a direct and proximate result of Defendants' violation of §12(a) of the 1933

8  Act, Plaintiffs have been injured in their business and property.  Portions of Plaintiffs'

9  investments have been transferred to the Defendants or third parties in the form of wrongfully

10  earned sales prices for land purchased at over inflated or above-market values, commissions on

11  the land sales, closing fees and costs, and development costs on over-encumbered land.  Plaintiffs

12  have incurred and continue to incur legal fees and costs to recover such losses and any potential

13  judgments against Defendants in the pending lawsuits.  As a direct and proximate result of

14  Defendants' wrongful conduct, Plaintiffs are entitled to restitution of all monies invested with

15  Solomon Capital, with interest thereon.

16                                         **X.**

17  **COUNT 6:  VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE
    SECTION 17200, ET SEQ.**

18
    **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT,
19  GRACE CAPITAL, ZPM, ZELENAK, VENTO, RDB DEVELOPMENT, KELLER
    WILLIAMS, and DOES 1-50)**

20

21      126.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 125

22  inclusive, as though set forth fully herein.

23      127.    The acts, omissions, misrepresentations, practices, and non-disclosures of

24  Defendants and DOES 1-50 as alleged herein constituted unlawful, unfair, and fraudulent

25  business acts and practices within the meaning of California Business and Professions Code §

26  17200, et seq.

27      128.    Plaintiffs agreed to invest, and in fact did invest with Defendants based upon

28  Defendants' representations and misrepresentations that they were paying fair market value for

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    the land to be purchased by Defendants and that Plaintiffs would receive a rate of return on their

2    investments. Plaintiffs were lured into transactions believing that Defendants were paying fair

3    market value for the land subject to the investment when Defendants had, in fact, agreed and

4    engineered to purchase the land at highly inflated or above-market rates in order to defraud the

5    investors and garner ill-gotten gains for the Defendants' benefit. The proceeds from this

6    wrongful activity were then used by Defendants to continue to perpetrate the fraud upon other

7    investors. Defendants' deception constitutes a fraudulent business practice under the California

8    Unfair Competition Law in that Defendants failed to disclose these fraudulent practices to

9    investors prior to investment.

10        129.    As a result of the foregoing, pursuant to California Business & Professions Code

11   §17203, Plaintiffs seek an Order of this Court requiring Defendants to immediately cease such

12   acts of unfair competition and enjoining Defendants from continuing to take investments from

13   investors. Plaintiffs additionally request an Order of this Court requiring the payment or return of

14   any monies wrongfully acquired, saved, or retained by Defendants by means of such acts of

15   unfair competition so as to restore to Plaintiffs any and all monies which were acquired and

16   obtained by means of such acts of unfair competition and/or as may be necessary to prevent the

17   use or employment of any practices which constitutes unfair competition, as well as imposing an

18   asset freeze or a constructive trust over such monies.

19        130.    Therefore, Plaintiffs seek an Order of this Court for all appropriate available

20   remedies under California Business & Professions Code §17203.

21                                    **XI.**

22                  **COUNT 7:  BREACH OF FIDUCIARY DUTY**

23   **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER and DOES 1-50)**

24        131.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 130

25   inclusive, as though set forth fully herein.

26        132.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER had a special

27   relationship with Plaintiffs, in that Defendants assumed a fiduciary position in relation to the

28   investors as investment advisers, trustees of the accounts, and managing partners of projects,

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL                        - 30 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    ventures, and the limited liability company. As such, Defendants were fiduciaries as to Plaintiffs.

2    Defendants breached their fiduciary duty to Plaintiffs by failing to make full disclosure of all

3    material facts concerning the transactions that might have affected Plaintiffs' investment

4    decisions. The Plaintiffs' losses were caused by and have resulted directly from the action,

5    misrepresentations, and omissions of Defendants.

6        133.    As fiduciaries, Defendants owed a duty of utmost care, integrity, honesty and

7    loyalty toward Plaintiffs. Defendants breached their fiduciary duty to Plaintiffs by, among other

8    things, misrepresenting that Defendants were paying fair market value for the land to be

9    purchased by Defendants and that Plaintiffs would receive a rate of return on their investments.

10    Plaintiffs were lured into transactions believing that Defendants were paying fair market value for

11    the land subject to the investment when Defendants had, in fact, agreed and engineered to

12    purchase the land at highly inflated or above-market rates in order to defraud the investors and

13    garner ill-gotten gains for the Defendants' benefit. The proceeds from this wrongful activity were

14    then used by Defendants to continue to perpetrate the fraud upon other investors.

15        134.    As a direct and proximate result of the breach of fiduciary duty by Defendants,

16    Plaintiffs have been injured in their business and property. Portions of Plaintiffs' investments

17    have been transferred to the Defendants or third parties in the form of wrongfully earned sales

18    prices for land purchased at over inflated or above-market values, commissions on the land sales,

19    closing fees and costs, and development costs on over-encumbered land. Plaintiffs have incurred

20    and continue to incur legal fees and costs to recover such losses and any potential judgments

21    against Defendants in the pending lawsuits.

22        135.    The Defendants' conduct as described above, involved malice, oppression and

23    fraud, and such conduct was clearly despicable. Such despicable and fraudulent conduct was

24    plainly conducted by the officers, directors, and/or managing agents of these Defendants and was

25    ratified by them, and by the Defendant corporation, SOLOMON CAPITAL. Accordingly, the

26    Court should assess punitive damages against these Defendants.

27    / / /

28    / / /

COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES,
FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY

## XII.

## COUNT 8: BREACH OF CONTRACT

### (Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER and DOES 1-50)

136.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 135 inclusive, as though set forth fully herein.

137.    In or about March 2005, Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER entered into an Operating Agreement with Plaintiffs.  A true and correct copy of the Operating Agreement is attached hereto as Exhibit "C" to the Complaint.

138.    As part of this Operating Agreement, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, as managers of Solomon Towers, LLC, agreed, among other things, to use company funds only to further the purposes of the company (Section 3.3), not to commingle the funds with their own or others' funds (Sections 3.3, 4.6, and 9.2), not to knowingly perform any act that contravened the Operating Agreement or was inconsistent with the purposes of the company (Section 4.6), and to keep accurate books and records for the company (Section 9.1).

139.    Defendants breached this Operating Agreement with Plaintiffs by, among other things, commingling the company's funds with their own, and using the funds for things other than those in furtherance of the purposes of the company, such as a one million dollar commission payment to Defendants' real estate broker, Defendant ZELEZNAK (who was also the owner of the land being purchased).  In addition, Defendants concealed this commingling and misuse of investor funds by keeping inaccurate or incomplete financial books and records.  As a result, Plaintiffs were lured into transactions believing that Defendants were paying fair market value for the land subject to the investment when Defendants had, in fact, agreed and engineered to purchase the land at highly inflated or above-market rates in order to defraud the investors and garner ill-gotten gains for the Defendants' benefit.  The proceeds from this wrongful activity were then used by Defendants to continue to perpetrate the fraud upon other investors.

140.    As a direct and proximate result of the breach of the Operating Agreement by Defendants, Plaintiffs have been injured in their business and property.  Portions of Plaintiffs' investments have been transferred to the Defendants or third parties in the form of wrongfully

RC1/5092539.3/JEL

- 32 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    earned sales prices for land purchased at over inflated or above-market values, commissions on

2    the land sales, closing fees and costs, and development costs on over-encumbered land. Plaintiffs

3    have incurred and continue to incur legal fees and costs to recover such losses and any potential

4    judgments against Defendants in the pending lawsuits.

5        141.   The Defendants' conduct as described above, involved malice, oppression and

6    fraud, and such conduct was clearly despicable. Such despicable and fraudulent conduct was

7    plainly conducted by the officers, directors, and/or managing agents of these Defendants and was

8    ratified by them, and by the Defendant corporation, SOLOMON CAPITAL. Accordingly, the

9    Court should assess punitive damages against these Defendants.

## XIII.

## COUNT 9: NEGLIGENT MISREPRESENTATION

**(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, and DOES 1-50)**

13       142.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 141,

14   inclusive, as though set forth fully herein.

15       143.   Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER and through their

16   agents, officers, directors, and employees, represented and promised Plaintiffs that Defendants

17   were paying fair market value for the land to be purchased by Defendants and that Plaintiffs

18   would receive a rate of return on their investments. Plaintiffs were lured into transactions

19   believing that Defendants were paying fair market value for the land subject to the investment

20   when Defendants had, in fact, agreed and engineered to purchase the land at highly inflated or

21   above-market rates in order to defraud the investors and garner ill-gotten gains for the

22   Defendants' benefit. The proceeds from this wrongful activity were then used by Defendants to

23   continue to perpetrate the fraud upon other investors.

24       144.   Defendants made these misrepresentations to induce Plaintiffs into purchasing the

25   subject investments and securities from the company Defendants.

26       145.   At the time the Defendants made these written and oral misrepresentations,

27   Defendants knew or should have known that they were not true. Defendants knew or should have

28   known that they could not fulfill these promises.

RC1/5092539.3/JEL

- 33 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

146.    Plaintiffs relied upon these written and oral statements in purchasing the investments and securities, without any knowledge Defendants had, in fact, agreed and engineered to purchase the land at highly inflated or above-market rates in order to defraud the investors and garner ill-gotten gains for the Defendants' benefit.  Had Plaintiffs known the truth, Plaintiffs would never have purchased the investments and securities from Defendants.

147.    As a direct and proximate result of the breach of fiduciary duty by Defendants, Plaintiffs have been injured in their business and property.  Portions of Plaintiffs' investments have been transferred to the Defendants or third parties in the form of wrongfully earned sales prices for land purchased at over inflated or above-market values, commissions on the land sales, closing fees and costs, development costs on over-encumbered land.  Plaintiffs have incurred and continue to incur legal fees and costs to recover such losses and any potential judgments against Defendants in the pending lawsuits.

148.    The Defendants' conduct as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the officers, directors, and/or managing agents of these Defendants and was ratified by them, and by the Defendant corporation, SOLOMON CAPITAL.  Accordingly, the Court should assess punitive damages against these Defendants.

## XIV.

## COUNT 10:  INTENTIONAL MISREPRESENTATION

**(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, and DOES 1-50)**

149.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 148, inclusive, as though fully set forth herein.

150.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, through their agents, officers, directors, and employees, represented and promised Plaintiffs that Defendants were paying fair market value for the land to be purchased by Defendants and that Plaintiffs would receive a rate of return on their investments.  Plaintiffs were lured into transactions believing that Defendants were paying fair market value for the land subject to the investment when Defendants had, in fact, agreed and engineered to purchase the land at highly inflated or

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  above-market rates in order to defraud the investors and garner ill-gotten gains for the

2  Defendants' benefit. The proceeds from this wrongful activity were then used by Defendants to

3  continue to perpetrate the fraud upon other investors.

4      151.  At the time that the Defendants made these written and oral representations to

5  Plaintiffs, they knew that they were not true. Defendants in fact had no intention of fulfilling

6  these promises and instead used this deception to trick Plaintiffs into purchasing investments and

7  securities when Defendants had no intention of purchasing land at fair market value for the

8  benefit of the Plaintiff investor. Instead, Defendants intended to and did purchase overly inflated

9  land at above market rates, in order to defraud the investors and garner ill-gotten gains for the

10  Defendants' benefit. Certain proceeds from this wrongful activity were then used by Defendants

11  to continue to perpetrate the fraud upon other investors.

12      152.  Plaintiffs relied upon these written and oral statements in purchasing the

13  investments and securities, without any knowledge that Defendants intended to and did purchase

14  overly inflated land at above market rates, in order to defraud the investors and garner ill-gotten

15  gains for the Defendants' benefit. Had Plaintiffs known the truth, Plaintiffs would never have

16  purchased the investments and securities for any purpose whatsoever.

17      153.  As a direct and proximate result of the breach of fiduciary duty by Defendants,

18  Plaintiffs have been injured in their business and property. Portions of Plaintiffs' investments

19  have been transferred to the Defendants or third parties in the form of wrongfully earned sales

20  prices for land purchased at over inflated or above-market values, commissions on the land sales,

21  closing fees and costs, development costs on over-encumbered land. Plaintiffs have incurred and

22  continue to incur legal fees and costs to recover such losses and any potential judgments against

23  Defendants in the pending lawsuits.

24      154.  The Defendants' conduct as described above, involved malice, oppression and

25  fraud, and such conduct was clearly despicable. Such despicable and fraudulent conduct was

26  plainly conducted by the officers, directors, and/or managing agents of these Defendants and was

27  ratified by them, and by the Defendant corporation, SOLOMON CAPITAL. Accordingly, the

28  Court should assess punitive damages against these Defendants.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

## XV.

### COUNT 11: CONSPIRACY

**(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, RDB DEVELOPMENT, KELLER WILLIAMS, and DOES 1-50)**

155.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 154 inclusive, as though set forth fully herein.

156.    On information and belief, at least as early as February 2005, and perhaps earlier, Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to sell real property to the Plaintiff investors for prices significantly over market value while promising fair returns on the investment, then to collect profits from the investments, leaving the properties severely undercapitalized, and leaving the investors with no return on their investment.

157.    Defendants' "Ponzi scheme" involved the "operators," SOLOMON CAPITAL, RONALD BUCHHOLZ, and CHARICE FISCHER that raised the investment capital, the "speculators," DONALD ZELEZNAK, Z-LOFT, LLC, JONATHON VENTO, and GRACE CAPITAL, that purchased the land in advance in preparation for later sale to the investors at a highly inflated price, and the "agent and broker" DONALD ZELEZNAK, KELLER WILLIAMS dba ZELEZNAK PROPERTY MANAGEMENT ("ZPM"), and KELLER WILLIAMS REALTY, INC. ("KELLER WILLIAMS"), that facilitated the transactions and received, in some instances, 20% (twenty percent) commission rates. The proceeds from this fraudulent Enterprise were then used by Defendants to perpetrate a fraud upon other investors.

158.    Defendants SOLOMON CAPITAL, RONALD BUCHHOLZ, and CHARICE FISCHER did the acts and things alleged herein pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

159.    Defendants DONALD ZELEZNAK, Z-LOFT, ZPM, LLC, JONATHON VENTO, and GRACE CAPITAL, LLC dba GRACE COMMUNITIES furthered the conspiracy by purchasing the Property in advance and offering it for investment.

160.    Defendants DONALD ZELEZNAK, ZPM, and KELLER WILLIAMS furthered the conspiracy by acting as the agent and broker in the transaction.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

**COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES, FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY**

161.    Plaintiffs are informed and believe and thereon allege that the last overt act in pursuance of the above-described conspiracy occurred in or about June of 2006, when the Defendants sought additional capital from Plaintiffs for the Property.

162.    Plaintiffs did not have knowledge of the above-described conspiracy at the time it was taking place. Plaintiffs could not have discovered the above-described conspiracy in the exercise of reasonable diligence because Plaintiffs were not sophisticated investors, because Plaintiffs relied on Defendants upholding their fiduciary duty to Plaintiffs, and because Defendants concealed their activities between several parties and fictional entities. Plaintiffs actually discovered the above-described conspiracy in or about July 2007, when they were contacted by the Santa Clara County District Attorney's office relative to its investigation of Defendants' activities.

163.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been generally damaged through the loss of their initial investments, as well as subsequent capital contributions.

164.    In doing the acts and things alleged herein, Defendants acted with malice and fraud as defined in Cal. Civil Code section 3294(c) in that they acted willfully and with intent to cause injury to the Plaintiffs and in conscious disregard of Plaintiffs' rights. Accordingly, the Court should assess punitive damages against these Defendants.

## XVI.

## COUNT 12:  ALTER EGO

### (Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, RDB DEVELOPMENT and DOES 1-50)

165.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 164 inclusive, as though fully set forth herein.

166.    On information and belief, there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, and FISCHER, such that any individuality and separateness between Defendants SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, and

RC1/5092539.3/JEL                                    - 37 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    FISCHER has ceased, and Defendants SOLOMON CAPITAL and RDB DEVELOPMENT are

2    the alter ego of Defendants BUCHHOLZ and FISCHER.  Defendants BUCHHOLZ and

3    FISCHER used assets of the corporations for their personal uses, caused assets of the corporations

4    to be transferred to them without adequate consideration, undercapitalized the corporate

5    investments, and withdrew funds from the corporation's bank accounts for their own personal

6    use.  Defendants BUCHHOLZ and FISCHER used funds from SOLOMON CAPITAL, in

7    connection with RDB DEVELOPMENT for their own personal residences and vehicles and/or

8    applied funds from SOLOMON CAPITAL accounts in furtherance of Defendants' fraudulent

9    Enterprise, as described herein.

10        167.    On information and belief, Defendants SOLOMON CAPITAL and RDB

11   DEVELOPMENT are, and at all times herein mentioned were, mere shells, instrumentalities, and

12   conduits through which Defendants BUCHHOLZ and FISCHER carried on their fraudulent

13   investment business in the corporate name, exercising complete control and dominance of such

14   businesses to such an extent that any individuality or separateness of Defendants SOLOMON

15   CAPTIAL and RDB DEVELOPMENT and Defendants BUCHHOLZ and FISCHER does not,

16   and at all times herein mentioned did not, exist.

17        168.    Therefore, Plaintiffs request that this Court disregard the corporate formalities of

18   Defendants SOLOMON CAPTIAL and RDB DEVELOPMENT and treat them as the alter egos

19   of Defendants BUCHHOLZ and FISCHER.

20                                    **XVII.**

21                            **COUNT 13: FRAUD**

22   **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, RDB
     DEVELOPMENT, and DOES 1-50)**

23

24        169.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 168

25   inclusive, as though fully set forth herein.

26        170.    Defendants failed to disclose the facts alleged herein, all of which were within

27   their knowledge at the time that Plaintiffs rendered their investments.  Defendants made false and

28   misleading representations to Plaintiffs concerning the fair market value of the Property as

RC1/5092539.3/JEL                          - 38 -

1    alleged herein, and the fact that Defendants and those involved in the Enterprise would benefit in

2    a manner undisclosed to Plaintiffs.  Defendants took affirmative actions in order to prevent

3    Plaintiffs from discovering the value of the Property, including, but not limited to,

4    misrepresentations by omission of material facts regarding the value of the Property at the time of

5    purchase, and the fact that the Property was being purchased from known associates of

6    Defendants, namely Defendants ZELEZNAK and VENTO, and/or their related companies, ZPM,

7    Z-LOFT, or GRACE CAPITAL.

8         171.    Defendants knew that the representations alleged herein were false and misleading

9    at the time they were made.

10         172.    Defendants made the aforesaid representations with an intent to defraud and

11   intentionally mislead Plaintiffs, and to induce Plaintiffs to act in reliance on these representations,

12   including causing Plaintiffs to place investments with Defendants for the purchase of the

13   Property.

14         173.    Plaintiffs were unaware of the falsity and intentionally misleading nature of the

15   aforementioned representations, including, but not limited to the misrepresentations by omission

16   of material facts, and justifiably acted in reliance upon the aforesaid representations.  Plaintiffs'

17   reliance was justifiable based upon the fiduciary relationship that Defendants had assumed with

18   Plaintiffs and Plaintiffs, therefore, had a responsibility to fully disclose all information concering

19   the Solomon Towers project to Plaintiffs in a full and truthful manner.

20         174.    As a direct and proximate result of Defendants' false and intentionally misleading

21   representations and concealment of the facts as alleged herein, Plaintiffs have been damaged and

22   are entitled to compensation in an amount to be determined according to proof.  Such damages

23   include, but are not limited to, the loss of investment obtained by fraud and loss of interest on the

24   investment capital.

25         175.    Furthermore, as a result of Defendant's intentionally false and misleading

26   representations, Plaintiffs are entitled to exemplary and punitive damages.

27   / / /

28   / / /

RC1/5092539.3/JEL

- 39 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# XVIII.

## COUNT 14: CONSTRUCTIVE FRAUD

### (Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER RDB DEVELOPMENT, and DOES 1-50)

176.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 175 inclusive, as though fully set forth herein.

177.    In their respective roles as the issuers of the unqualified securities and as the managing members of Solomon Towers, LLC and the Solomon Towers project, Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER individually and collectively owed to Plaintiff certain duties to make the fullest disclosure of all material facts that might affect Plaintiffs' decision to provide money to SOLOMON CAPITAL, BUCHHOLZ, and FISCHER for use in the Solomon Towers project.

178.    Defendants failed to disclose the facts alleged herein, all of which were within their knowledge at the time that Plaintiffs rendered their investments. Defendants made false and misleading representations to Plaintiffs concerning the fair market value of the Property as alleged herein, and the fact that Defendants and those involved in the Enterprise would benefit in a manner undisclosed to Plaintiffs. Defendants took affirmative actions in order to prevent Plaintiffs from discovering the value of the Solomon Towers project and the Property, including, but not limited to, misrepresentations by omission of material facts regarding the value of the Solomon Towers project and the Property at the time of purchase, and the fact that the Solomon Towers project and the Property were being purchased from known associates of Defendants, namely Defendants ZELEZNAK and VENTO, and/or their related companies, ZPM, Z-LOFT, or GRACE CAPITAL.

179.    Plaintiffs were unaware of the falsity and intentionally misleading nature of the aforementioned representations, including, but not limited to the misrepresentations by omission of material facts, and justifiably acted in reliance upon the aforesaid representations. Plaintiffs' reliance was justifiable based upon the fiduciary relationship that Defendants had assumed with Plaintiffs. Defendants, therefore, had a responsibility to fully disclose all information concerning

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley.
A Professional Corporation
Redwood City

1    the Solomon Towers project to Plaintiffs in a full and truthful manner.

2         180.    At all times mentioned herein, Plaintiffs were unaware of the existence of the

3    aforementioned material misrepresentations and omissions of material fact regarding the Solomon

4    Towers project and Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER's use of

5    the monies conveyed to Defendants for the Solomon Towers project.

6         181.    As a result of Defendants' failure to make full disclosure of material facts as well

7    as Defendants' misrepresentation of material facts that might have affected Plaintiffs' decision to

8    provide money to Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER for use in the

9    Solomon Towers project, Plaintiffs did, in fact, transfer the funds to Defendants SOLOMON

10    CAPITAL, BUCHHOLZ, and FISCHER and have been damaged and are now entitled to

11    compensation in an amount to be determined according to proof.  Such damages include, but are

12    not limited to, actual damages, interest thereon, punitive damages, attorney's fees, and other

13    damages according to proof.

14                                **XIX.**

15    **COUNT 15:  RESCISSION BASED ON MATERIAL MISREPRESENTATION AND**

16    **SECURITIES TRANSACTION PURSUANT TO CAL. CORP. CODE SECTIONS 25501 AND 25401**

17    **(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, and DOES 1-50)**

18         182.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 181,

19    inclusive, as though fully set forth herein.

20         183.    On or about February 2005, Defendants BUCHHOLZ, FISCHER, and

21    SOLOMON CAPITAL, in Santa Clara County, California, offered and sold to Plaintiffs and

22    investors a total of $5,100,000.00 of the membership interest in the limited liability company of

23    Solomon Towers project.  That transaction was made by means of both a written and oral

24    presentation and communication.  The presentation was in the form of a Power Point presentation

25    which omitted to state material facts necessary in order to make the statements made in that

26    communication, in light of the circumstances under which they were made, not misleading.

27    (Exhibits "A" and "B".)  The communications failed to set forth that the land being purchased by

28    the Solomon Towers project investment group would be done so at an over-inflated and above

RC1/5092539.3/JEL

- 41 -

1    fair market value price. A true copy of the Power Point presentation and pro-forma financials are

2    attached as Exhibits "A" and "B" and incorporated by reference.

3        184.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

4    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

5    "A"), failed to disclose the pre-existing relationship between Defendants BUCHHOLZ,

6    FISCHER, and SOLOMON CAPITAL with Defendants ZELEZNAK and VENTO and their

7    partnership entities Z-LOFT, ZPM, and GRACE CAPITAL. The failure to disclose this fact

8    constitutes a material omission since the Property was purchased by Defendants BUCHHOLZ,

9    FISCHER, and SOLOMON CAPITAL, on behalf of the Plaintiff investors, from Defendants

10    ZELEZNAK and VENTO, and/or their companies, Z-LOFT, ZPM, and GRACE CAPITAL.

11        185.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

12    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

13    "A"), failed to disclose the fact that the Property was not worth the amount that would be paid.

14    Further, Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER failed to disclose the

15    fact that the comparable square foot value for land in the area at the time of purchase was

16    approximately $33.19 per square foot, not the $178.75 per square foot amount paid by Defendants

17    BUCHHOLZ, FISCHER, and SOLOMON CAPITAL to Defendants ZELEZNAK and VENTO,

18    and/or their companies, Z-LOFT, ZPM, and GRACE CAPITAL.

19        186.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

20    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

21    "A"), failed to disclose the an accurate purchase price per square foot of the Property. According

22    to the documentation presented to the investors, the purchase price per square foot for the

23    Property was $153.05 per square foot when, in fact, the purchase price paid by Defendants

24    BUCHHOLZ, FISCHER, and SOLOMON CAPITAL to Defendants ZELEZNAK and VENTO,

25    and/or their companies, Z-LOFT, ZPM, and GRACE CAPITAL was actually $178.75 per square

26    foot.

27        187.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

28    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  "A"), failed to disclose the fact that the real estate agent and broker for the transaction,

2  ZELEZNAK and ZPM, was also the seller of the Property.  Further, Defendants SOLOMON

3  CAPITAL, BUCHHOLZ, and FISCHER failed to disclose the fact that ZELEZNAK received a

4  $1,000,000 commission for his role as the seller's agent for the transaction. (See Exhibit "D")

5  This commission rate is equivalent to a 20% (twenty-percent) commission which far exceeds the

6  prevailing market rate of 5% to 6% for sales transactions involving raw land.   Based on

7  information and belief, ZELEZNAK and ZPM acted in a dual agency role in connection with the

8  purchase and sale of the Property.  Defendant ZELEZAK and ZPM's dual agency was similarly

9  not disclosed by Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER to the Plaintiff

10  investors.

11      188.    Based on information and belief, Defendants SOLOMON CAPITAL,

12  BUCHHOLZ, and FISCHER, in connection with the presentation to the Plaintiff investors

13  regarding the Solomon Towers project (See Exhibit "A"), failed to disclose the fact that

14  ZELEZNAK and VENTO, and/or their related companies Z-LOFT, ZPM, and GRACE

15  CAPITAL would receive a distribution of the purchase and sale proceeds from the transaction.

16  Defendants further failed to disclose the pre-existing relationship between Defendants

17  BUCHHOLZ, FISCHER, and SOLOMON CAPITAL and Defendants VENTO and ZELEZNAK

18  and the fact that VENTO and ZELEZNAK were involved in the GRACE CAPITAL partnership

19  with the real estate agent for the transaction, ZELEZNAK who was also the seller of the Property.

20  Based on information and belief, Defendant VENTO and ZELEZNAK received a distribution

21  from the purchase and sale proceeds from the transaction at issue for the Property.  Defendants

22  VENTO and ZELEZNAK, and/or their related companies Z-LOFT, ZPM, and GRACE

23  CAPITAL qualify as materially aiding personnel under the Cal. Corporations Code and are,

24  therefore, jointly and severally liable under the Code.

25      189.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

26  with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

27  "A"), failed to disclose that the Plaintiff investors may be subject to supplemental capital

28  obligations in the future.  The Plaintiff investors were told that they had no obligation beyond

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL

- 43 -

1    their initial investment. The Proforma Finance & Investment Analysis: 10 Stories (Exhibit "A")

2    states: "Required Equity: $5,000,000." The Plaintiff investors were informed that no further

3    capital contribution would be "required" of them both verbally and in writing by Defendants

4    BUCHHOLZ, FISCHER, and SOLOMON CAPITAL. At the time that Defendants

5    BUCHHOLZ, FISCHER, and SOLOMON CAPITAL solicited and received the investments,

6    however, Defendants were aware of the fact that the project was severely undercapitalized.

7    Defendants failed to disclose that information to Plaintiff investors.

8         190.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

9    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

10   "A"), misrepresented the actual size of the Property to the Plaintiff investors by a material

11   amount. Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER represented that the

12   parcel size for the Property was ¾ of an acre, approximately 32,670 square feet. The tax records

13   for the Property, however, clearly show that the Property is approximately 28,000 square feet,

14   over 4,000 square feet smaller than SOLOMON CAPITAL represented to the Plaintiff investors.

15        191.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

16   with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

17   "A"), misrepresented the actual return or "profit" to the Plaintiff investors. The Proforma

18   Finance & Investment Analysis: 10 Stories (Exhibit "A") states: "Investor Profit: 50%." To date

19   the Plaintiff investors have received no return on investment from the Solomon Towers project.

20   To the contrary, the Plaintiff investors have been requested to make further capital call

21   contributions to the project. Further, according to pro forma financials disseminated by

22   Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER on Friday, February 29, 2008,

23   the Solomon Towers project is in severe financial distress and overleveraged in amount in excess

24   of $2,400,000. (Exhibit "E")

25        192.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

26   with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

27   "A"), misrepresented the zoning for the project. The Sales Pro Forma document for the Power

28   Point presentation states that the project would be for 15 stories. Based on information and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5092539.3/JEL                          - 44 -

1    belief, however, the land, at the time of purchase and sale, was only zoned for 10 stories.

2         193.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER, in connection

3    with the presentation to the Plaintiff investors regarding the Solomon Towers project (See Exhibit

4    "A"), misrepresented the timeline for completion of the project and return of investment capital

5    and profits to the Plaintiff investors.  According to the presentation to the investors in February of

6    2005, the project would require: (1) 60 days to acquire the land, (2) 9-12 months to explore

7    project definition, and (3) 2 years for build out and marketing.  Thus, according to Defendants

8    SOLOMON CAPITAL, BUCHHOLZ, and FISCHER CAPITAL's representations to the Plaintiff

9    investors, the Solomon Towers project would be complete and in the sales phase within 3 years

10   and 2 months, or April of 2008.  To date, however, construction has not begun on the project and

11   the project is in severe financial distress.

12        194.    Defendants SOLOMON CAPITAL, BUCHHOLZ, and FISCHER misrepresented

13   to the Plaintiff investors that  they were buying into a viable investment opportunity for a high

14   rise condominium project.  The reality, however, was the that Defendants BUCHHOLZ,

15   FISCHER, SOLOMON CAPITAL, Z-LOFT, ZPM, GRACE CAPITAL, ZELEZNAK and

16   VENTO through the investment scheme and Enterprise, had already extracted any potential

17   profits from the potential investment for themselves through the fraudulent Enterprise.  The

18   plaintiff investors were then left with a project that was not viable since it was "under water,"

19   meaning that the debt on the project so far outweighed the value that development prospects were

20   no longer possible absent an extreme pro forma or forecasted loss.

21        195.    As a result of the material misrepresentations and omissions, Plaintiffs are entitled

22   to rescind the above-described purchases of membership interest in Solomon Towers, LLC.

23        196.    Plaintiffs will tender to Defendants their membership interest in Solomon Towers,

24   LLC, for the above-described securities as purchased from Defendants and on which to date

25   Plaintiffs have received $0 in total income.

26        197.    Therefore, Plaintiffs seek an Order of this Court for the appropriate available

27   remedy of rescission and return of Plaintiffs' investment capital with interest from the date of the

28   investment pursuant to Cal. Corp. Code §§ 25501 and 25401.

RC1/5092539.3/JEL                                   - 45 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1

## XX.

2

### COUNT 16:  JOINT AND SEVERAL LIABILITY OF MANAGEMENT PRINCIPALS AND MATERIALLY AIDING PERSONNNEL PURSUANT TO CAL. CORP. CODE

3

### SECTION 25501, 25401, AND 25504

4

**(Against Defendants SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, KELLER**

5

**WILLIAMS, and DOES 1-50)**

6        198.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 197,

7    inclusive, as though fully set forth herein.

8        199.    Defendants ZELEZNAK, VENTO, Z-LOFT, GRACE CAPITAL, RDB

9    DEVELOPMENT, ZPM, and KELLER WILLIAMS, at the time of acts alleged herein, materially

10    assisted in the perpetration of the Enterprise and fraud upon the Plaintiffs.  Based on information

11    and belief, Z-LOFT, LLC purchased property in less desirable areas for market rate, and then sold

12    the property to SOLOMON CAPTIAL investors for significantly more than the market rate.

13    Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT,

14    ZELEZNAK, Z-LOFT, VENTO, GRACE CAPITAL, ZPM, and KELLER WILLIAMS profited

15    on the overly inflated and above-market value sale of the land to the detriment and loss of the

16    Plaintiff investors.

17        200.    Based on information and belief, Defendants SOLOMON CAPITAL, RDB

18    DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK, VENTO, GRACE CAPITAL, ZPM,

19    and, KELLER WILLIAMS had a pre-existing relationship prior to the purchase and sale

20    transaction of the Property and have conducted similar transactions with other investor groups to

21    further perpetrate the fraudulent Enterprise discussed herein.

22        201.    Defendants ZELEZNAK owned and managed Soho Lofts, LLC.  Soho Lofts, LLC

23    changed its name to Z-LOFT, LLC on August 17, 2004.  On July 25, 2002, Soho Lofts LLC

24    purchased the Property, located at 625-643 N. 2nd Avenue, Phoenix, AZ from Core Builders, Inc.

25    for $392,000.00.  According to the tax records, the square footage of the Property is 28,000

26    square feet.  Accordingly, the cost for this transaction was $14.00 per square foot.

27        202.    On April 11, 2005, Defendants ZELEZNAK and VENTO, and/or their related

28    entities Z-LOFT, ZPM, or GRACE CAPITAL sold the Property to Solomon Towers, LLC for

RC1/5092539.3/JEL

- 46 -

$5,004,929.00. The cost per square foot for this transaction was $178.75 per square foot. Based on information and belief and historical comparative research conducted in Spring 2007, the current market rate for the land from February to March 2005 was approximately $33.19 per square foot.

203.    Based on information and belief, Plaintiffs allege that Defendants Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK and VENTO all profited on the over-inflated and above market "pump and dump" sale to the detriment of the Plaintiff investors. Defendants ZPM and ZELEZNAK received a commission on the sale of the Property of $1,000,000.00 (one million dollars.) This commission rate is equivalent to a 20% (twenty-percent) commission which far exceeds the prevailing market rate of 5% to 6% for sales transactions involving raw land. The implications of this commission for the sale of the Property supports the conclusion that Defendants KELLER WILLIAMS and ZELEZNAK knowing and materially aided and assisted Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT, Z-LOFT, ZPM, GRACE CAPITAL, ZELEZNAK and VENTO to perpetrate the fraud and the Enterprise as discussed herein against the Plaintiffs. The implications of the over-inflated and above market commission for the sale of the Property from Defendants Z-LOFT, GRACE CAPITAL, VENTO and ZELEZNAK to the Plaintiffs supports the conclusion that Defendants Z-LOFT, ZPM, GRACE CAPITAL, ZELEZNAK and VENTO knowingly and materially aided and assisted in an Enterprise to perpetrate the fraud as discussed herein against the Plaintiffs.

204.    Plaintiffs have been damaged in an amount to be proven at trial. Therefore, Plaintiffs seek an Order of this Court for all appropriate available remedies under California Corporations Code §§ 25501, 25401, and 25504.

## XXI.

### COUNT 17:  RESCISSION OF SALE OF SECURITIES NOT QUALIFIED FOR SALE AND RESTITUTION OF CONSIDERATION PAID PURSUANT TO CAL. CORP. CODE SECTIONS 25503, 25102(F), AND 25110

**(Against Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, and DOES 1-50)**

205.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 204 inclusive, as though fully set forth herein.

RC1/5092539.3/JEL

- 47 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

206.    On or about February 2005, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, offered and sold to Plaintiffs and investors a total of $5,100,000.00 of membership interest on Solomon Towers, LLC. Defendants were the issuers of the investments and engaged in the trading of such securities. The Operating Agreement for the Solomon Towers project is attached hereto as Exhibit "C".

207.    This sale constituted an issuer transaction in that it was part of an initial offering of membership interest for capitalization purposes for Solomon Towers, LLC, and the issuers directly benefited from Plaintiffs' investment of securities and received a portion of the investments as the issuer of the security. At the time of Plaintiffs' acquisition and membership interests and investment in Solomon Towers, LLC, the sale was subject to qualification, was not exempt from qualification, and was not, and to the date of this Complaint, has not been qualified as any kind of securities transaction with the Commissioner of Corporations.

208.    As a result of the above-described acts, Defendants are liable to Plaintiffs, who are entitled to and hereby do, rescind the above-described purchase. Plaintiffs will tender before entry of judgment to Defendants their membership interests in the above-described security as purchased from Defendants and on which to date Plaintiffs have received $0 in total income.

Plaintiffs are informed and believe that the consideration given for the securities herein may not be capable of being returned in that the investment consideration was used to purchase property for an over-inflated and above fair market value in order to benefit Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, ZELEZNAK, VENTO, Z-LOFT, GRACE CAPITAL, ZPM, and KELLER WILLIAMS. The purchase of the Property at issue for the over-inflated and above fair market valuation constituted fraud upon the Plaintiffs and resulted in the distribution of ill-gotten gains to Defendants SOLOMON CAPITAL, BUCHHOLZ, FISCHER, ZELEZNAK, VENTO, Z-LOFT, GRACE CAPITAL, ZPM, and KELLER WILLIAMS. Further, there are multiple outstanding loans against the property and certain noteholders have intimated that foreclosure proceedings would pursue.

209.    Plaintiffs have been damaged in an amount to be proven at trial. Therefore, Plaintiffs seek an Order of this Court for all appropriate available remedies under California

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Corporations Code §§ 25503, 25102(f), and 25110.

2    **XXII.**

3    **COUNT 18:  JOINT AND SEVERAL LIABILITY OF MANAGEMENT PRINCIPALS**
     **AND MATERIALLY AIDING PERSONNNEL PURSUANT TO CAL. CORP. CODE**
4    **SECTIONS 25503, 25102(F), AND 25110**

5    **(Against Defendants SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ,**
     **FISCHER, Z-LOFT, GRACE CAPITAL, ZPM, ZELEZNAK, VENTO, KELLER**
6    **WILLIAMS, and DOES 1-50)**

7        210.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 209,

8    inclusive, as though fully set forth herein.

9        211.    Defendants ZELEZNAK and VENTO, and/or their related companies Z-LOFT,

10   ZPM, and GRACE CAPITAL, at the time of acts alleged herein, materially assisted in the

11   perpetration of the Enterprise and fraud upon the Plaintiffs and other putative investors.  Based on

12   information and belief, Defendants ZELEZNAK and VENTO, and/or their related companies Z-

13   LOFT, ZPM, and GRACE CAPITAL, purchased property in less desirable areas for market rate,

14   and then sold the property to SOLOMON CAPTIAL investors for significantly more than the

15   market rate.  Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB

16   DEVELOPMENT, ZELEZNAK, VENTO, Z-LOFT, GRACE CAPITAL, ZPM, and KELLER

17   WILLIAMS profited on the overly inflated and above-market value sale of the land to the

18   detriment and loss of the Plaintiff investors.

19       212.    Based on information and belief, Defendants SOLOMON CAPITAL, RDB

20   DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK, VENTO, ZPM, and KELLER

21   WILLIAMS had a pre-existing relationship prior to the purchase and sale transaction of the

22   Property and have conducted similar transactions with other investor groups to further perpetrate

23   the fraudulent Enterprise discussed herein.

24       213.    Defendants ZELEZNAK owned and managed Soho Lofts, LLC.  Soho Lofts, LLC

25   changed its name to Z-LOFTS, LLC on August 17, 2004.  On July 25, 2002, Soho Lofts LLC

26   purchased 625-643 N. 2nd Avenue, Phoenix, AZ (hereinafter referred to as "the Property") from

27   Core Builders, Inc. for $392,000.  According to the tax records, the square footage of the Property

28   is 28,000 square feet.  Accordingly, the cost for this transaction was $14.00 per square foot.

RC1/5092539.3/JEL

- 49 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

214.    On April 11, 2005, Defendants ZELEZNAK and VENTO, and/or their related entities Z-LOFT or GRACE CAPITAL sold the Property to Solomon Towers, LLC for $5,004,929. The cost per square foot for this transaction was $178.75 per square foot. Based on information and belief and historical comparative research conducted in Spring 2007, the current market rate for the land from February to March 2005 was approximately $33.19 per square foot.

215.    Based on information and belief, Plaintiffs allege that Defendants Z-LOFT, GRACE CAPITAL, RDB DEVELOPMENT, ZPM, ZELEZNAK and VENTO all profited on the over-inflated and above market "pump and dump" sale to the detriment of the Plaintiff investors. Defendants ZPM and ZELEZNAK received a commission on the sale of the Property of $1,000,000 (one million dollars.) This commission rate is equivalent to a 20% (twenty-percent) commission which far exceeds the prevailing market rate of 5% to 6% for sales transactions involving raw land. The implications of this commission for the sale of the Property supports the conclusion that Defendants ZPM and ZELEZNAK knowing and materially aided and assisted Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RDB DEVELOPMENT, Z-LOFT, ZPM, GRACE CAPITAL, ZELEZNAK, VENTO, and KELLER WILLIAMS to perpetrate the fraud and the Enterprise as discussed herein against the Plaintiffs. The implications of the over-inflated and above market commission for the sale of the Property from Defendants Z-LOFT, ZPM, GRACE CAPITAL, VENTO and ZELEZNAK to the Plaintiffs supports the conclusion that Defendants Z-LOFT, ZPM, GRACE CAPITAL, ZELEZNAK, VENTO, and KELLER WILLIAMS knowingly and materially aided and assisted in an Enterprise to perpetrate the fraud as discussed herein against the Plaintiffs.

216.    Plaintiffs have been damaged in an amount to be proven at trial. Therefore, Plaintiffs seek an Order of this Court for all appropriate available remedies under California Corporations Code §§ 25503, 25102(f), and 25110.

## XXIII.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, by and through their attorneys, pray for judgment against Defendants, and each of them, as follows:

- 50 -

RC1/5092539.3/JEL

1.   For rescission of the purchase and recovery of investment capital as the original consideration paid for the securities at issue;

2.   For interest on the value of the original consideration at the legal rate from the date of purchase and transfer of the consideration;

3.   For actual damages incurred to be proven at trial with interest thereon;

4.   For costs of suit herein incurred;

5.   For recovery of attorneys' fees;

6.   For punitive damages;

7.   For a permanent injunction preventing Defendants from further profiting from or disgorging said profits from their fraudulent Enterprise; and

8.   For such other and further relief as the Court may deem proper.

Dated: April 30, 2008                    ROPERS, MAJESKI, KOHN & BENTLEY


By: _____
    TODD A. ROBERTS
    JESSHILL E. LOVE
    Attorneys for Plaintiffs
    STEVE TRACHSEL, an individual, SUN
    CITY TOWERS, LLC, a California
    corporation, THOMAS CIRRITO, an
    individual, ATOCHA LAND, LLC, a
    Delaware limited liability company,
    MICHAEL CIRRITO, an individual, and
    CIRRITO HOLDINGS, LLC, a Delaware
    limited liability company

RC1/5092539.3/JEL

COMPLAINT FOR VIOLATIONS OF RICO, RULE 10B-5, SECTION 12(A), CAL. CORP. AND BUS. & PROF. CODES, FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND CONSPIRACY

# Exhibit A







Greater Phoenix

City of Phoenix: 1,421,298
Maricopa County: 3,194,798
State of Arizona: 5,307,331

Phoenix covers more than 500 square miles and has a population of 1.4 million, ranking it the sixth largest city in the United States. A premier resort destination, Phoenix has more than 300 sun-filled days a year and an average temperature of 74 degrees.

More than 50 percent of the population is between 18 and 54 years of age, which is younger than the national average. The greater Phoenix area is a $50 billion marketplace driven by technology. World-leading companies such as Intel, Avnet, Motorola, AlliedSignal, Honeywell and Boeing Company have chosen Phoenix for their corporate and regional headquarters. Phoenix Sky Harbor International Airport is the fifth busiest airport in the U.S.



2





















## Project Overview

▷ 10 Story high-rise, residential loft development
▷ Mid range price point: $400 psf
▷ 100 Units Planned
▷ Estimated Project Timeframe: 36 months

## Project Advantages & Benefits

▷ Central downtown Phoenix locations takes advantage of reverse migration trend
▷ Highly congruent with City of Phoenix general plan

## Comparative Sales Case: Monroe Towers



**MONROE PLACE**
LUXURY LOFTS

▷ Located 4 blocks south of our site
▷ Selling at $600 psf - $200 psf higher than the Solomon Tower proforma

8

## Residential Loft Buyer Analysis

Our local sales team is in place and ready to market the development once it is released. The sales team expects buyers to be from the following categories:

- 20% established, single professionals
- 25% empty-nesters
- 20% second home buyers
- 10% starter families
- 25% other, including investors



Solomon Tower
Proforma Numbers

9



## Development Proforma

| | |
|---|---|
| Land Area | 0.75 Acres |
| Land Cost psf | $ 153.05 |
| Building Area | 135,000 Gross Square Feet |
| Coverage | 413% |
| Number of Units | 100 |
| | |
| Total Land Cost | $ 5,000,000 |
| Closing Cost | 10,000 |
| Total Land Acquisition Cost | $ 5,010,000 |

## Development Proforma – 10 Stories

| | |
|---|---|
| Construction Costs | $ 27,000,00 |
| Permit Fees | 250,000 |
| Utility Connection Fees | 250,000 |
| Plan Review Fees | 50,000 |
| Construction Management | 500,000 |
| Architectural Design | 1,400,000 |
| Civil | 50,000 |
| Survey | 25,000 |
| Testing | 50,000 |
| Engineering | 50,000 |
| Signage | 25,000 |
| Legal Fees | 65,000 |
| Real Estate Taxes & Accounting | 75,000 |



## Development Proforma (cont.)

| | |
|---|---|
| Insurance | 900,000 |
| Marketing | 900,000 |
| Design Center Fees | 100,000 |
| Furniture, Furnishings & Equipment | 200,000 |
| Site Maintenance | 30,000 |
| Developer Fee | 1,000,000 |
| Interest Carry | 1,579,974 |
| Construction Finance Fees | 328,306 |
| Miscellaneous | 200,000 |
| Contingency | 1,000,000 |
| TOTAL CONSTRUCTION COST | $ 36,028,280 |
| TOTAL LAND COST | 5,010,000 |
| TOTAL PROJECT COST | $ 41,038,280 |



## Sales Proforma – 10 Stories

| | |
|---|---|
| Loft Sales | $54,225,000 |
| Sales Commissions (6%) | -3,253,500 |
| Closing Costs (0.75%) | -406,688 |
| Net Revenue | $50,564,813 |

11







## Sales Proforma – 15 Stories

| | |
|---|---|
| Loft Sales | $81,225,000 |
| Sales Commissions (6%) | -4,873,500 |
| Closing Costs (0.75%) | -609,188 |
| Net Revenue | $75,742,313 |
| Solomon Tower, LLC Profit | $20,545,669 |
| | |
| Investors (50%) | $10,272,834 |
| Solomon Capital (50%) | $10,272,834 |
| | |
| Total Return | 410% |

## Next Steps

1. Form Partnership and Raise Capital (3 weeks)

   a. Turn in your Commitment Form and signed Operating Agreement by Friday, Feb. 11th

   b. Initial Capital Contributions by Monday, Feb. 28th

2. Acquire Land (60 days)

3. Explore Project Definition (9-12 months)

4. Proceed with Build-out & Marketing (2 years)



# Exhibit B

Z Lofts
100 Lofts
1/14/2005

## Development Budget

| | | | |
|---|---|---|---|
| Land Area | | 0.75 | acres |
| Land Cost psf of Land Area | $ | 153.05 | |
| Building Area | | 135,000 | s.f. |
| Coverage | | 413% | |
| Number of Units | | 100 | units |

| | | | PSF | | Per Unit | |
|---|---|---|---|---|---|---|
| | | | | | | |
| Land | 5,000,000 | $ | 37.04 | $ | 50,000 | |
| Closing Costs | 10,000 | $ | 0.07 | $ | 100 | |
| Total Land Costs | 5,010,000 | $ | 37.11 | $ | 50,100 | |
| | | | | | | |
| Construction Costs | 27,000,000 | $ | 200.00 | $ | 270,000 | |
| Permit Fees | 250,000 | $ | 1.85 | $ | 2,500 | |
| Utility Connection Fees | 250,000 | $ | 1.85 | $ | 2,500 | |
| Plan Review Fees | 50,000 | $ | 0.37 | $ | 500 | |
| Construction Mgt Fees | 500,000 | $ | 3.70 | $ | 5,000 | |
| Architecture | 1,400,000 | $ | 10.37 | $ | 14,000 | |
| Civil | 50,000 | $ | 0.37 | $ | 500 | |
| Survey | 25,000 | $ | 0.19 | $ | 250 | |
| Testing | 50,000 | $ | 0.37 | $ | 500 | |
| Engineering | 50,000 | $ | 0.37 | $ | 500 | |
| Design Center Fees | 100,000 | $ | 0.74 | $ | 1,000 | |
| Furniture, Furnishings & Equipment | 200,000 | $ | 1.48 | $ | 2,000 | |
| Signage | 25,000 | $ | 0.19 | $ | 250 | |
| Legal | 65,000 | $ | 0.48 | $ | 650 | |
| Real Estate Taxes | 25,000 | $ | 0.19 | $ | 250 | |
| Insurance | 900,000 | $ | 6.67 | $ | 9,000 | |
| Marketing | 900,000 | $ | 6.67 | $ | 9,000 | |
| Site Maintenance | 30,000 | $ | 0.22 | $ | 300 | |
| Developer Fee | 1,000,000 | $ | 7.41 | $ | 10,000 | |
| Miscellaneous | 200,000 | $ | 1.48 | $ | 2,000 | |
| Contingency | 1,000,000 | $ | 7.41 | $ | 10,000 | |
| Accounting | 50,000 | $ | 0.37 | $ | 500 | |
| Interest Reserve | 5.500% | 1,579,974 | $ | 11.70 | $ | 15,800 |
| Financing Fees | 1.00% | 328,306 | $ | 2.43 | $ | 3,283 |
| Total Construction Costs | | 36,028,280 | $ | 266.88 | $ | 360,283 |
| | | | | | | |
| Total Project Costs | | 41,038,280 | $ | 303.99 | $ | 410,383 |

## Sales Summary

| | Size | Quantity | $ psf | | | | PSF | | Per Unit | |
|---|---|---|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 100 | $ | 400 | | 54,000,000 | $ | 400.00 | $ | 540,000 |
| Unit B | 0 | 0 | $ | - | $ | - | $ | - | | #DIV/0! |
| Unit C | 0 | 0 | $ | - | $ | - | $ | - | | #DIV/0! |
| Unit D | 0 | 0 | $ | - | $ | - | $ | - | | #DIV/0! |
| Lot Premiums | | 45 | $ | 5,000 per unit | $ | 225,000 | $ | 1.67 | $ | 5,000 |
| | | | | | | | | | | |
| Gross Sales Proceeds | | | | | $ | 54,225,000 | $ | 401.67 | $ 1,205,000 | |
| Less: | | | | | | | | | | |
| Sales Commission | | 6.00% | | | | 3,253,500 | $ | 24.10 | $ | 72,300 |
| Closing Costs | | 0.75% | | | | 406,688 | $ | 3.01 | $ | 9,038 |
| Net Sales Proceeds | | | | | $ | 50,564,813 | $ | 374.55 | $ 1,123,663 | |

## Equity Analysis

| | | | |
|---|---|---|---|
| Total Project Costs | | $ | 41,038,280 |
| Loan to Cost | | | 80% |
| | | | |
| Loan Amount | | $ | 32,830,624 |
| | | | |
| Cash Equity | | $ | 5,000,000 |
| | | | |
| Project Profit | | $ | 9,526,532 |
| | | | |
| Manager Profit | 50% | $ | 4,763,266 |
| | | | |
| Investor Profit | 50% | $ | 4,763,266 |
| | | | |
| Project Cash on Cash Return | | | 191% |
| Investor Cash on Cash Return | | | 95% |

Z Lofts
150 Lofts
1/14/2005

| Development Budget | | | | | | |
|---|---|---|---|---|---|---|
| Land Area | | 0.75 | acres | | | |
| Land Cost psf of Land Area | $ | 153.05 | | | | |
| Building Area | | 202,500 | s.f. | | | |
| Coverage | | 620% | | | | |
| Number of Units | | 100 | units | | | |

| | | | PSF | | Per Unit | |
|---|---|---|---|---|---|---|
| Land | 5,000,000 | $ | 24.69 | $ | 50,000 | |
| Closing Costs | 10,000 | $ | 0.05 | $ | 100 | |
| Total Land Costs | 5,010,000 | $ | 24.74 | $ | 50,100 | |
| | | | | | | |
| Construction Costs | 40,500,000 | $ | 200.00 | $ | 405,000 | |
| Permit Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Utility Connection Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Plan Review Fees | 50,000 | $ | 0.25 | $ | 500 | |
| Construction Mgt Fees | 500,000 | $ | 2.47 | $ | 5,000 | |
| Architecture | 1,400,000 | $ | 6.91 | $ | 14,000 | |
| Civil | 50,000 | $ | 0.25 | $ | 500 | |
| Survey | 25,000 | $ | 0.12 | $ | 250 | |
| Testing | 50,000 | $ | 0.25 | $ | 500 | |
| Engineering | 50,000 | $ | 0.25 | $ | 500 | |
| Design Center Fees | 100,000 | $ | 0.49 | $ | 1,000 | |
| Furniture, Furnishings & Equipment | 200,000 | $ | 0.99 | $ | 2,000 | |
| Signage | 25,000 | $ | 0.12 | $ | 250 | |
| Legal | 65,000 | $ | 0.32 | $ | 650 | |
| Real Estate Taxes | 25,000 | $ | 0.12 | $ | 250 | |
| Insurance | 900,000 | $ | 4.44 | $ | 9,000 | |
| Marketing | 900,000 | $ | 4.44 | $ | 9,000 | |
| Site Maintenance | 30,000 | $ | 0.15 | $ | 300 | |
| Developer Fee | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Miscellaneous | 200,000 | $ | 0.99 | $ | 2,000 | |
| Contingency | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Acounting | 50,000 | $ | 0.25 | $ | 500 | |
| Interest Reserve | 5.500% | 2,125,071 | $ | 10.49 | $ | 21,251 |
| Financing Fees | 1.00% | 441,573 | $ | 2.18 | $ | 4,416 |
| Total Construction Costs | | 50,186,644 | $ | 247.84 | $ | 501,866 |
| | | | | | | |
| Total Project Costs | | 55,196,644 | $ | 272.58 | $ | 551,966 |

## Sales Summary

| | Size | Quantity | $ psf | | | | PSF | Per Unit |
|---|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 150 | $ 400 | | | 81,000,000 | $ 400.00 | $ 540,000 |
| Unit B | 0 | 0 | $ - | | $ - | | $ - | #DIV/0! |
| Unit C | 0 | 0 | $ - | | $ - | | $ - | #DIV/0! |
| Unit D | 0 | 0 | $ - | | $ - | | $ - | #DIV/0! |
| Lot Premiums | | 45 | $ 5,000 | per unit | $ | 225,000 | $ 1.11 | $ 5,000 |
| | | | | | | | | |
| Gross Sales Proceeds | | | | | $ | 81,225,000 | $ 401.11 | $ 1,805,000 |
| Less: | | | | | | | | |
| Sales Commission | | 6.00% | | | | 4,873,500 | $ 24.07 | $ 108,300 |
| Closing Costs | | 0.75% | | | | 609,188 | $ 3.01 | $ 13,538 |
| Net Sales Proceeds | | | | | $ | 75,742,313 | $ 374.04 | $ 1,683,163 |

## Equity Analysis

| | | |
|---|---|---|
| Total Project Costs | $ | 55,196,644 |
| Loan to Cost | | 80% |
| Loan Amount | $ | 44,157,315 |
| Cash Equity | $ | 5,000,000 |
| Project Profit | $ | 20,545,669 |
| Manager Profit | 50% | $ | 10,272,834 |
| Investor Profit | 50% | $ | 10,272,834 |
| | | |
| Project Cash on Cash Return | | 411% |
| Investor Cash on Cash Return | | 205% |

# Exhibit C

# OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "Agreement"), is made and entered into as of February 5th, 2005, by and among those Persons who are identified as Members in Exhibit A to this Agreement (each individually a "Member" and, collectively, the "Initial Members"), and Solomon Towers, LLC, a Nevada limited-liability company (the "Company").

For the consideration of their mutual covenants set forth below, the Members and the Company agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Definitions.    As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" means the Nevada Limited Liability Company Act, N.R.S. § 86.011 et seq, as amended from time to time.

"Additional Capital Contributions" means the additional contributions to the capital of the Company described in Section 3.2.

"Agreement" means this written limited liability company agreement, as originally executed and as amended or restated from time to time.

"Assignee" means a Person who acquires an Interest in the Company but who has not been admitted as a Substitute Member.

"Capital Account" means as defined in Section A.1 of Appendix 1.

"Capital Contribution" means any contribution to the capital of the Company whenever made.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. All references herein to sections of the Code shall include any corresponding provision on provisions of succeeding law.

"Covered Person" means a Member, the Manager, or any Person that directly or indirectly controls or is controlled by the Company.

"Gross Asset Value" means as defined in Section A.1 of Appendix 1.

"Interest" in the Company shall mean the economic rights of a Member and their permitted assignees and successors to share in distributions of cash and other property from the Company pursuant to the Act and this Agreement, together with their distributive share of the Company's net income or loss for federal and state income taxes.

1

"Losses" has the meaning as set forth in Section A.1 of Appendix 1.

"Majority in Interest" means those Members owning, in aggregate, greater than fifty percent (50.0%) of the Interests in the Company.

"Manager" means Ron Buchholz or Charice Buchholz or any other Person who becomes a Manager pursuant to this Agreement.    Except as otherwise provided in this Agreement, if more than one, each Manager shall have all of the powers and authority exercisable by a Manager pursuant to the Act and this Agreement.

"Member" means (a) the Initial Members until such time, if any, that any such Person becomes a Withdrawn Member, (b) any Person acquiring an Interest directly from the Company in accordance with this Agreement until such time, if any, that any such Person becomes a Withdrawn Member, and (c) any Person who acquires an Interest in the Company in a Permitted Transfer and who is deemed, or is admitted as, a Substitute Member until such time, if any, that such Person becomes a Withdrawn Member.

"Net Cash Flow" means, with respect to any period, the Company's gross receipts, reduced by the portion thereof used to pay or establish reserves for all Company expenses, debt payments and accrued interest, contingencies, and proposed acquisitions, all as determined in the sole discretion of the Manager.  "Net Cash Flow" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances.

"Percentage Interest" means the percentage interests in the Profits and Losses of this Company.  The initial Percentage Interests are set forth on Exhibit A.

"Permitted Transfer" has the meaning set forth in Section 11.2.

"Person" means any individual, firm, corporation, partnership, limited liability company, association or other legal entity.

"Profits" has the meaning set forth in Section A.1 of Appendix 1.

"Substitute Member" means a Person who acquires an Interest from a Member and who satisfies all of the conditions of Section 11.5.

"Super-Majority in Interest" means those Members owning, in aggregate, greater than seventy-five percent (75.0%) of the Interests in the Company.

"TMP" means the Person designated in accordance with Section 9.2(b).

"Transfer" means, when used as a noun, any voluntary or involuntary sale, assignment, gift, transfer, or other disposition and, when used as a verb, means voluntarily or involuntarily to sell, assign, gift, transfer, or otherwise dispose of.

"Treasury Regulations" means the Regulations issued by the Treasury Department under the Code.

2

"Withdrawal Event" means with respect to a specified Person the death, retirement, resignation, expulsion, bankruptcy, or dissolution of such Person.

"Withdrawn Member" means a Member following the occurrence of a Withdrawal Event with respect to such Member.

## ARTICLE II

## FORMATION OF THE LIMITED LIABILITY COMPANY

2.1    General.  The Initial Members organized the Company as a manager-managed limited-liability company in accordance with the Act and the terms of this Agreement by filing the Articles of Organization with the Nevada Secretary of State on _____ __, 2005.

2.2    Name.  The name of the Company is "Solomon Towers, LLC" and the business of the Company shall be carried on in this name with such variations and changes as a Manager in its sole discretion may deem necessary or appropriate to comply with requirements of the jurisdictions in which the Company's operations shall be conducted.

2.3    Purposes and Powers.  The Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized under Nevada law.  The Company shall have all of the powers permitted by law.  The initial purpose of the Company shall be to acquire real property and the development of a high rise residential tower or towers in downtown Phoenix, Arizona

2.4    Registered Office.  The registered office shall be the office maintained at the street address of the resident agent.

2.5    Term.  The term of the Company commenced on the filing of the Articles of Organization for the Company and shall not expire except in accordance with the provisions of Article XII of this Agreement or in accordance with the Act.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1    Initial Capital Contributions.  The Initial Members of the Company shall each contribute to the capital of the Company the contributions described in Exhibit A. Capital Contributions to the Company may consist of cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services.

3.2    Additional Capital Contributions.  The Members shall be required to make Additional Capital Contributions only in the amount(s) and at the time(s) that the Manager, in its sole discretion, shall deem necessary for the conduct of the business of the Company.  The first additional capital contributions shall be as described in Exhibit A and shall be made by the Initial Members within ten (10) business days of receipt of notice regarding same from the Manager.

"Withdrawal Event" means with respect to a specified Person the death, retirement, resignation, expulsion, bankruptcy, or dissolution of such Person.

"Withdrawn Member" means a Member following the occurrence of a Withdrawal Event with respect to such Member.

## ARTICLE II

### FORMATION OF THE LIMITED LIABILITY COMPANY

2.1     General.  The Initial Members organized the Company as a manager-managed limited-liability company in accordance with the Act and the terms of this Agreement by filing the Articles of Organization with the Nevada Secretary of State on _____ __, 2005.

2.2     Name.  The name of the Company is "Solomon Towers, LLC" and the business of the Company shall be carried on in this name with such variations and changes as a Manager in its sole discretion may deem necessary or appropriate to comply with requirements of the jurisdictions in which the Company's operations shall be conducted.

2.3     Purposes and Powers.  The Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized under Nevada law.  The Company shall have all of the powers permitted by law.  The initial purpose of the Company shall be to acquire real property and the development of a high rise residential tower or towers in downtown Phoenix, Arizona

2.4     Registered Office.  The registered office shall be the office maintained at the street address of the resident agent.

2.5     Term.  The term of the Company commenced on the filing of the Articles of Organization for the Company and shall not expire except in accordance with the provisions of Article XII of this Agreement or in accordance with the Act.

## ARTICLE III

### CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions.  The Initial Members of the Company shall each contribute to the capital of the Company the contributions described in Exhibit A. Capital Contributions to the Company may consist of cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services.

3.2     Additional Capital Contributions.  The Members shall be required to make Additional Capital Contributions only in the amount(s) and at the time(s) that the Manager, in its sole discretion, shall deem necessary for the conduct of the business of the Company.  The first additional capital contributions shall be as described in Exhibit A and shall be made by the Initial Members within ten (10) business days of receipt of notice regarding same from the Manager.

3

3.3 <u>Use of Capital Contributions</u>. All Capital Contributions shall be expended in furtherance of the business of the Company. Capital Contributions shall not be commingled with the funds of any other Person or entity, except that the funds may be deposited in an account in the name of the Company in a bank or other financial institution as the Manager deems appropriate.

3.4 <u>No Interest on Capital Contributions</u>. No interest shall accrue on any Capital Contributions made to the Company.

3.5 <u>No Unauthorized Withdrawals of Capital Contributions</u>. No Member shall have the right to withdraw or to be repaid any of such Member's Capital Contributions so made, except as specifically provided in this Agreement.

3.6 <u>Return of Capital</u>. Except as otherwise provided in this Agreement, no Member shall be entitled to the return of the Member's Capital Contributions to the Company. Further, it is expressly provided that the Manager shall have no personal liability for the repayment of the Capital Contributions made by any Member, it being agreed that any return of capital or Profits made pursuant to this Agreement shall be made solely from the assets of the Company.

**ARTICLE IV**

**MANAGEMENT**

4.1 <u>Management by Manager - General.</u> The business and affairs of the Company shall be managed by its designated Manager or Managers. Other than those rights and powers expressly reserved to Members by this Agreement, the Manager shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as the Manager deems necessary or expedient to accomplish the purposes of the Company. The Manager shall act in good faith and in a manner that the Manager reasonably believes to be in the best interests of the Company and its Members.

4.2 <u>Delegation of Powers and Responsibilities</u>. The Manager shall be authorized to delegate such powers and responsibilities as it may deem appropriate for the efficient operation of the business of the Company.

4.3 <u>Management Powers and Responsibilities</u>. Without limiting the generality of Section 4.1, but subject to the provisions of Section 4.4 and any other provision in this Agreement, the Manager shall have power and authority, on behalf of the Company:

(a) To open accounts in the name of the Company with banks and other financial institutions and designate and remove from time to time, at the discretion of the Manager, all signatories on such bank accounts;

(b) To purchase policies of comprehensive general liability insurance and to purchase such other insurance coverage as the Manager shall determine to be necessary or desirable to insure the Members or to protect the Company's assets;

4

(c)    To execute on behalf of the Company all instruments and documents including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, and any other instruments or documents necessary, in the opinion of the Manager, to the conduct of the business of the Company;

(d)    To employ accountants, legal counsel, managing agents, other experts, and independent contractors to perform services for the Company and to compensate them from Company funds;

(e)    Subject to Section 10.1, to admit new Members to the Company;

(f)    As otherwise provided in this Agreement, to borrow money from banks, other lending institutions, or the Members, on such terms as the Manager deems appropriate, and in connection therewith to encumber and grant security interests in the assets of the Company to secure payments of the borrowed sum;

(g)    Except as otherwise provided in this Agreement, to pay or cause to be paid incentive compensation to any Member or the Manager, including, without limitation, incentive compensation in the form of revenues derived by the Company, bonuses and profit sharing;

(h)    To acquire by purchase, lease, or otherwise, any real or personal tangible property;

(i)    To acquire by purchase, lease, or otherwise, any intangible property;

(j)    To prepay, refinance, increase, modify, or extend any liabilities of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of the property or assets of the Company;

(k)    To comply with, or cause to be complied with, all provisions of the Act governing the administration of a limited liability company, including, but not limited to, filing with the Nevada Secretary of State any required and necessary amended Articles of Organization; and

(l)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

4.4    <u>Certain Actions Requiring the Consent of the Members.</u>  Notwithstanding any other provisions of this Agreement relating to the authority of the Manager, the following actions shall require the prior written consent of a Super-Majority in Interest:

(a)    Subject to Section 13.3, to amend this Agreement;

(b)    To sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan;

5

(c)     To enter into any joint venture investment with any other Person;

(d)     To merge the Company with or to consolidate the Company with any other entity, or otherwise cause the Company to participate in any reorganization with any other entity;

(e)     To name additional managers of the Company;

(f)     To dissolve the Company as set forth in Section 12.1(a); and

(g)     To file a voluntary petition in bankruptcy, or appoint a receiver for the Company.

4.5     <u>Affirmative Manager Responsibilities</u>.  Notwithstanding any other provision(s) in this Agreement, the Manager shall be required to perform or cause to be performed the following functions:

(a)     Maintain adequate records and books of accounts;

(b)     Maintain sufficient insurance customary to the operations carried on by the Company;

(c)     Comply with all applicable laws and obtain all permits necessary to conduct the Company's business; and

(d)     Comply with the terms of all material agreements entered into by the Company.

4.6     <u>Prohibited Acts</u>.  Neither the Manager nor any other officer or agent of the Company shall have authority to do any of the following acts on behalf of the Company:

(a)     Possess property of the Company, or assign rights in property of the Company for other than a purpose of the Company;

(b)     Commingle the funds of the Company with those of any other Person;

(c)     Knowingly perform any act that contravenes the provisions of this Agreement;

(d)     Knowingly take any action that is inconsistent with achieving the purposes of the Company, except as otherwise provided in this Agreement;

(e)     Knowingly perform any act that would subject any Member to personal liability commensurate with that of a general partner of a general partnership; or

(f)     Possess property of the Company, or assign rights in property of the Company for other than a purpose of the Company.

6

4.7    Reliance Upon Actions by the Manager. Any Person dealing with the Company may rely without any duty of inquiry upon any action taken by the Manager on behalf of the Company. Any and all deeds, bills of sale, assignments, mortgages, deeds of trust, security agreements, promissory notes, or other contracts or instruments executed by the Manager on behalf of the Company shall be binding upon the Company, and all of the Members agree that a copy of this provision may be shown to the appropriate parties in order to confirm the same. Without limiting the generality of the foregoing, any Person dealing with the Company may rely upon a certificate or written statement signed by a Manager as to:

(a)    The identity of the Manager or any Member;

(b)    The existence or nonexistence of any fact or facts that constitute a condition precedent to acts by the Manager or that are in any other manner germane to the affairs of the Company;

(c)    The Persons who are authorized to execute and deliver any instrument or documents on behalf of the Company; or

(d)    Any act or failure to act by the Company on any other matter whatsoever involving the Company, or any Member.

4.8    Initial Managers, Number, Tenure, and Qualifications. The initial Managers shall be Ron Buchholz and Charice Buchholz. The initial Managers shall hold office until the earlier of their respective death, resignation, or removal. If a Manager dies, resigns or is removed from office, any replacement Manager shall be determined by a Majority in Interest. The Manager shall not be required to be a resident of the State of Nevada, nor be a Member of the Company.

4.9    Resignation. A Manager may resign at any time by delivering written notice to all the Members. The resignation of the Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation shall not affect the Manager's rights and liabilities as a Member, if applicable.

4.10    Removal. A Manager may be removed from office with or without cause by the unanimous written consent of all the Members.

4.11    Vacancies. Any vacancy occurring for any reason in the office of Manager may be filled by the affirmative vote of a Majority in Interest.

4.12    Independent Activities. Neither this Agreement nor any obligation undertaken pursuant hereto shall prevent the Managers from engaging in any activities that they choose, or require the Managers to permit the Company or any Member to participate in such activities. The foregoing shall also apply with respect to the activities of any officer, employee, or agent of the Company except to the extent prescribed by the Manager.

4.13    Salary and Expenses. The Manager may receive reasonable compensation for services rendered in its capacity as Manager as determined by the consent of a Majority of the Members. The Manager and Members shall be entitled to have the Company pay, or be

reimbursed by the Company for, reasonable and necessary out-of-pocket expenses incurred on behalf of the Company and approved by the Manager.

## ARTICLE V

## DISTRIBUTIONS TO MEMBERS

5.1     Distributions of Net Cash Flow.  Prior to the dissolution of the Company and the commencement of the liquidation of its assets and winding up of its affairs, the Manager may in its sole discretion, distribute from time to time the Net Cash Flow to the Members pro rata in accordance with their respective Percentage Interests.

5.2     Distributions in Liquidation.  Following the dissolution of the Company and the commencement of winding up and the liquidation of its assets, distributions to the Members shall be governed by Section 12.2.

5.3     Amounts Withheld.  All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member for all purposes of this Agreement.

5.4     State Law Limitation on Distributions.  Notwithstanding any provision to the contrary contained in this Agreement, the Manager shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

## ARTICLE VI

## ALLOCATION OF PROFITS AND LOSSES

6.1     Allocation of Profits and Losses.  After making any special allocations required under Appendix 1, the Profits and Losses of the Company (and each item of income, gain, loss, and deduction entering into the computation thereof) for each year, shall be allocated among the Members pro rata in accordance with their respective Percentage Interests.

6.2     Tax Allocations.  All items of income, gain, loss, deduction and credit of the Company for any tax period shall be allocated among the Members in accordance with the allocations of Profits and Losses prescribed in this Article VI and Appendix 1.

6.3     Allocation in Respect to Transferred Interest.  If a Member's Interest is conveyed in a Permitted Transfer during any year, allocations of Profits and Losses and items of income, gain, loss, and deduction with respect to such Interest shall be allocated between the transferor and the transferee by taking into account their varying interests in such Interest during the year as though the Company's books were closed on the date of the Permitted Transfer.

## ARTICLE VII

## LIABILITIES, RIGHTS AND OBLIGATIONS OF MEMBERS

7.1    _Limitation of Liability._ Each Member's liability for the debts and obligations of the Company shall be limited as set forth in the Act and other applicable law. The provisions of this Section 7.1 shall not be deemed to limit in any way the liabilities of any Member to the Company and to the other Members arising from a breach of this Agreement, including any breach of the representations set forth in Section 13.10.

7.2    _Access to Company Records._ Upon the written request of any Member, the Manager shall permit such Member, at a reasonable time to both the Manager and the Member, to inspect and copy, at the Member's expense, the Company records required to be maintained pursuant to Section 9.1.

7.3    _Priority And Return of Capital._ No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Profits, Losses, or distributions; provided, however, that this Section 7.3 shall not apply to repayment of any loans (as distinguished from Capital Contributions) that a Member may make to the Company, if applicable.

7.4    _Authority to Bind the Company, Management Authority._ Unless authorized to do so by this Agreement or otherwise by the Manager in writing, no Member shall have any power or authority to bind the Company in any way, to pledge the Company's credit, to render the Company liable for any purpose, or to otherwise engage in the management of the Company. It is expressly provided herein that for the purposes of this Section 7.4 and any other provision of this Agreement, unless the context indicates to the contrary, the term "Member" includes any individual Member or group of Members.

7.5    _Waiver of Action for Partition._ Each Member irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to property of the Company.

7.6    _Cooperation With Tax Matters Partner._ Each Member agrees to cooperate with the TMP and to do or refrain from doing any or all things reasonably required by the TMP in connection with the conduct of any proceedings involving the TMP.

7.7    _Voting Rights._ The Members shall have the right to vote on the matters specifically reserved for their approval or consent set forth in this Agreement.

7.8    _Meetings of Members._ The Manager shall convene a meeting of the Members upon the request of a Majority in Interest of the Members or a Manager. Such meeting shall be held not later than ten (10) days following request therefor. Any meeting of Members shall be held at the registered office of the Company or at such other place as all of the Members shall unanimously agree. Any Member may participate in any meeting of Members by means of a conference telephone or similar communication equipment.

## ARTICLE VIII

## LIABILITY, EXCULPATION AND INDEMNIFICATION

8.1     Liability. Except as otherwise provided by the Act or pursuant to any agreement, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

8.2     Exculpation. No Covered Person shall be liable to the Company or any Member for any act or omission taken or suffered by such Covered Person in good faith and in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement; provided, however, that Covered Persons shall remain liable to the Company for acts in breach of this Agreement, breach of any fiduciary duty owed to the Company and for gross negligence and willful misconduct in connection with matters relating to the Company.

8.3     Indemnification.

(a)     The Company shall, to the fullest extent permitted by applicable law, indemnify, hold harmless and release each Covered Person from and against all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated, that may accrue to or be incurred by any Covered Person as a result of the Covered Person's activities associated with the Company; provided, however, that the benefits of this Section 8.3(a) shall not extend to acts in breach of this Agreement, breach of any fiduciary duty owed to the Company and for gross negligence and willful misconduct in connection with matters relating to the Company.

(b)     Members shall not be required directly to indemnify any Covered Person.

## ARTICLE IX

## BOOKS AND RECORDS, REPORTS, TAX ACCOUNTING, BANKING

9.1     Books and Records. The Manager, at the expense of the Company, shall keep or cause to be kept adequate books and records for the Company that contain an accurate account of all business transactions arising out of and in connection with the conduct of the Company required by the Act. Additionally, at the expense of the Company, the Manager shall maintain or cause to be maintained the following records:

(a)     A list of the full name and last known business, residence, or mailing address of each Member, both past and present;

(b)     A copy of the Articles of Organization for the Company, and all amendments thereto;

10

(c)     Copies of the Company's currently effective Agreement and all amendments thereto, copies of any prior Agreements no longer in effect, and copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services;

(d)     Copies of the Company's federal, state, and local income tax returns and reports for the six (6) most recent years;

(e)     Copies of financial statements of the Company, if any, for the six most recent years;

(f)     Minutes of every meeting of the Members;

(g)     Any written consents or approvals obtained from Members for actions taken by the Manager; and

(h)     Any written consents or approvals obtained from Members for actions taken by Members without a meeting.

Any Member or its designated representative shall have the right, at any reasonable time, to have access to and may inspect and copy the contents of such books or records.

9.2     Tax Matters.

(a)     The Members intend that the Company shall be operated in a manner consistent with its treatment as a partnership for federal and state income tax purposes. The Members agree not to take any action inconsistent with this expressed intent. Specifically, it is expressly provided that the TMP shall take no action to cause the Company to elect to be taxed as a corporation pursuant to Regulations Section 301.7701-3(a) or any counterpart under state law. It is further expressly provided that each Member agrees not to make any election for the Company to be excluded from the application of the provisions of Subchapter K of the Code.

(b)     Charice Buchholz is hereby designated as the tax matters partner as defined in Section 6231 of the Code (the "TMP") of the Company and shall be authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the TMP and to do or refrain from doing any or all things reasonably required by the TMP to conduct such proceedings. The TMP shall serve as TMP of the Company until he dies (if an individual) or it dissolves (if an entity) or resigns as TMP. Any successor TMP shall be selected by a Majority in Interest of the Members.

9.3     Bank Accounts. All funds of the Company shall be deposited in the name of the Company in an account or accounts maintained with such bank or banks selected by the Manager. The funds of the Company shall not be commingled with the funds of any other Person. Checks shall be drawn upon the Company account or accounts only for the purposes of the Company and shall be signed by authorized Persons on behalf of the Company.

# ARTICLE X

## ADMISSIONS AND WITHDRAWALS

10.1    Admission of Member.  No additional Persons shall be admitted as a Member of the Company as a result of the issuance of additional Interests after the date of formation of the Company without the consent of a Majority in Interest of the Members and unanimous consent of the Managers.  Additionally, no Person shall be admitted as a Member of the Company after the date of formation of the Company as a result of a Transfer of a Member's Interest(s) except in accordance with Section 11.5.

10.2    Right to Withdraw.  A Member may withdraw from the Company at any time by mailing or delivering a written notice of withdrawal to the Manager.  If the withdrawing Member is the Manager, such Member may withdraw by mailing or delivering a written notice of withdrawal to the Company and to the other Members at their last known addresses set forth in Exhibit A.

10.3    Rights of Withdrawn Member.  Upon the occurrence of a Withdrawal Event with respect to a Member, the Withdrawn Member (or the Withdrawn Member's personal representative or other successor if applicable) shall cease to participate in management of the Company or to have any rights of a Member except only the right to receive distributions occurring at the times and equal in amounts to those distributions the Withdrawn Member would otherwise have received if a Withdrawal Event had not occurred; provided, however, that in the event of a Withdrawal Event that entails the death of a Member, the personal representative or other successor, or successors of such Person shall be admitted as a Member or as Members of the Company immediately following the death of such Person with the identical rights and obligations as a Member possessed by such Person immediately preceding such Person's death. The preceding sentence shall also apply in the event of the death of any personal representative or successor who succeeds to an interest as a Member of the Company upon the death of any such Person.  If in any case there are no remaining Members, distributions to any Withdrawn Member shall be governed by Section 12.2.

# ARTICLE XI

## RESTRICTIONS ON TRANSFERABILITY

11.1    General.  No Member shall be authorized to transfer all or a portion of their Interest unless the Transfer constitutes a Permitted Transfer.

11.2    Permitted Transfers.  Subject to the conditions and restrictions set forth in Section 11.3, a Transfer of a Member's Interest shall constitute a Permitted Transfer provided that:

(a)    The Transfer is made to another Member; or

(b)    The Transfer is made following compliance with the terms of the right-of-first refusal set forth in Section 11.4.

11.3   <u>Conditions To Permitted Transfer</u>.  A Transfer shall not be treated as a Permitted Transfer unless the following conditions are satisfied:

(a)   The transferor and the transferee reimburse the Company for all costs that the Company incurs in connection with such Transfer; and

(b)   The transferor and the transferee agree to execute such documents and instruments necessary or appropriate in the discretion of the Manager to confirm such Transfer.

It is expressly provided herein that the transferee of an Interest in a Permitted Transfer under Sections 11.2(a) and (b) shall automatically become a Substitute Member unless the transferor determines to the contrary.  If the transferee of an Interest in a Permitted Transfer shall not become a Substitute Member, the transferee shall have only the rights set forth in Section 11.6 hereof.

11.4   <u>Right of First Refusal</u>.

(a)   <u>General</u>.  If any Member desires to Transfer all or a portion of the Member's Interest to any Person who is not a Member and the Transfer is not described in Section 11.2(a) or (b), such Transfer shall not constitute a Permitted Transfer unless such Member shall afford the Company and the other Members a right-of-first refusal pursuant to this Section 11.4.

(b)   <u>Notice</u>.  Before Transferring their Interest, a Member must first provide to the Company and the other Members at least seventy-five (75) days ("<u>Notice Period</u>") prior written notice of their intention to Transfer any part or all of their Interest (their "<u>Disposition Notice</u>").  The Member proposing to dispose of all or part of his, her or its Interest shall be known as the "Disposing Member" and the other Members shall be known as the "Non-Disposing Members" for purposes of this Agreement.  In the Disposition Notice, the Disposing Member shall specify the price at which the Interest is proposed to be sold or transferred ("<u>Offering Price</u>"), which may not consist of consideration other than cash and/or promissory notes, the portion of their Interest to be sold or transferred, the identity of the proposed purchaser or transferee, and the terms and conditions of the proposed transaction.

(c)   <u>Option to Company</u>.  The Manager may elect, on behalf of the Company, within fifteen (15) days after receiving the Disposition Notice, to purchase the Interest proposed to be disposed of by the Disposing Member at the Offering Price.  The terms and conditions of the purchase by the Company shall be the terms and conditions of the proposed transaction, as set forth in the Disposition Notice.

(d)   <u>Options to Members</u>.  If the entire Interest covered by the Disposition Notice is not purchased by the Company, the remaining Interest may be purchased by the Non-Disposing Members on the same terms and at the same price available to the Company.  Each Non-Disposing Member shall have the option to purchase that portion of the Disposing Member's Interest that is necessary to maintain their Percentage Interest vis-a-vis the other Non-Disposing Members.  If any Non-Disposing Member does not purchase the portion of the Interest available to them, the remaining Interest will then be available for purchase by the other Non-Disposing Members in proportion to their Percentage Interests.

13

(e)    Timing. If the Company decides to purchase less than all of the Interest offered by the Disposing Member, within fifteen (15) days after the Company reaches such decision, and, in any event, at the expiration of the first thirty (30) days of the Notice Period specified in Section 11.4(b), the Company shall so notify each Non-Disposing Member. The notice shall state that the Company did not exercise its option to purchase with respect to the entire Interest offered pursuant to the Disposition Notice and shall contain appropriate information concerning the Non-Disposing Members' options to purchase all or any part of the remaining Interest offered by the Disposing Member. Each Non-Disposing Member must give written notice to the Disposing Member and the other Non-Disposing Members of the exercise of their option to acquire their pro rata portion of such Interest within the first forty-five (45) days of the Notice Period. If any Non-Disposing Member does not elect to purchase all of the portion of the Interest available to them, the remaining Non-Disposing Members shall be entitled to purchase such Interest in accordance with subparagraph (d) by giving written notice to the Disposing Member and the other Non-Disposing Members within the first sixty (60) days of the Notice Period.

(f)    Condition to Electing Option. The options set forth in Sections 11.4(c) and 11.4(d) shall be subject to the condition that in no event shall less than one hundred percent (100%) of the Interest proposed to be disposed of by the Disposing Member be purchased in the aggregate by the Company and the Non-Disposing Members.

(g)    Transfer to Third Party. If neither the Company nor the Non-Disposing Members shall have purchased the entire Interest covered by the Disposition Notice as provided in the foregoing subsections of this Section 11.4 within the first sixty (60) days of the notice period, the Disposing Member may sell to Persons other than the Company and the Non-Disposing Members, provided that any disposition must be made on the terms and conditions and to the party specified in the Disposition Notice and must be consummated within the Notice Period. After the termination of the Notice Period, the restrictions of this Article 11.4 shall apply again.

11.5    Admission of Substitute Member.

(a)    Except as otherwise provided in paragraph (b) of this Section 11.5, a transferee of an Interest who is not a Member shall be admitted to the Company as a Substitute Member only upon satisfaction of the following conditions:

(i)    The Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(ii)    The transferee becomes a party to this Agreement and executes such documents and instruments as the Members determine are necessary or appropriate to confirm such transferee as a Member and such transferee's agreement to be bound by the terms of this Agreement;

(iii)    The transferee provides the Company with evidence satisfactory to counsel for the Company that such transferee has made each of the representations and covenants set forth in Section 13.10 hereof; and

14

(iv)    A Majority in Interest (defined for this purpose by excluding the transferor Member) consent to the admission of the transferee as a Substitute Member, which consent may be given or withheld for any reason or for no reason.

(b)    A transferee of an Interest in a Permitted Transfer under Sections 11.2(a) and (b) shall automatically become a Substitute Member unless the transferor directs in writing to the contrary.

11.6    Rights of Assignee.  A Person who acquires an Interest in the Company (other than a Person who was a Member before such acquisition) but who is not admitted to the Company as a Substitute Member, shall have only the right to receive the distributions and allocations of taxable income or loss to which the Member would have been entitled under this Agreement with respect to the transferred Interest and shall not have or enjoy any right to participate in the management of the Company, or to exercise any voting rights hereunder or to receive any financial information or reports relating to the Company or any other rights of a Member under the Act or this Agreement, unless and until the purchaser or transferee is admitted as a Member pursuant to Section 10.1 hereof.

11.7    Prohibited Transfers.  Any purported Transfer of Interests that is not a Permitted Transfer shall be null and void and of no force and effect whatsoever.  In the case of an attempted Transfer that is not a Permitted Transfer, the parties engaging in or attempting to engage in such Transfer shall be liable to and shall indemnify and hold harmless the Company from all loss, cost, liability and damages that the Company or any Member shall incur as a result of such attempted Transfer.

## ARTICLE XII

### DISSOLUTION AND TERMINATION

12.1    Dissolution.  The Company shall be dissolved upon the first to occur of any of the following events:

(a)    The affirmative vote or written agreement of all the Members;

(b)    The entry of a decree of judicial dissolution under the Act; or

(c)    The sale, exchange, or other disposition of all or substantially all the assets of the Company.

It is expressly provided herein that the Company shall not be dissolved upon the occurrence of a Withdrawal Event with respect to a Manager or a Member unless there are no Members.

12.2    Liquidation, Winding Up and Distribution of Assets.  A Manager shall, upon dissolution of the Company, proceed to liquidate the Company's assets and properties, discharge the Company's obligations, and wind up the Company's business and affairs as promptly as is consistent with obtaining the fair value thereof.  The proceeds of liquidation of the Company's assets, to the extent sufficient therefor, shall be applied and distributed as follows:

(a)     First, to the payment and discharge of all of the Company's debts and liabilities except those owing to Members or to the establishment of any reasonable reserves for contingent or unliquidated debts and liabilities;

(b)     Second, to the payment of any accrued interest owing on any debts and liabilities owing to Members in proportion to the amount due and owing to each Member;

(c)     Third, to the payment of outstanding principal amounts owing on any debts and liabilities owing to Members in proportion to the amount due and owing to each Member; and

(d)     Fourth, to the Members in accordance with the positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs, including any Capital Account Adjustments associated with the allocation of Profits and Losses with respect to any transaction which results in the dissolution and liquidation of the Company. Any such distributions to the Members in respect of their Capital Accounts shall be made within the time requirements of Section 1.704-1(b)(3)(ii)(b)(2) of the Regulations. If for any reason the amount distributable pursuant to this Section 12.2(d) shall be more than or less than the sum of all the positive balances of the Members' Capital Accounts, the proceeds distributable pursuant to this Section 12.2(d) shall be distributed among the Members in accordance with the ratio by which the positive Capital Account balance of each Member bears to the sum of all positive Capital Account balances.

12.3    <u>Deficit Capital Accounts</u>.  No Member shall have any obligation to contribute or advance any funds or other property to the Company by reason of any negative or deficit balance in such Member's Capital Account during or upon completion of winding up or at any other time.

12.4    <u>Articles of Dissolution</u>.  When all the remaining property and assets have been applied and distributed in accordance with Section 12.2 hereof, the Manager (or such other Person designated by the Members) shall cause "Articles of Dissolution" to be executed and filed with the Nevada Secretary of State in accordance with the Act.

12.5    <u>Return of Contribution Non-Recourse to Other Members</u>.  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contributions. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against the Manager or any other Member.

12.6    <u>In Kind Distributions</u>.  A Member shall have no right to demand and receive any distribution from the Company in any form other than cash. However, a Member may be compelled to accept a distribution of an asset in kind if the Company is unable to dispose of all of its assets for cash.

16

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1 _Notices._ Except as otherwise provided herein, any notice, demand, or communication required or permitted to be given to a Member by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the Member or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's address set forth in _Exhibit A_. Except as otherwise provided herein, any such notice shall be deemed to be given on the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

13.2 _Governing Law._ This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Nevada.

13.3 _Amendments._ This Agreement may not be amended except by a written agreement of all of the Members. Notwithstanding the foregoing, the Manager shall be authorized to make any amendments to this Agreement which, in the opinion of counsel to the Company, are necessary to maintain the status of the Company as a partnership for federal and state income tax purposes.

13.4 _Additional Documents and Acts._ Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement and the transactions contemplated hereby.

13.5 _Headings._ The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

13.6 _Severability._ If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

13.7 _Heirs, Successors, and Assigns._ Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement and by applicable law, their respective heirs, legal representatives, successors, and assigns.

13.8 _Creditors and Other Third Parties._ None of the provisions of this Agreement shall be for the benefit of, or enforceable, by any creditors of the Company or any other third parties.

17

13.9    Section, Other References. Except to the extent provided, references to the terms "Section," "Schedule," "Exhibit", or "Appendix" means to the corresponding Sections, Schedules, Exhibits, or Appendices of this Agreement.

13.10    Authority to Adopt Agreement. By execution hereof, each Member represents and covenants as follows:

(a)    The Member has full legal right, power, and authority to deliver this Agreement and to perform the Member's obligations hereunder;

(b)    This Agreement constitutes the legal, valid, and binding obligation of the Member enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy and other laws of general application relating to creditors' rights or general principles of equity;

(c)    This Agreement does not violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default under any other agreement of which the Member is a party; and

(d)    The Member's investment in Interests in the Company is made for the Member's own account for investment purposes only and not with a view to the resale or distribution of such interest.

13.11    Sole and Absolute Discretion. Except as otherwise provided in this Agreement, all actions that the Manager may take and all determinations that the Manager may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of the Manager.

13.12    Counterparts. This Agreement may be executed in one or more counterparts each of which shall for all purposes be deemed an original and all of such counterparts, taken together, shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**COMPANY:**

SOLOMON TOWERS, LLC

By: _____
Ron Buchholz, Manager

By: _____
Charice Buchholz, Manager

18

**MEMBERS:**

Sun City Towers, LLC

Steven Trachsel

Name:    Steven Trachsel

Title:    Manager

Date:    3/3/05

## EXHIBIT A

## SCHEDULE OF MEMBERS

| Member | Address | Initial Capital Contribution | First Additional Capital Contribution | % Interest |
|---|---|---|---|---|

Solomon Towers, LLC
Exhibit A
Schedule of Members

| Investor # | Name | Member Capital Contribution | Member Percentage Interest |
|---|---|---|---|
| 1 | Atocha Land, LLC C/O Tom Cirrito, Manager | $ 650,000.00 | 15.59% |
| 2 | Cirrito Holdings C/O Michael Cirrito, Manager | $ 150,000.00 | 3.60% |
| 3 | David Towers, LLC C/O Roland Lee, Manager | $ 500,000.00 | 11.99% |
| 4 | Lee Living Trust C/O Roland Lee, Trustee | $ 100,000.00 | 2.40% |
| 5 | JKAT Properties, LLC C/O James Coates, Manager | $ 250,000.00 | 6.00% |
| 6 | Daystream ST, LLC C/O Jan Edbrooke, Manager | $ 1,000,000.00 | 23.98% |
| 7 | Kang Living Trust C/O Yung Ho Kang, Trustee | $ 150,000.00 | 3.60% |
| 8 | The Laubach Living Trust C/O Mark Laubach, Trustee | $ 150,000.00 | 3.60% |
| 9 | Al & Betty Miller | $ 150,000.00 | 3.60% |
| 10 | Sun City Towers, LLC C/O Steven Trachsel, Manager | $ 200,000.00 | 4.80% |
| 11 | Tower Capital Partners, LLC C/O Sam Stafford, Manager | $ 150,000.00 | 3.60% |
| 12 | Dennis Krantz | $ 150,000.00 | 3.60% |
| 13 | CRS Properties, LLC C/O Todd Squellati, Manager | $ 200,000.00 | 4.80% |
| 14 | Tony & Cynthia Liardon | $ 60,000.00 | 1.44% |
| 15 | Timothy & Carole Hendrix | $ 32,000.00 | 0.77% |
| 16 | Buchholz Family Trust C/O Melody Buchholz, Trustee | $ 108,900.00 | 2.61% |
| 17 | The Opie-Gluska Family Trust C/O Michael Opie, Trustee | $ 90,000.00 | 2.16% |
| 18 | Figone Family Living Trust C/O Al Figone, Trustee | $ 78,500.00 | 1.88% |
| Total | | $ 4,169,400.00 | 100.00% |

Solomon Towers, LLC
Exhibit B
Notes to Solomon Towers, LLC

| Loan # | Name | Loan Amount |
|--------|------|-------------|
| 1 | Pensco FBO Tamara Gluska, IRA (Acct.# GL040) | $ 15,500.00 |
| 2 | Pensco FBO Tamara Gluska, IRA (Acct.# GL039) | $ 18,900.00 |
| 3 | Pensco FBO Michael Opie, IRA (Acct.# OP005) | $ 75,600.00 |
| 4 | Pensco FBO Juan Bettaglio, IRA (Acct.# BE1BJ) | $ 200,000.00 |
| 5 | Equity Trust FBO Alan J Figone, IRA (Acct. # 36929) | $ 98,500.00 |
| 6 | Equity Trust FBO Janet M Figone, IRA (Acct. # 36930) | $ 23,000.00 |
| 7 | Pensco FBO William E Buchholz, IRA (Acct.# BU212) | $ 82,000.00 |
| 8 | Pensco FBO William E Buchholz, IRA (Acct.# BU213) | $ 62,000.00 |
| 9 | Pensco FBO Melody J Buchholz, IRA (Acct.# BU214) | $ 58,000.00 |
| 10 | Pensco FBO William E Buchholz, IRA (Acct.# BU216) | $ 31,100.00 |
| 11 | Sterling Trust FBO Timothy Mark Hendrix, IRA (Acct.# 077536) | $ 95,000.00 |
| 12 | Sterling Trust FBO Carole Ann Hendrix, IRA (Acct.# 077535) | $ 23,000.00 |
| 13 | Sterling Trust FBO Millard Buchholz, IRA (Acct. # 077438) | $ 58,000.00 |
| | | |
| Total | | $ 840,600.00 |

Solomon Towers, LLC
Exhibit B
Notes to Solomon Towers, LLC

| Loan # | Name | Loan Amount |
|--------|------|-------------|
| 1 | Pensco FBO Tamara Gluska, IRA (Acct.# GL040) | $ 15,500.00 |
| 2 | Pensco FBO Tamara Gluska, IRA (Acct.# GL039) | $ 18,900.00 |
| 3 | Pensco FBO Michael Opie, IRA (Acct.# OP005) | $ 75,600.00 |
| 4 | Pensco FBO Juan Bettaglio, IRA (Acct.# BE1BJ) | $ 200,000.00 |
| 5 | Equity Trust FBO Alan J Figone, IRA (Acct. # 36929) | $ 98,500.00 |
| 6 | Equity Trust FBO Janet M Figone, IRA (Acct. # 36930) | $ 23,000.00 |
| 7 | Pensco FBO William E Buchholz, IRA (Acct.# BU212) | $ 82,000.00 |
| 8 | Pensco FBO William E Buchholz, IRA (Acct.# BU213) | $ 62,000.00 |
| 9 | Pensco FBO Melody J Buchholz, IRA (Acct.# BU214) | $ 58,000.00 |
| 10 | Pensco FBO William E Buchholz, IRA (Acct.# BU216) | $ 31,100.00 |
| 11 | Sterling Trust FBO Timothy Mark Hendrix, IRA (Acct.# 077536) | $ 95,000.00 |
| 12 | Sterling Trust FBO Carole Ann Hendrix, IRA (Acct.# 077535) | $ 23,000.00 |
| 13 | Sterling Trust FBO Millard Buchholz, IRA (Acct. # 077438) | $ 58,000.00 |
| | | |
| Total | | $ 840,600.00 |

(d)    Section 752(c) of the Code shall be applied in determining the amount of any liabilities taken into account for purposes of this definition of "Capital Account"; and

(e)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Sections 1.704-1(b) and 1.704-2 of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations.  The Manager may modify the manner of computing the Capital Accounts or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member) in order to comply with such Regulations, provided that any such modification is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 12.2 upon the dissolution of the Company.  Without limiting the generality of the preceding sentence, the Manager shall make any adjustments that are necessary or appropriate to maintain equality between the aggregate sum of the Capital Accounts and the amount of capital reflected on the balance sheet of the Company, as determined for book purposes in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations.  The Manager shall also make any appropriate modifications if unanticipated events (for example, the availability of investment tax credits) might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" under Regulations Section 1.704-2(d) of the Regulations.

"Depreciation" means, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if such depreciation, amortization or other cost recovery deductions with respect to any such asset for federal income tax purposes is zero for any year, Depreciation shall be determined with reference to the asset's Gross Asset Value at the beginning of such year using any reasonable method selected by the Manager.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value for any asset (other than money) contributed by a Member to the Company shall be as determined by the Manager and the contributing Member;

(b)    The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager as of the following times: (i) the acquisition of additional Interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the

# APPENDIX 1

## SPECIAL TAX AND ACCOUNTING PROVISIONS

A.1    Accounting Definitions.    The following terms, which are used predominantly in this Appendix 1, shall have the meanings set forth below for all purposes under this Agreement.

"Adjusted Capital Account Balance" means, with respect to any Member, the balance of such Member's Capital Account as of the end of the relevant year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or as determined pursuant to Regulations Section 1.704-1(b)(2)(ii)(c), or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Debit to such Capital Account the items described in clauses (4), (5) and (6) of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Capital Account" means, with respect to any Member or other owner of Interests in the Company, the Capital Account maintained for such Person in accordance with the following provisions:

(a)    To each such Person's Capital Account, there shall be credited the amount of money and the initial Gross Asset Value of the such Person's Capital Contributions as determined by the Manager, such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections A.2 and A.3 hereof, and the amount of any Company liabilities assumed by such Person;

(b)    To each such Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Person pursuant to any provision of this Agreement as determined by the Manager, such Person's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Sections A.2 and A.3 hereof, and the amount of any liabilities of such Person assumed by the Company;

(c)    In the event any Interest or portion thereof (or other equity interest in the Company) is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest;

Company to a Member of more than a *de minimis* amount of cash or property as consideration for Interest in the Company, if (in any such event) such adjustment is necessary or appropriate, in the reasonable judgment of the Manager, to reflect the relative economic interests of the Members in the Company; or (iii) the liquidation of the Company for federal income tax purposes pursuant to Regulations Section 1.704-1(b)(2)(ii)(g);

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal its gross fair market value on the date of distribution;

(d)     The Gross Asset Value of the Company's assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Section A.2(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent that an adjustment pursuant to subsection (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d); and

(e)     If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account from time to time with respect to such asset for purposes of computing Profits and Losses.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" under Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Debt Minimum Gain" has the same meaning as the term "partner nonrecourse debt minimum gain" under Section 1.704-2(i)(2) of the Regulations and shall be determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" under Regulations Section 1.704-2(i)(1). The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for each Fiscal Year of the Company equals the excess (if any) of the net increase (if any) in the amount of Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during such Fiscal Year over the aggregate amount of any distributions during such Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent that such distributions are from the proceeds of such Member Nonrecourse Debt which are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(2) of the Regulations.

"Nonrecourse Debt" or "Nonrecourse Liability" has the same meaning as the term "nonrecourse liability" under Section 1.704-2(b)(3) of the Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a Company Fiscal Year equals the excess (if any) of the net increase (if any) in the amount of Company Minimum

Gain during that Fiscal Year over the aggregate amount of any distributions during that Fiscal Year of proceeds of a Nonrecourse Debt that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Section 1.704-2(c) of the Regulations.

"Profits" or "Losses" means, for each Fiscal Year or other period, the taxable income or taxable loss of the Company as determined under Code Section 703(a) (including in such taxable income or taxable loss all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code) with the following adjustments:

(a)    All items of gain or loss resulting from any disposition of the Company's property shall be determined upon the basis of the Gross Asset Value of such property rather than the adjusted tax basis thereof;

(b)    Any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss;

(c)    Any expenditures of the Company that are described in Code Section 705(a)(2)(B), or treated as such pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and that are not otherwise taken into account in the computation of taxable income or loss of the Company, shall be deducted in the determination of Profits or Losses;

(d)    If the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b) or (c) of the definition of "Gross Asset Value" set forth in this Appendix 1, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses unless such gain or loss is specially allocated pursuant to Section A.2 hereof;

(e)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in determining such taxable income or loss, there shall be deducted Depreciation, computed in accordance with the definition of such term in this Appendix 1; and

(f)    Notwithstanding any of the foregoing provisions, any items that are specially allocated pursuant to Section A.2 or A.3 hereof shall not be taken into account in computing Profits or Losses.

A.2    Special Allocations. The allocation of Profits and Losses for each Fiscal Year shall be subject to the following special allocations in the order set forth below:

(a)    Company Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain for any Fiscal Year, each Member shall be specially allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain during such year, determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the preceding sentence shall be made among the Members in proportion to the respective amounts required to be allocated to each of them pursuant to such Regulation. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f)(6). Any special

(v)

allocation of items of Company income and gain pursuant to this Section A.2(a) shall be made before any other allocation of items under this Appendix 1. This Section A.2(a) is intended to comply with the "minimum gain chargeback" requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease during a Fiscal Year in the Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt, then each Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such year (and, if necessary, subsequent years) an amount equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the preceding sentence shall be made among the Members in proportion to the respective amounts to be allocated to each of them pursuant to such Regulation. Any special allocation of items of income and gain pursuant to this Section A.2(b) for a Fiscal Year shall be made before any other allocation of Company items under this Appendix 1, except only for special allocations required under Section A.2(a) hereof. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section A.2(b) is intended to comply with the provisions of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. If any Member receives any adjustments, allocations, or distributions described in clauses (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii)(d), items of income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate as quickly as possible, to the extent required by such Regulation, any deficit in such Member's Adjusted Capital Account Balance, such balance to be determined after all other allocations provided for under this Appendix 1 have been tentatively made as if this Section A.2(c) were not in this Agreement.

(d)    Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount (if any) such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section A.2(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Appendix 1 have been made as if Section A.2(c) hereof and this Section A.2(d) were not in the Agreement.

(e)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Members in accordance with their Percentage Interests.

(f)    Member Nonrecourse Deductions. Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated, in accordance with

Regulations Section 1.704-2(i)(1), to the Member or Members who bear the economic risk of loss for the Member Nonrecourse Debt to which such deductions are attributable.

       (g)     Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset under Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

       A.3    Curative Allocations. The allocations set forth in subsections (a) through (g) of Section A.2 hereof ("Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provisions of this Appendix 1 (other than the Regulatory Allocations and the next two (2) following sentences), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. For purposes of applying the preceding sentence, Regulatory Allocations of Nonrecourse Deductions and Member Nonrecourse Deductions shall be offset by subsequent allocations of items of income and gain pursuant to this Section A.3 only if (and to the extent) that: (a) the Manager reasonably determines that such Regulatory Allocations are not likely to be offset by subsequent allocations under Section A.2(a) or Section A.2(b) hereof, and (b) there has been a net decrease in Company Minimum Gain (in the case of allocations to offset prior Nonrecourse Deductions) or a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt (in the case of allocations to offset prior Member Nonrecourse Deductions). The Manager shall apply the provisions of this Section A.3, and shall divide the allocations hereunder among the Members, in such manner as will minimize the economic distortions upon the distributions to the Members that might otherwise result from the Regulatory Allocations.

       A.4    General Allocation Rules.

       (a)     In the event Members are admitted to the Company on different dates during any year, the Profits (or Losses) allocated to the Members for each such year shall be allocated among the Members in proportion to the Interests that each Member holds from time to time during such year in accordance with Code Section 706, using any convention permitted by law and selected by the Manager.

       (b)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any method permissible under Code Section 706 and the Regulations thereunder.

(c)    For purposes of determining the Members' proportionate shares of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), their respective interests in Member profits shall be in the same proportions as their Percentage Interests.

KERBYB\LAS\76384.1

# Exhibit D

| A. U.S. DEPARTMENT OF HOUSING AND URB. LOPMENT | | |
|---|---|---|

SETTLEMENT STATEMENT

|   | | |   | | |   | |
|---|---|---|---|---|---|---|---|
| 1. | ☐ | FHA | 2. | ☐ | F. | 3. | ☐ CONV. UNINS. |
| 4. | ☐ | VA | 5. | ☐ | CONV. INS. | | |

B. TYP _AN    OMB No. 2502-0265

Camelback Title Agency, LLC
1440 E. Missouri Ave.
Suite C102-3
Phoenix, AZ 85014

**FINAL**

6. ESCROW FILE NUMBER:    7. LOAN NUMBER:
00009008-045 GC
8. MORTGAGE INSURANCE CASE NUMBER:

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER:    Solomon Towers, LLC

ADDRESS OF BORROWER:    Attn : Ron Buchholz or Nicole, 20 Great Oaks Blvd.,#230
San Jose, Ca 95119

E. NAME OF SELLER:    Z Lofts, LLC

ADDRESS OF SELLER:    Grace Communities/Sue Pierce, 9500 E. Ironwood Square
Scottsdale, Az 85258

F. NAME OF LENDER:
ADDRESS OF LENDER:

G. PROPERTY LOCATION:    2ND Avenue & McKinley
Phoenix, AZ
Maricopa 111-40-024
Lots 15,17,19 and 21, of Bennett Place, 2/43

H. SETTLEMENT AGENT:    Camelback Title Agency, LLC
PLACE OF SETTLEMENT:    1440 E. Missouri Ave., Suite C102-3, Phoenix, AZ 85014

I. SETTLEMENT DATE:    04/11/2005    PRORATION DATE:    04/11/2005    FUNDING DATE:

| J.        SUMMARY OF BORROWER'S TRANSACTION | | K.        SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | 400. Gross Amount Due To Seller: | |
| 101. Contract Sales Price | 4,000,000.00 | 401. Contract Sales Price | 4,000,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to Borrower (line 1400) | 1,004,929.15 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments For Items Paid By Seller In Advance: | | Adjustments For Items Paid By Seller In Advance: | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due from borrower: | 5,004,929.15 | 420. Gross Amount Due to Seller | 4,000,000.00 |
| 200. Amounts Paid by or in behalf of Borrower: | | 500. Reductions In Amount Due To Seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. | | 502. Settlement charges to Seller (line 1400) | 11,526.57 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. pt closing funds | 1,904,000.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. Earnest Money pd to seller | 3,100,000.00 | 506. Earnest Money pd to seller | 3,100,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller: | | Adjustments For Items Unpaid By Seller: | |
| 210. City/Town Taxes | | 510. City/Town Taxes | |
| 211. County Taxes 01/01/05 - 04/11/05 | 1,328.14 | 511. County Taxes 01/01/05-04/11/05 | 1,328.14 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 5,005,328.14 | 520. Total Reductions In Amount Due Seller | 3,112,854.71 |
| 300. Cash at Settlement from/to Borrower: | | 600. Cash at Settlement to/from Seller: | |
| 301. Gross amount due from Borrower (line 120) | 5,004,929.15 | 601. Gross amount due to Seller (line 420) | 4,000,000.00 |
| 302. Less amount paid by/for Borrower (line 220) | 5,005,328.14 | 602. Less reductions in amount due Seller (line 52 | 3,112,854.71 |
| 303. Cash TO Borrower: | 398.99 | 603. Cash TO Seller: | 887,145.29 |

Hudc.rpt (12/17/2003)    Printed by Gloria Cramer on 04/12/2005 at 06:24:53 PM

OMB No. 2502-0265

| L. SETTLEMENT CHARGES: | | ESCROW FILE NUM... 00009008-045 GC |
|---|---|---|

| | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Sales/Broker's Commission:** | | -- | -- |
| Based on Price $4,000,000.00 @ % = | | | |
| Division of Commission (line 700) follows: | | | |
| 701. $      to Keller Williams Southwest Real | | | |
| 702. $      to | | | |
| $      to | | | |
| 703. Commission paid at settlement | | | |
| 704. Sales Tax on Commission to | | 1,000,000.00 | |
| **800. Items Payable In Connection With Loan:** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount Fee | | | . |
| 803. Appraisal Fee | | | |
| 804. Credit Report | | | |
| 805. Lenders inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Assumption Fee | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. Items Required By Lender To Be Paid In Advance:** | | | |
| 901. Interest | | | |
| 902. Mortgage Insurance Premium | | | |
| 903. Hazard Insurance Premium | | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited With Lender:** | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual Assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. AGGREGATE ADJUSTMENT      months @$ | | | |
| **1100. Title Charges:** | | | |
| 1101. Settlement or closing fee to Camelback Title Agency, LLC | | 1,207.15 | 1,207.15 |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | | |
| 1106. Notary Fees | | | |
| 1107. Attorney's Fees | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance | | | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage $ | | | |
| 1110. Owner's coverage $  4,000,000.00 | | 3,597.00 | 5,035.80 |
| Lender's coverage $ | | | |
| Lender's coverage $ | | | |
| 1111. Tracking/Recon to Camelback Title Agency, LLC | | | 75.00 |
| 1112. Endorsement 116.1-Survey to Camelback Title Agency, LLC | | 75.00 | |
| 1113. **See attached for breakdown | | 40.00 | 155.00 |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording Fees: Deed$      10.00  Mortgage $      Release $      10.00 | | 10.00 | 10.00 |
| 1202. City/County tax/stamps | | | |
| 1203. State tax/stamps | | | |
| 1204. City Transfer Tax | | | |
| 1205. County Transfer Tax | | | |
| 1206. Affidavit Of Property Value to Camelback Title Agency, LLC | | | 2.00 |
| 1207. | | | |
| **1300. Additional Settlement Charges:** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection | | | |
| 1303. Property Taxes-All 2004 to Maricopa County Treasurer | | | 2,465.42 |
| 1304. Property Taxes- All 2004 to Maricopa County Treasurer | | | 2,576.20 |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1400. Total Settlement Charges (Enter on line 103,Section J -and- line 502, Section K) | | 1,004,929.15 | 11,526.57 |

OMB No. 2502-0265

**HUD-1 Settlement Statement Certification**

Es.   Number:   00009008-045  GC

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

**Buyers Signatures:**

Solomon Towers, LLC,
a Nevada Limited Liability Company

By:  Ron Buchholz
Its:  Managing Member

**Sellers Signatures:**

Z Lofts, LLC,
an  Arizona Limited Liability Company

By: Donald J. Zeleznak
Its: Managing Member

**Settlement Agent:**

Camelback Title Agency, LLC

Date:

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Attachments:**

OMB No. 2502-0265

Escrow Number:    00009008-045  GC

| HUD 1113 DETAILED BREAKDOWN OF TITLE CHARGES | | |
|---|---|---|

| Description | Buyer Amount | Seller Amount |
|---|---|---|
| 1115. Courier fee to Camelback Title Agency, LLC | 20.00 | 40.00 |
| 1116. Wire Transfer to Camelback Title Agency, LLC | 20.00 | 40.00 |
| 1117. Inspection to Camelback Title Agency, LLC | | 75.00 |
| Total as shown on HUD Page 2 Line #1113. | 40.00 | 155.00 |

# Exhibit E

9:54 AM
02/29/08
Accrual Basis

**Solomon Towers, LLC**
**Balance Sheet**
As of February 29, 2008

**ASSETS**

| | |
|---|---|
| **Current Assets** | |
| **Checking/Savings** | |
| BofA Liquid CD | 40,394.26 |
| United Security Bank X4240 | 22,543.62 |
| **Total Checking/Savings** | 62,937.88 |
| | |
| **Total Current Assets** | 62,937.88 |
| | |
| **Other Assets** | |
| **Investment in Property** | |
| Accounting | 39,300.00 |
| Acquisition | |
| Commissions | 1,000,000.00 |
| Acquisition - Other | 4,000,000.00 |
| **Total Acquisition** | 5,000,000.00 |
| | |
| Acquisition Costs | 3,000.00 |
| Architectural Fees | 142,317.72 |
| Bank Service Fees | 315.00 |
| Capitalized Interest | |
| Interest OOP - Mesa Bank | 28,807.30 |
| Late Charge - Mesa Bank | 75.00 |
| Int Reserve - Mesa Bank | 42,593.98 |
| Note Holders (Accrued) | 592,110.93 |
| **Total Capitalized Interest** | 663,587.21 |
| | |
| Construction Management | 9,000.00 |
| Consultants - Reimbursement | 4,841.36 |
| Consulting | 175,069.27 |
| Development Fees | 330,000.00 |
| Eng/Environment | 9,034.12 |
| Insurance | 648.66 |
| Legal | 69,034.59 |
| Loan Fees | 25,125.00 |
| Marketing | 7,568.75 |
| Miscellaneous | 3,046.71 |
| Permits and Fees | 9,825.00 |
| Postage/Delivery | 75.87 |
| Printing & Reproduction | 3,915.11 |
| Project Management | 56,800.00 |
| RE Taxes | 17,423.48 |
| Site Maintenance | 7,917.67 |
| Survey | 276.00 |
| Title & Closing | 5,354.15 |
| Travel | 9,171.57 |

9:54 AM
02/29/08
Accrual Basis

**Solomon Towers, LLC**
## Balance Sheet
As of February 29, 2008

| | |
|---|---|
| Total Investment in Property | 6,592,647.24 |
| **Total Other Assets** | 6,592,647.24 |
| **TOTAL ASSETS** | **6,655,585.12** |

**LIABILITIES & EQUITY**

Liabilities

Current Liabilities

Accounts Payable

| | |
|---|---|
| Accounts Payable | 1,575.00 |
| **Total Accounts Payable** | 1,575.00 |

Other Current Liabilities

Notes Payable

| | |
|---|---|
| **Total Notes Payable** | 1,185,600.00 |
| **Total Other Current Liabilities** | 1,186,615.35 |
| **Total Current Liabilities** | 1,188,190.35 |

Long Term Liabilities

| | |
|---|---|
| A&D Loan - Mesa Bank | 750,000.00 |
| Accrued Interest Payable | |
| **Total Accrued Interest Payable** | 436,850.51 |
| **Total Long Term Liabilities** | 1,186,850.51 |
| **Total Liabilities** | 2,375,040.86 |

Equity

| | |
|---|---|
| **Total Equity** | 4,280,544.26 |
| **TOTAL LIABILITIES & EQUITY** | **6,655,585.12** |

9:56 AM
02/29/08
Accrual Basis

**Solomon Towers, LLC**
**Profit & Loss**
All Transactions

| | |
|---|---|
| **Ordinary Income/Expense** | |
| **Expense** | |
| Bank Service Charges | 0.00 |
| Interest Expense | 0.00 |
| Travel Expense | 0.00 |
| **Total Expense** | 0.00 |
| | |
| **Net Ordinary Income** | 0.00 |
| | |
| **Other Income/Expense** | |
| **Other Income** | |
| Interest Income | 1,144.26 |
| **Total Other Income** | 1,144.26 |
| | |
| **Net Other Income** | 1,144.26 |
| | |
| **Net Income** | **1,144.26** |

1  TODD A. ROBERTS (SBN 129722)
   JESSHILL E. LOVE (SBN 208348)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   1001 Marshall Street, Suite 300
3  Redwood City, CA  94063
   Telephone:     (650) 364-8200
4  Facsimile:     (650) 780-1701

5  Attorneys for Plaintiffs
   STEVE TRACHSEL, an individual; SUN CITY
6  TOWERS, LLC, a California corporation;
   THOMAS CIRRITO, an individual; ATOCHA
7  LAND, LLC, a Delaware limited liability company;
   MICHAEL CIRRITO, an individual; and CIRRITO
8  HOLDINGS, LLC, a Delaware limited liability
   company

9           UNITED STATES DISTRICT COURT - NORTHERN DISTRICT OF CALIFORNIA

10                                SAN JOSE DIVISION

11

12  STEVE TRACHSEL, an individual; SUN          CASE NO.  C08 02248RS
    CITY TOWERS, LLC, a California
13  corporation; THOMAS CIRRITO, an             **[PROPOSED] ORDER GRANTING
    individual; ATOCHA LAND, LLC, a             *EX PARTE* APPLICATION FOR
14  Delaware limited liability company;         TEMPORARY RESTRAINING ORDER**
    MICHAEL CIRRITO, an individual; and
15  CIRRITO HOLDINGS, LLC, a Delaware           **[FED. R. CIV. PROC. § 65, NORTHERN
    limited liability company,                  DISTRICT OF CALIFORNIA CIVIL
16                                              LOCAL RULES 7-10 AND 65-1]**
17                  Plaintiffs,
                                                **Date:      June 4, 2008
18  v.                                          Time:      9:30 a.m.
                                                Ctrm:      4
19  RONALD BUCHHOLZ; CHARICE                    Judge:     Hon. Richard Seeborg**
    FISCHER; RDB DEVELOPMENT, LLC,
20  a Nevada limited liability company;
    SOLOMON CAPITAL, INC., a Nevada
21  corporation; JONATHON VENTO;
    GRACE CAPITAL, LLC, dba GRACE
22  COMMUNITIES, an Arizona limited
    liability company; DONALD ZELEZNAK;
23  Z-LOFTS, LLC, an Arizona limited
    liability company; ZELEZNAK
24  PROPERTY MANAGEMENT, LLC dba
    KELLER WILLIAMS REALTY, an
25  Arizona limited liability company;
    KELLER WILLIAMS REALTY, INC., a
26  Texas corporation; and DOES 1-50,
    inclusive,
27
                    Defendants.
28

RC1/5129741.1/TC3                    - 1 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Plaintiffs STEVE TRACHSEL, SUN CITY TOWERS, LLC, THOMAS CIRRITO,

2    ATOCHA LAND, LLC, MICHAEL CIRRITO, and CIRRITO HOLDINGS, LLC ("Plaintiffs")

3    Ex Parte Application for Temporary Restraining Order came before the Court for hearing on

4    June 4, 2008. Todd A. Roberts appeared for Plaintiffs; Andrew August appeared for Defendants

5    Buchholz, Fischer, RDB Development, Inc., and Solomon Capital, Inc.

6    The Court having considered the papers and arguments submitted in support of, and good

7    cause appearing:

8    IT IS HEREBY ORDERED that Plaintiffs' ex parte application for a temporary

9    restraining order is granted. Defendants Ronald Buchholz, Charice Fischer, RDB Development,

10   Inc., and Solomon Capital, Inc. ARE HEREBY RESTRAINED AND ENJOINED from spending,

11   concealing, or transferring any assets acquired from investors of Solomon Capital or any of its

12   related companies, or any assets related in any way to the project commonly referred to as the

13   "Solomon Towers project." Defendants are further enjoined from altering or destroying any

14   evidence or potential evidence, including, but not limited to, all corporate business and financial

15   records for Solomon Towers, Solomon Capital, RDB Development, and all other related

16   companies in both written and electronic format. Defendants are further enjoined from using

17   Solomon Towers, LLC funds or other investor funds for the defense of this action

18   IT IS FURTHER ORDERED that Plaintiffs are relieved from posting a bond in this

19   regard pending the Court's consideration of Plaintiffs' Application for Writ of Attachment and

20   Right to Attach Order.

21

22

23   Dated:_____, 2008       _____

                                                HON. RICHARD SEEBORG

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

[PROPOSED] ORDER GRANTING *EX PARTE*
APPLICATION FOR TEMPORARY
RESTRAINING ORDER